## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

THE KING'S ENGLISH, INC.; SAM WELLER'S ZION
BOOKSTORE; NATHAN FLORENCE; W. ANDREW
MCCULLOUGH; COMPUTER SOLUTIONS
INTERNATIONAL, INC.; MOUNTAIN WIRELESS
UTAH, LLC; THE SEXUAL HEALTH NETWORK,
INC.; UTAH PROGRESSIVE NETWORK
EDUCATION FUND, INC.; AMERICAN
BOOKSELLERS FOUNDATION FOR FREE
EXPRESSION; AMERICAN CIVIL LIBERTIES
UNION OF UTAH; ASSOCIATION OF AMERICAN
PUBLISHERS, INC.; COMIC BOOK LEGAL
DEFENSE FUND; FREEDOM TO READ
FOUNDATION; and PUBLISHERS MARKETING
ASSOCIATION,

       **Plaintiffs,**

       **V.**

MARK SHURTLEFF, in his official capacity as
ATTORNEY GENERAL OF THE STATE OF UTAH;
VON J. CHRISTIANSEN, AMY F. HUGIE, N.
GEORGE DAINES, GENE E. STRATE, DENNIS L.
JUDD, MELVIN C. WILSON, KAREN ALLEN, DAVID
A. BLACKWELL, WALLACE A. LEE, HAPPY J.
MORGAN, SCOTT F. GARRETT, JARED W.
ELDRIDGE, ERIC S. LIND, LERAY G. JACKSON,
KELLY M. WRIGHT, MARVIN D. BAGLEY,
GEORGE W. "JUDD" PRESTON, DAVID E.
YOCOM, CRAIG C. HALLS, ROSS C. BLACKHAM,
R. DON BROWN, DAVID R. BRICKEY, DOUGLAS
J. AHLSTROM, JOANN STRINGHAM, CARLYLE
KAY BRYSON, THOMAS L. LOW, BROCK R.
BELNAP, MARVIN D. BAGLEY and MARK R.
DECARIA, in their official capacities as UTAH
DISTRICT and COUNTY ATTORNEYS,

       **Defendants.**

Judge Ted Stewart
DECK TYPE: Civil
DATE STAMP: 06/09/2005 @ 08:57:10
CASE NUMBER:  2:05CV00485  TS



## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Dockets.Justia.com

## PRELIMINARY STATEMENT

1.      The Internet has revolutionized our society, representing the most participatory marketplace of mass speech yet developed – it is in many ways a far more speech-enhancing medium than radio or television, print, the mails, or even the village green.  Hundreds of millions of people can now engage in interactive communication on a national and global scale via computer networks that are connected to the Internet.  The Internet enables average citizens, with a few simple tools and at a very low cost, to participate in local or worldwide conversations, publish an online newspaper, distribute an electronic pamphlet, and communicate with a broader audience than ever before possible.  The Internet provides millions of users with access to a vast range of information and resources.  Internet users are far from passive listeners – rather, they are empowered by the Internet to seek out exactly the information they need and to respond with their own communication, if desired.

2.      The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it.  Unlike television, cable, radio, newspapers, magazines or books, the Internet provides the average citizen with an affordable means for communicating with, accessing and posting content to a worldwide audience.

3.      The State of Utah has enacted a broadly restrictive censorship law that imposes severe content-based restrictions on the availability, display and dissemination of constitutionally-protected speech on the Internet.  House Bill 260, enacted on March 2, 2005, and signed by Governor Jon Huntsman, Jr. on March 21, 2005 (the "Act"), among other things:

- Apparently expands existing Utah law with respect to distribution to minors of harmful to minors material to include Internet content and Internet service providers ("ISPs").

- Requires the Attorney General to create a public registry of websites that he has unilaterally declared to include constitutionally-protected harmful to minors material, without any judicial review.

- Requires ISPs either to block access to websites included in the registry and other constitutionally-protected content or to provide filtering software to users.

- Requires Utah-connected content providers to self-evaluate and label the content of their speech, at the risk of criminal punishment.

A copy of the Act is attached hereto as Appendix A.

4.     The Act infringes the liberties of the residents of the State of Utah, imposing the restrictive hand of the State to supplant the power and responsibility of parents to control that which may be viewed by their children.  It also infringes the liberties of millions of persons outside Utah who are affected by these restrictions.

5.     Portions of the Act took effect on March 21, 2005, the date of the Governor's signature.  The remaining provisions become effective at various times in 2006.

6.     With respect to the application to the Internet of the criminal provisions relating to distribution to minors of harmful to minors materials, 18 federal judges, including three Courts of Appeal, as well as one State Supreme Court, have struck down as unconstitutional laws in Arizona, Michigan, New Mexico, New York, South Carolina, Vermont, Virginia, and Wisconsin similar to the Act.  In addition, the United States Supreme Court invalidated a similar federal law on First Amendment grounds in Reno v. ACLU, 521 U.S. 844 (1997), aff'g 929 F. Supp. 824 (E.D.Pa. 1996).

7.      With respect to requiring ISPs to block access to particular websites on the Internet, the U.S. District Court for the Eastern District of Pennsylvania recently invalidated a similar Pennsylvania state law, finding the law to be unconstitutional on both First Amendment and Commerce Clause grounds. Center for Democracy & Technology v. Pappert, 337 F. Supp. 2d 606 (E.D. Pa. 2004). In that case, the court found that as a result of the ISPs' attempts to comply with blocking orders requiring ISPs to block access to fewer than 400 websites, the ISPs unavoidably also blocked access to more than one million completely unrelated websites. Id. at 624, 642 (Findings of Facts ¶¶ 77, 189).

8.      Since essentially all speech on the Internet is accessible in Utah, regardless of the geographical location of the person who posted it, the Act threatens Internet users nationwide and even worldwide. Moreover, because blocking a website often results in blocking wholly unrelated websites communicating constitutionally protected speech, the Act threatens an enormous array of websites and their users. This action seeks to have the Act declared facially unconstitutional and void, and to have the State enjoined from enforcing the Act, by reason of the First, Fifth, and Fourteenth Amendments to, and the Commerce Clause of, the United States Constitution.

9.      Because of the way the Internet works, the Act's prohibition on distributing to minors material by the Internet that is "harmful to minors" effectively bans distribution of that same material to adults.

10.      The speech primarily targeted by the Act – material that is asserted to be "harmful to minors"– is constitutionally protected for adults. This includes, for example,

valuable works of literature and art, safer sex information, examples of popular culture, and a wide range of robust human discourse about current issues and personal matters that may include provocative or sexually oriented language and images.

11.     The Act inevitably means that Internet content providers will limit the range of their speech, because there are no reasonable technological means that enable users of the Internet to ascertain the age of persons who access their communications, or to restrict or prevent access by minors to certain content.  Consequently, the Act reduces adult speakers and users in cyberspace to reading and communicating only material that is suitable for young children.

12.     In addition, the Act prohibits speech that is valuable and constitutionally protected for minors, especially older minors.

13.     To the extent any ISPs comply with the Act by blocking access to certain websites, the Act inevitably means that access to other unrelated and wholly innocent websites will also be blocked.  Moreover, the blocking of websites (both those targeted by the Act and the unrelated websites) will in most cases prevent all customers of an ISP, both in Utah and elsewhere in the country, from accessing the websites.  In some other cases, an ISP will not have the technical capability to block their customers' access to specified websites on the Internet.

14.     Plaintiffs represent a broad range of individuals and entities who are speakers, content providers and access providers on the Internet.  Plaintiffs post and discuss content including resources on sexual advice for disabled persons, AIDS prevention, visual art and images, literature and books and resources for gay and lesbian youth.

15. The Act violates the First Amendment and Commerce Clause rights of plaintiffs, their members, their users and tens of millions of other speakers and users of the Internet, and threatens them with irreparable harm.

16. In addition, the Act violates the Commerce Clause of the United States Constitution because it regulates commerce occurring wholly outside of the State of Utah, because it imposes an impermissible burden on interstate and foreign commerce, and because it subjects interstate use of the Internet to inconsistent state regulations. An online content provider outside of Utah cannot know whether someone in Utah might download his or her content posted on the Web; consequently, the content provider must comply with Utah law or face the threat of criminal prosecution.

17. Plaintiffs seek permanent injunctive relief prohibiting enforcement of the Act.

## JURISDICTION AND VENUE

18. This case arises under the U.S. Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and F.C.R.P. 65.

19. Venue is proper in this district under 28 U.S.C. § 1391(b).

## THE PARTIES

20. Plaintiff THE KING'S ENGLISH, INC. is a 27 year-old, locally-owned independent book store in Salt Lake City. The King's English Bookshop carries a broad range of books, publishes a newsletter with book reviews and other news about books

and hosts frequent readings and signings by a variety of authors. It maintains a website at kingsenglish.booksense.com. The King's English, Inc. has its principal place of business in Salt Lake City, Utah. It sues on its own behalf and on behalf of users of its website.

21. Plaintiff SAM WELLER'S ZION BOOKSTORE was established in Salt Lake City in 1929. Sam Weller's Zion Bookstore carries a wide variety of new, used and rare books, and maintains an extensive online collection available through its website, www.samwellers.com. It also publishes its newsletter on the website. Sam Weller's has its principal place of business in Salt Lake City, Utah. It sues on its own behalf and on behalf of users of its website.

22. Plaintiff NATHAN FLORENCE is a Salt Lake City artist who sells and displays his artwork on the World Wide Web, as well as in local and regional galleries. Some of Mr. Florence's art depicts nude figures in a tradition that is centuries old. Mr. Florence maintains a website at www.nflorencefineart.com. He sues on his own behalf and on behalf of users of his website.

23. Plaintiff W. ANDREW MCCULLOUGH was a candidate for Attorney General of Utah in the 2004 election, and operates a campaign website at www.andrewmccullough.org. He anticipates running for state-wide office again in the future, and therefore continues to maintain his website. Mr. McCullough's website is dedicated to legal issues that are of interest to him and his supporters. His website shares an Internet Protocol Address with more than 45,000 other, unrelated sites, some of which contain material that may be deemed harmful to minors. Mr. McCullough sues

on his own behalf and on behalf of users of www.andrewmccullough.org on the World Wide Web.

24. Plaintiff COMPUTER SOLUTIONS INTERNATIONAL, INC., d/b/a CSolutions ("CSolutions"), is an Internet service provider that provides Internet access and web hosting services to customers in and outside of the state of Utah. CSolutions is incorporated in Utah and has its principal place of business in Salt Lake City. CSolutions sues on its own behalf, and on behalf of its customers, who are both users of the Internet and publishers of content available on the Internet.

25. Plaintiff MOUNTAIN WIRELESS UTAH, LLC ("Mountain Wireless") is an Internet service provider that provides Internet access and web hosting services to customers in and outside of the state of Utah. Mountain Wireless is organized in Utah and has its principal place of business in Park City, Utah. Mountain Wireless sues on its own behalf, and on behalf of its customers, who are both users of the Internet and publishers of content available on the Internet.

26. Plaintiff THE SEXUAL HEALTH NETWORK, INC. ("The Sexual Health Network") is a small, Internet-based company incorporated in the State of Connecticut. It maintains a Web site at www.sexualhealth.com. The Sexual Health Network was founded in May 1996, by Dr. Mitchell Tepper while he was working on his doctoral dissertation at the University of Pennsylvania Program in Human Sexuality Education. Dr. Tepper also has a Master in Public Health degree from the Yale University School of Medicine. Dr. Tepper is currently the President of the Sexual Health Network. The Sexual Health Network is dedicated to providing easy access to sexuality information, education and other sexuality resources for people with disability, chronic illness or

8

other health-related problems. The Sexual Health Network sues on its own behalf and on behalf of users of sexualhealth.com on the World Wide Web.

27. Plaintiff UTAH PROGRESSIVE NETWORK EDUCATION FUND, INC. ("UPNet") is a coalition of organizations and individuals committed to promoting social, racial, economic and environmental justice. The groups involved in the coalition are committed to civil rights and liberties and use communication to unite people around a better understanding of issues. UPNet operates a website at www.upnet.org that serves as a resource for the community on a wide range of issues. Its website shares an Internet Protocol Address with more than 1700 other, unrelated websites, some of which contain material harmful to minors. UPNet sues on its own behalf, on behalf of its members, and on behalf of users of its website.

28. Plaintiff AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION ("ABFFE") was organized as a not-for-profit organization by the American Booksellers Association in 1990 to inform and educate booksellers, other members of the book industry and the public about the dangers of censorship, and to promote and protect the free expression of ideas, particularly freedom in the choice of reading materials. ABFFE is incorporated in Delaware and has its principal place of business in New York City. ABFFE, most of whose members are bookstores in the United States, sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the patrons of their member bookstores.

29. Plaintiff AMERICAN CIVIL LIBERTIES UNION OF UTAH ("ACLU of Utah") is the Utah affiliate of the American Civil Liberties Union, a nationwide, nonpartisan

organization of nearly 300,000 members dedicated to defending the principles of liberty and equality embodied in the Constitution, including the Bill of Rights. The ACLU of Utah has more than 2,300 members, is incorporated in Utah and has its principal place of business in Salt Lake City. The ACLU of Utah sues on its own behalf, and on behalf of its members who use online computer communications systems. The ACLU of Utah maintains a website at www.acluutah.org.

30.     Plaintiff ASSOCIATION OF AMERICAN PUBLISHERS, INC. ("AAP") is the national association of the United States book publishing industry. AAP's approximately 300 members include most of the major commercial book publishers in the United States, as well as smaller and non-profit publishers, university presses and scholarly associations. AAP members publish hardcover and paperback books in every field and a range of educational materials for the elementary, secondary, post-secondary and professional markets. Members of AAP also produce computer software and electronic products and services. AAP is incorporated in New York, and has its principal places of business in New York City and in the District of Columbia. AAP represents an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment. AAP sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the readers of its members' books.

31.     Plaintiff COMIC BOOK LEGAL DEFENSE FUND ("CBLDF") is a non-profit corporation dedicated to defending the First Amendment Rights of the comic book industry. CBLDF, which has its principal place of business in Northampton, Massachusetts, represents over 1,000 comic book authors, artists, retailers, distributors,

publishers, librarians and readers located in Utah, throughout the country and the world. Some of the comic books created, published, distributed and offered for sale by CBLDF's members, though constitutionally protected, could be deemed to be harmful to minors and therefore subject to the Act. The First Amendment rights of CBLDF and its members will be adversely affected unless the Act is enjoined. CBLDF sues on its own behalf, on behalf of its members, and on behalf of the readers of their materials.

32.     Plaintiff FREEDOM TO READ FOUNDATION, INC. ("FTRF") is a non-profit membership organization established in 1969 by the American Library Association to promote and defend First Amendment rights, to foster libraries as institutions fulfilling the promise of the First Amendment for every citizen, to support the rights of libraries to include in their collections and make available to the public any work they may legally acquire and to set legal precedent for the freedom to read on behalf of all citizens. FTRF is incorporated in Illinois and has its principal place of business in Chicago. FTRF sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the patrons of its member libraries.

33.     Plaintiff PUBLISHERS MARKETING ASSOCIATION ("PMA") is a nonprofit trade association representing more than 4,200 publishers across the United States and Canada. The PMA represents predominantly nonfiction publishers and assists members in their marketing efforts to the trade. PMA is incorporated in California, and has its principal office in Manhattan Beach, California. PMA sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of readers of its members' publications.

34.    Defendant MARK SHURTLEFF is the Attorney General of the State of Utah and is sued in his official capacity as such. He is the chief law enforcement officer of the State of Utah. In addition to specific duties given to him under the Act, pursuant to Utah Code § 67-5-1, defendant Shurtleff shall "prosecute...all causes to which the state...is a party" and shall "exercise supervisory powers over the district and county attorneys of the state in all matters."

35.    Defendants VON J. CHRISTIANSEN, AMY F. HUGIE, N. GEORGE DAINES, GENE E. STRATE, DENNIS L. JUDD, MELVIN C. WILSON, KAREN ALLEN, DAVID A. BLACKWELL, WALLACE A. LEE, HAPPY J. MORGAN, SCOTT F. GARRETT, JARED W. ELDRIDGE, ERIC S. LIND, LERAY G. JACKSON, KELLY M. WRIGHT, MARVIN D. BAGLEY, GEORGE W. "JUDD" PRESTON, DAVID E. YOCOM, CRAIG C. HALLS, ROSS C. BLACKHAM, R. DON BROWN, DAVID R. BRICKEY, DOUGLAS J. AHLSTROM, JOANN STRINGHAM, CARLYLE KAY BRYSON, THOMAS L. LOW, BROCK R. BELNAP, MARVIN D. BAGLEY and MARK R. DECARIA are District and County Attorneys for all of the counties in Utah and are sued in their official capacity as such. They have authority to prosecute criminal violations in their respective counties.

## FACTS

36.    Many of the claims raised in this Complaint arise because of the specific technical aspects of Internet communications and the capabilities (or lack of capabilities) of Internet content providers and Internet service providers. The facts in this Complaint are organized into four major sections. First, the Complaint provides a general overview of Internet communications. Second, the Complaint describes a

number of technical details about how Internet content providers make content available as part of the "World Wide Web," and how the Web and other communications flow over the Internet. Third, the different elements of the Act challenged in this Complaint are identified. And fourth, the Complaint details the impact of the Act on Internet communications in general, and on the rights of the Plaintiffs in particular.

## A.   An Overview of Internet Communications

37.   The Internet is a decentralized, local medium of communication that links people, institutions, corporations and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. Although estimates are difficult due to its constant and rapid growth, the Internet is currently believed to connect more than 888 million users worldwide. In addition, in 2002, approximately 31 billion email messages were sent per day. It is expected that by 2006, this number should reach 60 billion email messages per day.

38.   Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the Internet or limits the ability of others to access such materials. Rather, the range of digital information available to Internet users—which includes text, images, sound and video—is individually created, maintained, controlled and located on millions of separate individual computers around the world.

## How People Access the Internet

39.   Individuals have several easy means of gaining access to the Internet. Many educational institutions, businesses, and local communities provide a variety of ways to allow users to easily access the Internet.

13

40.     Almost all libraries provide their patrons with free access to the Internet through computers located at the library. Some libraries also host online discussion groups and chat rooms. Many libraries also post their card catalogs and online versions of material from their collections.

41.     In the United States, most people access the Internet through companies known as Internet service providers ("ISPs"). Home Internet users are likely to contract on a monthly or annual basis with an ISP, and will access that ISP's network over a "dial-up" telephone line, or a higher-speed connection such as a cable "DSL," or wireless circuit. Some ISPs charge a monthly fee ranging from $15-50 monthly, but some provide their users with free or very low-cost Internet access. National "commercial online services," such as America Online, serve as ISPs and also provide subscribers with additional services, including access to extensive content within their own proprietary networks.

42.     Similarly, businesses in the United States commonly contract with an ISP to provide Internet access to their employees, or to connect their internal computer network to the ISP's network (which is in turn connected to the greater Internet). Many businesses connect to their ISP's networks (and the Internet) over dedicated high-speed connections, while other businesses access the Internet over dial-up telephone lines.

**Ways of Exchanging Information on the Internet**

43.     Users need not identify themselves to access most of the information on the Internet. Although in many (but not all) cases, users identify themselves to their ISPs (or their schools, employers or other entities providing Internet access), but once connected to the Internet the users generally do not need to identify themselves further in order to be able to access content on the Internet. Further, the user names or email

addresses selected by many Internet users for their Internet communications seldom if ever provide enough information to indicate the users' real identities. Indeed, many user names are pseudonyms or pen names that often provide users with a distinct online identity and help to preserve their anonymity and privacy. America Online, for example, allows every subscriber to use up to six different "screen names," which may be used for different family members or for separate pseudonyms for a single individual.

44.    Once an individual is connected to the Internet, there are a wide variety of methods for obtaining information, and for communicating with other users.

45.    **Email.** The simplest and perhaps most widely used method of communication on the Internet is via electronic mail, commonly referred to as "email." Using one of many available "mailers"—software capable of reading and writing an email—a user is able to address and transmit via computer a message to a specific individual or group of individuals who have email addresses.

46.    **Discussion Groups.** Online discussion groups are another of the most popular forms of communication via computer networks. Discussion groups allow users to post messages onto a public computerized "bulletin board" and to read and respond to messages posted by others in the discussion group. Discussion groups have been organized on many different computer networks and cover virtually every topic imaginable. Discussion groups can be formed by individuals, institutions or organizations or by particular computer networks.

47.    "USENET" newsgroups are a popular set of discussion groups available on the Internet and other networks. Currently there are USENET newsgroups on more

than 30,000 different subjects, and over 100,000 new messages are posted to these groups each day.

48.     "Web logs" or "blogs" are another very popular form of discussion forum, in which one or a small number of "bloggers" can lead discussions on whatever topics concern the bloggers or the discussion group.  Estimates of how many blogs exist today range from 10 to 50 million separate blogs available on the Internet.

49.     **Mailing Lists.**  Similarly, users also can communicate within a group by subscribing to automated electronic mailing lists that allow any subscriber to a mailing list to post a particular message that is then automatically distributed to all of the other subscribers on that list.  These lists are sometimes called "mail exploders" or "listservs."

50.     **Chat Rooms.**  "Chat rooms" also allow users to engage in simultaneous conversations with another user or group of users by typing messages and reading the messages typed by others participating in the "chat."  Chat rooms are available on the Internet and on commercial online services.  Although chat rooms are often set up by particular organizations or networks, any individual user can start an online "chat."

51.     Users of any of the above methods of Internet communication can send or view images as well as text, and images are frequently distributed via these media to users throughout the world.

52.     Online discussion groups, mailing lists, and chat rooms create an entirely new global public forum—a cyberspace village green—where people can associate and communicate with others who have common interests, and engage in discussion or debate on every imaginable topic.

**The World Wide Web**

53.     The World Wide Web (the "Web") is the most popular way to provide and retrieve information on the Internet. Anyone with access to the Internet and proper software can create "webpages" or "homepages" which may contain many different types of digital information—text, images, sound and even video. The Web comprises hundreds of millions of separate "websites" and "webpages" that display content provided by particular persons or organizations. Any Internet user anywhere in the world with the proper software can create her own webpage, view webpages posted by others, and then read text, look at images and video and listen to sounds posted at these websites.

54.     The Web serves in part as a global, online repository of knowledge, containing information from a diverse array of independent and distributed sources that are easily accessible to Internet users around the world. Though information on the Web is contained on millions of independent computers, each of these computers is connected to the Internet through communications "protocols" that allow the information on the Web to become part of an interconnected body of knowledge accessible by all webusers.

55.     Many large corporations, banks, brokerage houses, newspapers and magazines now provide online editions of their publications and reports on the Web or operate independent websites. Many government agencies and courts also use the Web to disseminate information to the public. For example, defendants Mark Shurtleff and David Yocom (the District Attorney of Salt Lake County) have posted Internet websites containing information available to the public, as have all of the plaintiffs. In addition, many individual users and small community organizations have established

17

individualized homepages on the Web that provide information of interest to members of the particular organization, communities and to other individuals.

56.     To gain access to the information available on the Web, a person generally uses a Web "browser"—software such as Internet Explorer or Mozilla Firefox—to display, print and download documents that are formatted in the standard Web formatting language.  Generally, each document on the Web has an address that allows users to find and retrieve it, but some websites dynamically create addresses so that a given document may not always have the same address.

57.     Most Web documents also contain "links."  These are short sections of text or image that refer and link to another document.  Typically the linked text is blue or underlined when displayed, and when selected by the user on her computer screen, the referenced document is automatically displayed, wherever in the world it actually is stored.  Links, for example, are used to lead from overview documents to more detailed documents on the same website, from tables of contents to particular pages, and from text to cross-references, footnotes, and other forms of information.  For example, plaintiff Utah ACLU's Web homepage provides links to several other webpages, including publications, press releases and legislative information.

58.     Links may also take the user from the original website to another website on a different computer connected to the Internet, a computer that may be located in a different area of the country, or even the world.  For example, plaintiff ACLU of Utah's website links to the website of the National ACLU.  This link appears seamless from the user's point of view; in fact the national website is located on an entirely separate computer that is not maintained or controlled by the ACLU of Utah.

18

59.     Through the use of these links from one computer to another, a user can move from one document to another, unifying the diverse and voluminous information made available by millions of users on the Internet into a single body of knowledge that can be searched and accessed.

60.     A number of "search engines" and directories—such as Google and Yahoo—are available free of charge to help users navigate the World Wide Web. Once a user has accessed the search service, he or she simply types a word or string of words as a search request, and the search engine provides a list of websites that contain or relate to the search string.

## The Interactive Character of Communication Over the Internet

61.     As can be seen from the various ways that people can exchange information and communicate via this new technology, the Internet is "interactive" in ways that distinguish it from traditional communication media. For instance, users are not passive receivers of information as with television and radio; rather, a user can easily respond to the material he or she receives or views online. In addition, "interactivity" means that Internet users must actively seek out with specificity the information they wish to retrieve and the kinds of communications in which they wish to engage. For example, to gain access to material on the World Wide Web, a user must know and type the address of a relevant website or find the website by typing a relevant search string in one of several available search engines or activate a website link. Similarly, a user wishing to view text posted to a newsgroup must log on to the Internet and then connect to a USENET server, select the relevant group, review the relevant header lines—which provide brief content descriptions—for each message and then access a particular message to read its content.

## The Range of Content Available on the Internet

62.    The information made available on the Internet is as diverse as human thought.  Content on the Internet is provided by the millions of Internet users worldwide, and the content ranges from academic writings, to humor, to art, to literature, to medical information, to music, to news, to movie clips and to human sexuality.  For example, on the Internet one can view the full text of the Bible, all of the works of Shakespeare and numerous other classic works of literature.  One can browse through paintings from museums around the world, view in detail images of the ceiling of the Sistine Chapel, watch or download motion pictures or hear selections from the latest rap music albums.  At any one time, the Internet serves as the communication medium for literally hundreds of thousands of global conversations, political debates and social dialogues.  It is a global art museum, movie theater, bookstore, research facility and Hyde Park.

63.    Although the overwhelming majority of the websites on the Internet do not involve nudity or sexual activity, such material is available on the Internet.  For example, an Internet user can read online John Cleland's eighteenth-century novel, <u>Fanny Hill: Memoirs of a Woman of Pleasure</u>; view sixteenth-century Italian paintings of nude women, eighteenth-century Japanese erotic prints, and twentieth-century images; text discussing ways for married couples to improve their physical relationships, portraying methods of practicing safer sex, and depicting the method for conducting a breast self-examination; as well as commercial pornography.  Much of this material is similar, if not identical, to material that is routinely discussed in cafes and on the street corners, and that is distributed through libraries, bookstores, record stores and newsstands.

## B.    Technical Details About Internet and Web Communications

64.    As discussed above, most people access the Internet through ISPs. A network of a typical ISP is in turn connected, directly or indirectly, to all other ISPs in the world, which are in turn connected to their customers. Collectively, all of these ISPs and their customers comprise the global Internet.

65.    For accessing content on the World Wide Web, the most common sequence is for a user to request content from a website, and for the website to return individual webpages to the user. This sequence is illustrated as follows, with the initial request shown by the arrows on the left, and the response shown by the arrows on the right:

User



User's ISP

Website's ISP

Website

66.    In the vast majority of cases, the user's ISP is different from the website's ISP. Thus, the user's ISP does not typically have any knowledge of or relationship with the actual owner of the website.

67.    Individuals, businesses, governments and other institutions (hereafter "web publishers") that want to make content broadly available over the Internet can do so by creating a website on the World Wide Web.

68.    To make a website available on the World Wide Web, a web publisher must place the content or "webpages" onto a computer running specialized "web server"

software.  This computer, known as a "web server," transmits the requested webpages in response to requests sent by users on the Internet.

69.     Web publishers have a variety of options for making a website available over a web server.  First, a web publisher can own and operate a web server on the web publisher's premises (including, possibly, the web publisher's home).  In this case, a web publisher would contract with an ISP for Internet access, and through that connection would connect the web server to the Internet.

70.     Second, and far more commonly today, a web publisher may contract with a "web host" (or an ISP that also operates as a "web host") to own and operate the necessary web server on the web host's premises (or third party premises arranged by the web host).  A web host will typically operate one or more web servers that can store the webpages for customers and make those web pages generally available to users on the Internet.

71.     Typically, when creating a website, a web publisher obtains a "domain name" that can be used to designate and locate the website.  For example, plaintiff THE SEXUAL HEALTH NETWORK, INC., obtained the domain name "sexualhealth.com" for use with its website.

72.     A domain name can be coupled with additional information to create a "Uniform Resource Locator," or "URL," which represents a more complete way to designate the location of certain content or other resources on the Internet.

73.     A URL is the commonly used textual designation of an Internet website's "address."  Thus, for example, the URL of plaintiff's website referenced above is "http://www.sexualhealth.com."  The "http" indicates that the "Hypertext Transfer

Protocol" (the main protocol used to transmit World Wide Web pages) is to be used. The "www.sexualhealth.com" indicates a name that can be used to locate the specific web server(s) that can contain the content for the requested website.

74.     A web page accessed by a URL like "http://www.sexualhealth.com" is commonly referred to as the "homepage" of the website.  A URL could also contain a reference to a specific "sub-page" that is contained in a website (such as "http://www.sexualhealth.com/aboutus.php").  A single website can contain thousands of different webpages.  Although in many cases the same web publisher is responsible for all pages and sub-pages on a website, in other situations (including but not limited to that described in the following paragraph) wholly different and independent web publishers are responsible for different sub-pages on a single website.

75.     Beyond the methods described immediately above, web publishers can use another common method to make webpages available on the World Wide Web.  A web publisher can place content with a service provider that operates a "community" of users on the Internet and offers to host webpages of the users as part of its service (hereafter "Online Community").  This type of Online Community exists only in "cyberspace," and does not relate to any particular physical community.  In the United States, for example, GeoCities is a popular Online Community, and GeoCities hosts webpages of its tens of thousands of users (which commonly are individuals, or very small businesses or organizations).  There are also smaller Online Communities that individuals might host out of their homes.  A key difference with publishing web content through an Online Community is that web publishers' webpages do not typically have their own domain name.  For example, the Green Party of Ogden, Utah, is part of the

GeoCities Online Community, and its webpages are available at the URL "http://www.geocities.com/greenpartyogden."

76.     Although a URL such as http://www.sexualhealth.com or http://www.geocities.com/greenpartyogden provides enough information for a human user to access the desired Internet website, the URLs alone are not sufficient for the user's computer to locate the website. The user's computer must first determine the numeric "Internet Protocol Address" or "IP Address" of the desired website. When a user seeks to access a particular URL, the user's computer does a "look up" through a hierarchy of global databases to determine the IP Address of the computer server that can provide the desired webpages.

77.     In the most commonly used method, IP Addresses are expressed as a series of four numbers separated by periods. Thus, for example, the IP Address of the website designated by http://www.sexualhealth.com is 209.35.187.200. This numeric IP Address provides a user's computer with a precise address of the web server to which the user's computer must send a request for webpages with the URL http://www.sexualhealth.com.

78.     Most ISPs receive and forward Internet communications based solely on the IP Address of the destination of the communication, wholly without regard to the specific content of the communication. Thus, a typical ISP would handle an email message addressed to a specific IP Address in exactly the same way that it would handle a webpage that is being sent to the same IP Address.

79.     Indeed, for most ISPs, the network does not "read" or analyze the content of the communication in order to be able to determine whether the communication was

an email, a webpage or some other type of Internet communication. Moreover, the networks of most ISPs do not include the physical equipment that would be necessary to analyze every communication passing through the network, and do not have the ability to take any action based on the content of the communication.

80.     Although a specific URL in general refers only to one specific website, the same is not true for IP Addresses -- there is not a one-to-one correlation between URLs and IP Addresses. An individual web server computer -- with a single IP Address -- can "host" tens, hundreds, thousands or even hundreds of thousands of different websites. Thus, many different websites (each with their own unique URLs) can be hosted on the same physical web server, and all can share the same IP Address of that web server.

81.     For example, 209.35.187.200 is the IP Address of the website www.sexualhealth.com. But that exact same numeric IP Address is also used by more than 6,000 other wholly unrelated websites (including, for example, the websites of a local Kansas court, www.14thjudicialdistrict-ks.org, a North Carolina radiology center, www.Adcdurham.com, and a bank in the Bahamas, www.Bahamasdevelopmentbank.com). If a user on the Internet seeks to access the www.sexualhealth.com website, the user's ISP knows only that the user is sending a communication to 209.35.187.200. The user's ISP does not "open" or "read" the communication to determine which specific website is actually being requested.

82.     Although ISPs transport most Internet communications without looking at any information other than the IP Address, a web server that supports multiple websites does "read" the full web request in order to determine which website is being requested. In the example of www.sexualhealth.com, the web server located at 209.35.187.200 will

read any web request it receives to determine which of the thousands of websites located at that address should be provided.

### C.    **The Provisions of the Act**

83.    The Act has a number of different coordinating and overlapping provisions.[1] This Complaint challenges five components of the Act, as detailed below:

84.    **Extension of Utah Harmful-to-Minors Law to the Internet.** Section 5 (amending Utah Code § 76-10-1206) expands existing Utah law with respect to distribution to minors of "harmful to minors" material to include Internet content publishers and ISPs. Plaintiffs challenge this section as unconstitutional.

85.    **Mandatory Labeling.** Section 9 enacts Utah Code § 76-10-1233, which requires Utah-connected Internet content providers to self-evaluate and label the content of their speech, at the risk of criminal punishment. Plaintiffs challenge this section as unconstitutional.

86.    **Creation of Adult Content Registry, and Mandated ISP Blocking of Listed Sites.** Sections 2 (enacting Utah Code § 67-5-19) and 8 (enacting Utah Code § 76-10-1232) require (a) defendant SHURTLEFF to create an "adult content registry" including websites that he alone determines, with no judicial or other review, to contain material that is "harmful to minors," and (b) ISPs to block access to websites that appear on the registry. Utah Code § 76-10-1232 specifies that the ISPs may "block material from the adult content registry by domain name or Internet Protocol address." Plaintiffs challenge these sections as unconstitutional.

---

[1] Plaintiffs challenge essentially the entire Act *except* Sections 1 and 3. Thus, when Plaintiffs ask the Court to enjoin the Act, they are seeking to enjoin the entire Act except Sections 1 and 3.

87. **Mandated ISP Blocking of "Pornographic" Material as Determined by the ISP's Customers.** Section 4 amends Utah Code § 76-10-1205 and effectively requires ISPs to block access to "any pornographic material or material reasonably believed by [a customer] to be pornographic." Plaintiffs challenge this section as unconstitutional.

88. **Mandated ISP Blocking of Harmful-to-Minors Material.** Section 7 enacts Utah Code § 76-10-1231, which requires ISPs to block access to "harmful to minors" material. Plaintiffs challenge this section as unconstitutional.

89. Some but not all of the challenged sections that impose obligations on ISPs to block access to certain content are triggered by the affirmative requests of individual customers of the ISPs. Because of the technical realities of the Internet and the operations of most ISPs, in many (if not most or all) circumstances the ISPs will implement any blocking across their entire network and thus the access to lawful websites by non-requesting customers will also be blocked. For this and other reasons, the "customer choice" approach does not cure the constitutional defects raised in this Complaint.

90. Many of the obligations imposed on ISPs by the Act can be satisfied if an ISP provides to a requesting customer filtering software that the customer can install on his or her own computer. Although plaintiffs believe that governmental promotion of the voluntary use of such filtering software is a constitutionally less restrictive alternative to the challenged sections of the Act, ISPs are specifically given the option by the Act of blocking access to websites using technical means that will also block access to unrelated websites. For this and other reasons, the inclusion of the "filtering software

27

option" does not eliminate the overall unconstitutional impact of the challenged sections under both the First Amendment to, and the Commerce Clause of, the U.S. Constitution.

### D. Impact of the Act on Internet Speech and Communications in General, and on the Plaintiffs in Particular

91.    The harmful impacts of the Act on Internet speech in general, and on the plaintiffs in particular, are far reaching. Because the Act is multi-faceted, the impacts on speech are discussed below with regard to each of the five different facets of the Act challenged in this Complaint. Following that is a discussion of the impact on interstate commerce that flows from all of the challenged sections of the Act. Concluding is a discussion of the impact on the individual plaintiffs.

### The Act's Impact on Internet Speech

### Extension of Utah Harmful-to-Minors Law to the Internet (Section 5, Utah Code § 76-10-1206)

92.    Because of the nature of the Internet, this section of the Act bans certain constitutionally-protected speech among adults and substantially burdens the dissemination and receipt of other constitutionally protected speech.

93.    The United States Congress and the states of Arizona, Michigan, New Mexico, New York, South Carolina, Vermont, Virginia and Wisconsin previously enacted laws similar to these sections of the Act, which were either held unconstitutional or enjoined on First Amendment and Commerce Clause grounds.

94.    Speech on the Internet is generally available to anyone with access to basic communications technology. Anyone who posts content to the Web, chat rooms, mailing lists or discussion groups makes that content automatically available to all users worldwide, including minors. Because minors have access to all of these fora, any

"harmful to minors" communication in these fora could be punishable under the Act. Knowledge that the recipient is a minor is not required under the Act, and knowledge of the "character and content" of the material is presumed. Due to the very nature of the Internet, virtually every communication on the Internet may potentially be received by a minor and therefore may potentially be the basis for prosecution.

95. Because many of the terms in the Act are overbroad, the Act further chills the speech of content providers on the Web. For example, the Act fails to distinguish between material that is "harmful" for older as opposed to younger minors.

96. Further, the reference to "prevailing standards in the adult community [in the State of Utah] as a whole with respect to what is suitable material for minors" is overbroad because, due to the borderless nature of the Internet, it effectively imposes Utah standards on content providers and users in all other states even if other states have more liberal standards regarding what is considered "harmful to minors." As a consequence, content providers and users of the Web will likely err on the side of caution and not post content on the Web that they would otherwise have posted. In this way, the Act chills speech on the Web and thus causes irreparable harm to the First Amendment freedoms of online speakers.

97. Many of the hundreds of millions of users of the Internet are speakers and content providers subject to the Act. Anyone who sends an email, participates in a discussion group or chat room, or maintains a homepage on the Web potentially is subject to the Act, because his or her communication might be accessed by a minor in the State of Utah. Given the technology of the Internet, there are no reasonable means for these speakers to ascertain the age of persons who access their messages, or for

restricting or preventing access by minors to certain content. From the perspective of these speakers, the information they make available on the public spaces of the Internet either must be made available to all users of the Internet, including users who may be minors, or it will not be made available at all.

98. For instance, when a user posts a message to a USENET discussion group, it is automatically distributed to hundreds of thousands of computers around the world, and the speaker has no ability to control whom will access his or her message from those computers. Similarly, users who communicate on mailing lists have no way to determine the ages of other subscribers to the list. Finally, content providers on the Web have no reasonable way to verify the age of persons who access their websites. For these reasons, there is no practical way for content providers to withhold material that may be "harmful to minors"—as prohibited by the Act—from people younger than 18 years old.

99. Moreover, the Act is overbroad because it allows prosecution even if the sender had no knowledge or reason to know of the recipient's age. Although knowledge of the "character and content" of the material is required, knowledge that the recipient is a minor is not required.

100. Because Internet speakers have no means to restrict minors in Utah from accessing their communications, the Act effectively requires almost all discourse on the Internet—whether among citizens of Utah or among users anywhere in the world—to be at a level suitable for young children. The Act therefore bans an entire category of constitutionally protected speech between and among adults on the Internet.

101.    In addition, any person who disagrees with or objects to sexual content on the Internet could cause a speaker to be prosecuted under the Act by having a minor view the online speech, resulting in a "heckler's veto" of Internet speech. Further, any person who disagrees with sexual content on the Internet could cause a speaker to fear prosecution under the Act by claiming to be a minor, whether or not the person actually is one.

102.    The Act also prohibits older minors from communicating and accessing protected speech. Even if some depictions or discussions of nudity and sexual conduct may be considered by some to be inappropriate or "harmful" for younger minors, many depictions and discussions—including safer sex resources—are valuable, at least for older minors.

103.    Even if there were means by which speakers on the Internet could ascertain or verify the age of persons who receive their content (and there are no such means), requiring users to identify themselves and to disclose personal information in order to allow verification of age would prevent Internet users from maintaining their privacy and anonymity on the Internet.

104.    Because of the global nature of the Internet, defendants cannot demonstrate that these sections of the Act are likely to reduce the availability in Utah of material that may be "harmful to minors" on the Internet.

105.    It is estimated that in excess of 40% of the content provided on the Internet originates abroad. All of the content on the global Internet is equally available to all Internet users worldwide and may be accessed as easily and as cheaply as content that originates locally. Because it is not technologically possible to prevent

content posted abroad from being available to Internet users in the State of Utah, these sections of the Act will not accomplish their purported purpose of keeping inappropriate content from minors in Utah.

106. Conversely, there are many alternative means that are more effective at assisting parents in limiting a minor's access to certain material, if desired.

107. Some ISPs and commercial online services like America Online provide features that subscribers may use to prevent children from accessing chat rooms and to block access to websites and news groups based on keywords, subject matter, or other designations. These services also offer screening software that blocks messages containing certain words and tracking and monitoring software to determine which resources a particular online user, such as a child, has accessed. They also offer children-only discussion groups that are closely monitored by adults.

108. Online users also can purchase special software applications, known as user-based filtering software, that enable them to control access to online resources. These applications allow users to block access to certain websites and resources, to prevent children from giving personal information to strangers by email or in chat rooms and to keep a log of all online activity that occurs on the home computer.

109. User-based blocking programs are not perfect, both because they fail to screen all inappropriate material and because they inadvertently block valuable Internet websites. However, a voluntary decision by concerned parents to use these products for their children constitutes a far less restrictive alternative than the Act's imposition of criminal penalties for protected speech upon the universe of Internet users. Moreover,

the Act itself demonstrates that the voluntary use by customers of filtering software would satisfy the governmental interests sought to be advanced by the Act.

### Creation of Adult Content Registry, and Mandated
### ISP Blocking of Listed Sites (Sections 2 & 8, Utah Code §§ 67-5-19, 76-10-1232)

110.    Defendant SHURTLEFF's designation of a website for inclusion on the Adult Content Registry is wholly without any judicial review of his determination, either before or after such designation.

111.    No website, ISP or Internet user is afforded an opportunity to participate in any adversarial proceeding before defendant SHURTLEFF designates a website for inclusion on the Adult Content Registry.

112.    The operation of the Adult Content Registry is similar to the censorship system held to be unconstitutional by the United States Supreme Court in Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963).

113.    Most ISPs cannot as a technical matter effectively comply with a requirement to block specific websites designated in the Adult Content Registry by blocking content based on the specific URL of a website or a webpage.  To effectively comply with the blocking requirement, most ISPs can only block access to a website by blocking access to the numeric Internet Protocol Address ("IP Address") of the website.

114.    The blocking by numeric IP Address is specifically authorized and directed by the Act.

115.    To effectively comply with the blocking requirement, most ISPs would be forced to create an "exception" in a "routing table" in order to "null route" or "mis-route" Internet traffic associated with the IP Address.

116. Blocking access to an IP Address will block access to all websites that use that IP Address, including websites that are wholly unrelated to any URLs listed the Adult Content Registry.

117. The sharing of IP Addresses among wholly unrelated websites is a very common practice on the Internet today.

118. According to recent research, over 85% of all Internet websites that have domain names ending in ".com," ".net" or ".org" share their IP Addresses with at least one other Internet website.

119. According to recent research, over 66% of all Internet websites that have domain names ending in ".com," ".net" or ".org" share their IP Addresses with at least fifty other Internet websites.

120. In some cases, hundreds, thousands and even hundreds of thousands of websites share a single IP Address.

121. In most cases, the websites that share their IP Address with dozens or hundreds of other websites have no affiliation or relationship with the other websites that share their IP Address.

122. Internet websites that carry hard core pornographic sexual content can share their IP Address with unrelated non-sexual websites.

123. IP Address 206.251.184.80 provides a good illustration of IP Address sharing. That IP Address is used by over 18,000 unrelated websites including a variety of hardcore sexually oriented websites, such as

    www.4dirtypics.com
    www.a-1--sexmap.com
    www.adamandeveshop.com
    www.addixgalleries.com

www.adultlovecam.com
www.amateur-sex-sluts.com
www.babe-x.com
www.badboyfantasies.com

as well as a diversity of websites that are wholly non-sexual, including

www.abqmennonite.org (church in New Mexico)
www.acunafurniture.com (furniture store in Texas)
www.adirondackprinters.com (printer repair in New York)
www.african-drums.com (online drum store)
www.africanhumanrightscenter.org (advocacy organization in Washington, DC)
www.alicebrentano.com (real estate agent in Kansas)
www.alphabetmoon.com (children's accessories store in Texas)
www.amazinggraceministries.net (missionary organization in Massachusetts)
www.angusbookkeeping.com (accounting firm in California)
www.arkansasfoosball.com (foosball league in Arkansas)
www.attorneypaulgold.com (attorney in Kentucky)
www.ayersrockguide.com (Japanese language guide to Australian site)
www.bagelsandbeyond.com (bagel store in Massachusetts)
www.bellol.com (clothing manufacturer in China).

124.    If any one of the 18,000+ websites that use IP Address 206.251.184.80 is included on the Adult Content Registry, the actions of ISPs to comply with their blocking obligation would block access to all 18,000+ websites. Thus, a requirement to block access to, for example, "www.amateur-sex-sluts.com" would result in the blocking of "www.amazinggraceministries.net," "www.bagelsandbeyond.com" and thousands of other unrelated websites.

125.    Blocking obligations imposed on most ISPs targeting any particular URL are very likely to lead to the blocking of access to wholly unrelated websites that share the IP Address of the targeted URL.

126.    As an alternative to blocking by Internet Protocol Address, the Act permits ISPs to block by "domain name." If ISPs sought to comply with the Act by blocking by domain name, they would "spoil" or manipulate a data table used in the "domain name lookup" process.

127.    Such an approach would still result in the blocking of access to lawful Internet content, because under such an approach the ISP would have to block access to all portions of a website, even if only one portion of a website was designated in the Adult Content Registry.  For example, the Geocities Online Community has thousands of unrelated websites all hosted under the www.geocities.com domain name.  Thus, if an ISP were required to block access to hardcore or adult oriented websites in the Geocities community (such as www.geocities.com/realfreepix/index.html, www.geocities.com/sylviakristel2/pictures.html and www.geocities.com/brnt524/index.html), the ISP would also block access to thousands of unrelated websites, including for example www.geocities.com/ldsdemocrats/index.html (a political website aimed at Mormons) and www.geocities.com/saltlakeseagullsafc/saltlakeseagulls.html (a Salt Lake City sports club).

128.    Although many ISPs could attempt to block access to a website by its IP Address or possibly by its domain name, some ISPs – for some or all of their customers – have no technical means by which they could attempt to block access to a website.

129.    For many regional or national ISPs, any action taken to comply with blocking obligations under the Act will affect the Internet access of customers both in Utah and in other states around the country (and in some cases in other countries).  In other words, content blocked as a result of the Act will be blocked far outside of Utah's borders.

130.    Specifically, the blocking of websites challenged in this Complaint would have a direct and significant harmful affect on interstate and foreign commerce and

communications. In almost all (if not all) cases, the blocking provisions challenged in this Complaint interfere with the ability of Internet users located outside of Utah to access content also located outside of Utah. In most cases, the communications obstructed by the Act would have taken place (but for the Act) entirely outside of the borders of Utah.

131. Wholly innocent and completely lawful websites on the Internet would be blocked if ISPs comply with the Act by blocking access to websites designated in the Adult Content Registry.

### Mandated ISP Blocking of "Pornographic" Material as Determined by the ISP's Customers (Section 4, Utah Code § 76-10-1205)

132. The effective blocking obligation imposed under this section will have all of the impacts described above with reference to the Adult Content Registry, except that instead of defendant SHURTLEFF designating websites to be blocked, Section 4 permits individual customers to designate websites to be blocked (so long as the customers "reasonably believed" the website to be "pornographic"). Allowing individual customers to impose blocking obligations on ISPs greatly exacerbates the constitutional problems raised by the Adult Content Registry provisions of the Act.

### Mandated ISP Blocking of Harmful-to-Minors Material (Section 7, Utah Code § 76-10-1231)

133. The effective blocking obligation imposed under this section will have all of the impacts described above with reference to the Adult Content Registry, except that, instead of defendant SHURTLEFF designating websites to be blocked, under Section 7 the ISP will be required to block access to vast numbers of websites on the Internet.

Thus, it is unavoidable that a significant amount of constitutionally-protected non-harmful-to-minors content will also be blocked. Moreover, the actions of many ISPs to block access to harmful to minors content will result in blocking access for all of the customers of the ISP.

## Mandatory Labeling (Section 9, Utah Code § 76-10-1233)

134. Section 9 of the Act effectively requires that Utah-located or connected websites and other Internet content publishers either to technically block access by minors to content that is harmful to minors, or to "label" material that is harmful to minors as being harmful to minors. The obligation to block access by minors suffers from all of the same problems discussed above with regard to Sections 3 and 5 of the Act. In addition, the obligation to "label" material as harmful to minors constitutes "compelled speech" in violation of the First Amendment.

## The Act's Burden on Interstate Commerce

135. The Act impacts the speech of online speakers across the nation—not just in the State of Utah—because it is impossible for Internet users to determine the geographic location of persons who access their information. Internet users elsewhere have no way to determine whether information posted to the Web, discussion groups, or chat rooms will be accessed by persons residing in the State of Utah. The various websites on the Internet can be accessed by anyone in the world; therefore, there is no way for speakers to ensure that residents of Utah will not receive their communications. Thus, all users, even if they do not reside in Utah or intend to communicate with residents of Utah, must comply with the Act.

136.    The Act unjustifiably burdens interstate commerce and regulates conduct that occurs wholly outside the State of Utah.  The Act chills speakers outside of Utah and curtails speech that occurs wholly outside the borders of Utah, thereby causing irreparable harm.  Like the nation's railways and highways, the Internet is by its nature an instrument of interstate commerce.  Just as goods and services travel over state borders by train and truck, information flows across state (and national) borders on the Internet.  Internet content providers that are located outside of Utah, such as The Sexual Health Network, as well as people participating in chat rooms, newsgroups or mail exploders, have no feasible way to determine whether their information will be accessed or downloaded by someone who is located in Utah.  Just as a user of the Internet cannot identify the age of another user of the Internet, one also cannot identify where a particular user or speaker resides, or from where a particular user may be accessing or downloading information on the Internet.  Due to the nature of the technology, a non-Utahan, even if he or she has no desire to reach anyone in Utah, will be forced to self-censor his or her speech on the Internet in order to comply with the Act and avoid the possibility that a minor from Utah will gain access to this information, thereby subjecting the speaker to prosecution in Utah.  In addition, because more than one website is often on a server, blocking a single website will often block many more non-offending websites.  As a regional or national ISP typically cannot restrict blocking to Utah users only, such non-offending websites will also be blocked as to users of that ISP in the rest of the United States.  Therefore, the Act interferes significantly with the interstate flow of information and with interstate commerce.

137.   Moreover, interstate and international computer communications networks—like the nation's railroads—constitute an area of the economy and society that particularly demands uniform rules and regulations.  The states of New York, New Mexico, Arizona, Wisconsin, Vermont, Virginia, Pennsylvania, Michigan and South Carolina previously enacted laws similar to the Act, which were enjoined on Commerce Clause grounds because of the inconsistent obligations imposed on online speakers across the country.

138.   Because the definition of "harmful to minors" in Utah Code § 76-10-1201(4) depends in part upon "prevailing standards in the adult community" in the State of Utah as a whole, the Act effectively imposes regulations on interstate speech that conflict with the community standards of other States and their local communities.  If each state implements its own regulations, as Utah has done, regarding what information can be legally distributed via this new technology, interstate commerce will be greatly inhibited and disrupted as persons around the world try to discern what can and cannot be communicated in the many different jurisdictions connected to these networks.

**The Act's Impact on the Plaintiffs**

139.   Plaintiffs interact with and use the Internet in a wide variety of ways, including as content providers, access providers and users.  The Act burdens plaintiffs in all of these capacities.  Plaintiffs who are users and content providers are subject to the Act.  These plaintiffs fear prosecution under the Act for communicating, sending, displaying or distributing material that might be deemed by some to be "harmful to minors" under the Act.  They also fear liability for material posted by others to their online discussion groups, chat rooms, mailing lists and websites.  Plaintiffs have no way

to avoid prosecution under the Act and are left with two equally untenable alternatives: (i) risk prosecution under the Act, or (ii) attempt to engage in self-censorship and thereby deny adults and older minors access to constitutionally protected material.

## The King's English Bookshop

140. Plaintiff The King's English Bookshop was founded in Salt Lake City in 1978. The King's English website, kingsenglish.booksense.com, provides information about books, including pictures of bookcovers and detailed descriptions of book contents provided by Booksense, a national service for independent booksellers. The website also includes the store's newsletter which offers book reviews, photos, information about upcoming events and other local items.

141. The King's English sells books covering a variety of topics, some of which contain sexual content. It carries, recommends and sells, for instance, such classics as D. H. Lawrence's Lady Chatterly's Lover and Gustave Flaubert's Madame Bovary; contemporary classics from Henry Miller's Tropic of Capricorn to Doris Lessing's The Golden Notebooks to Vladimir Nabokov's Lolita; more recent fiction such as Isabel Allende's The Stories of Eva Luna, Margaret Atwood's The Handmaid's Tale, Michael Ondaatje's The English Patient, Mark Spragg's The Fruit of Stone; and non-fiction, an example of which is Our Bodies Ourselves put out by the Boston Women's Collective and recently re-issued. These and other books that the King's English carries, when recommended on-line, could be described in ways that depict nudity and/or sexual conduct; an example is Margaret Atwood's most recent novel Oryx and Crake, which John Updike called "brilliant," and the Christian Science Monitor described as 'bewitching"; the cover features two nude female torsos joined as one. If the Act is not enjoined, the store will be inhibited from posting constitutionally protected material on its

website and may have to reconsider use of Booksense or any similar national web service. The King's English Bookshop fears prosecution under the Act if it does not self-censor.

142.   Because of how the online Booksense system operates, it would be practically impossible for The King's English to review and "label" all of the content on its website.

## Sam Weller's Zion Bookstore

143.   Plaintiff Sam Weller's Zion Bookstore was established in Salt Lake City in 1929. The World Wide Web provides Sam Weller's Zion Bookstore with the opportunity to offer its books for sale over the Internet. In addition to selling books over the Internet, Sam Weller's also publishes a bi-monthly newsletter about books, book reviews and lists store events on its website.

144.   Some of the books made available through www.samwellers.com contain references to nudity and sexual conduct. If the Act is not enjoined, Sam Weller's would be forced to risk criminal prosecution for providing constitutionally protected speech on the Internet about books that it routinely sells from its store, or to self-censor its website to remove all references to nudity and sexual conduct. Sam Weller's is considering joining a national web service, such as Booksense, but is concerned as to whether it will subject the firm to prosecution under the Act. This would prevent, for example, individuals looking for information about sexual health or gay and lesbian issues from obtaining access to valuable resources available through the Internet.

145.   Because of the volume and dynamic nature of the content on its website, it would be extremely burdensome if not impossible for Sam Weller's to review and "label" all of the content on its website.

## Nathan Florence

146.    Plaintiff Nathan Florence believes that the World Wide Web provides a unique and low-cost opportunity to exhibit his work to both local communities and to the world. Some of his art depicts nude figures in a tradition that is centuries old. For example, some of his paintings depict nude women in various positions.

147.    Mr. Florence uses his website to display his art, and is worried that some of the depictions of nude figures, as well as other aspects of his art, might be considered in violation of provisions of the Act. Because he is uncertain what will be considered in violation of the Act, he would have to self-censor, shut down his website entirely, or risk criminal prosecution for providing constitutionally-protected artistic expression.

## W. Andrew McCullough

148.    Plaintiff Andrew McCullough is a candidate for Attorney General of Utah, and operates a campaign website at www.andrewmccullough.org. This website contains no content that could be considered harmful to minors. The website is, however, hosted on a Web Server located at IP Address 207.150.192.12, along with more than 45,000 other unrelated websites, including sexually oriented websites such as www.20sex.net, www.100-free-porn-revealed.com, www.247porn.net, www.adulteensex.com and www.adult-sexspot.com. If an ISP takes technical action to block access to these or other sexually oriented websites located at IP Address 207.150.192.12, it is very likely that access to www.andrewmccullough.org will also be blocked. Thus, McCullough fears that his website will be blocked as a result of actions by ISPs to comply with the Act.

## CSolutions

149.    Plaintiff Computer Solutions, Inc. is both an Internet service provider and a hosting company as defined in the Act.  As such, all of the challenged provisions of the Act apply to or affect CSolutions.  Complete compliance with Utah Code §§ 76-10-1204, 76-10-1205, 76-10-1206, 76-10-1231, and 76-10-1232 as enacted or amended by the Act may not be possible, and thus CSolutions reasonably fears prosecution under or application of any of those sections to CSolutions.  If compliance with those sections is possible, it would be burdensome and costly, and would adversely harm the ability of CSolutions' customers to access constitutionally protected content on the Internet.

150.    As a hosting company, the web hosting customers of CSolutions would be subject to Utah Code § 76-10-1233.  That section harms CSolutions' ability to compete for and retain customers, and it harms the customers' constitutional rights to post content on the Internet.

## Mountain Wireless

151.    Plaintiff Mountain Wireless is both an Internet service provider and a hosting company as defined in the Act.  As such, all of the challenged provisions of the Act apply to or affect Mountain Wireless.  Complete compliance with Utah Code §§ 76-10-1204, 76-10-1205, 76-10-1206, 76-10-1231, and 76-10-1232 as enacted or amended by the Act may not be possible, and thus Mountain Wireless reasonably fears prosecution under or application of any of those sections to Mountain Wireless.  If compliance with those sections is possible, it would be burdensome and costly, and would adversely harm the ability of Mountain Wireless' customers to access constitutionally protected content on the Internet.

152. As a hosting company, the web hosting customers of Mountain Wireless would be subject to Utah Code § 76-10-1233. That section harms Mountain Wireless' ability to compete for and retain customers, and it harms the customers' constitutional rights to post content on the Internet.

## The Sexual Health Network

153. Plaintiff The Sexual Health Network's Web website (sexualhealth.com) includes a wide array of sex education materials for people with disabilities and chronic diseases. Some resources are written specifically for The Sexual Health Network, while other materials are adapted from a variety of sources. Topics covered include both general matters (such as information about the effects of aging on sexuality, or ideas to help increase women's sexual pleasure), to disability-specific issues (such as sexual positions that may enhance intercourse for individuals with particular disabilities, or advice on dealing with low sexual self-esteem that may accompany a disability).

154. The articles and other information available on sexualhealth.com necessarily involve the use of sexually explicit language and visual images. Frank, detailed explanations are given in order for the information that the website provides to be useful to its viewers.

155. Sexual Health Network publishes a monthly newsletter that is sent to nearly 5,000 subscribers.

156. The Sexual Health Network's website offered co-branded content, such as webcasts that are produced by Healthology (a health-related website), that are accessible by clicking on links or banners on Sexual Health Network's website.

157.    The Sexual Health Network's website also provides links to other sexuality-related websites such as the Sinclair Intimacy Institute (producers of explicit educational videos designed to help couples improve their sex lives).

158.    The Sexual Health Network fears that making the materials on the sexualhealth.com website available online could be alleged to constitute "distribution" of "harmful to minors" material and thus subject it to prosecution under the Act.

159.    If the Act is not enjoined, the Sexual Health Network must choose between risking criminal prosecution or curtailing its speech by removing from its website any material that could be alleged to be "harmful to minors."

## Utah Progressive Network Education Fund, Inc.

160.    Plaintiff Utah Progressive Network Education Fund, Inc. ("UPNet") is a coalition of organizations and individuals committed to promoting social, racial, economic and environmental justice, and operates a website at www.upnet.org. This website contains no content that could be considered "harmful to minors." The website is, however, hosted on a web server located at IP Address 65.121.176.20, along with more than 1,500 other unrelated websites, including sexually oriented websites such as www.second-cumming.com and www.sensualawakenings.com. If an ISP takes technical action to block access to these or other sexually oriented websites located at IP Address 65.121.176.20, it is very likely that access to www.upnet.org will also be blocked. Thus, UPNet fears that its website will be blocked as a result of actions by ISPs to comply with the Act.

## American Booksellers Foundation for Free Expression

161.    Plaintiff ABFFE has hundreds of bookseller members who are located from coast to coast, as well as in the State of Utah, many of whom sell materials that

contain descriptions or depictions of nudity or sexual conduct, and which deal frankly with the subject of human sexuality. ABFFE's members are not "adult bookstores." Many member bookstores use the Internet and electronic communications to obtain information and excerpts of books from publishers. For example, member booksellers may review current popular titles such as Nymph by Francesa Lia Block, Pictures & Passion: A History of Homosexuality in the Visual Arts by James W. Saslow, American Pastoral by Philip Roth and The Joy of Sex, which include passages or images describing nudity and sexual conduct. Some member bookstores also have their own webpages that discuss the contents of books sold in stores.

162. ABFFE members' right to learn about, acquire and distribute material describing or depicting nudity and sexual conduct, and their patrons' right to purchase such materials, will be seriously infringed by the Act if it is not enjoined because ABFFE members and the publishers with whom they transact business will be forced to self-censor or risk prosecution under the Act.

**American Civil Liberties Union of Utah**

163. Plaintiff ACLU of Utah not only works to uphold the Bill of Rights, but also devotes considerable resources to public education about civil liberties. The ACLU of Utah maintains a website (www.acluutah.org) that offers electronic copies of the affiliate's publications, reports, legal documents, press releases and other material related to its legal, legislative, educational and advocacy work. The website is updated at least weekly, and often daily. Some of the ACLU of Utah's online resources contain sexual subject matter. Examples include copies of ACLU of Utah and ACLU court briefs in cases involving arts censorship, obscenity, sex education, privacy rights and

discrimination against gays and lesbians. Additionally, the ACLU of Utah's website links to national ACLU's extensive online resources.

164. The ACLU of Utah does not moderate its computer communications systems because such editing or censorship would be antithetical to the organization's belief in freedom of speech. Furthermore, the ACLU of Utah considers minors to be an important audience for its online resources. If the Act is not enjoined, the ACLU of Utah fears that it would be compelled either to refrain from offering constitutionally protected civil liberties materials or to face potential criminal prosecution.

**Association of American Publishers, Inc.**

165. Plaintiff AAP sues on behalf of its members who are content providers and users of the Internet. Although their businesses are primarily based on print publishing, AAP's members are very actively involved in the Internet. AAP's members create electronic products to accompany and supplement their printed books and journals; create custom educational material on the Internet; communicate with authors and others, receive manuscripts, and edit, typeset, and design books electronically; transmit finished products to licensed end-user customers, communicate with bookstores and other wholesale and retail accounts; and promote authors and titles online.

166. Many of AAP's members have webpages and provide information to the world on the Internet. Some of the content provided by AAP's members contains nudity or sexual conduct. Many of the efforts to ban books in various communities have been directed at books published by AAP's members, and AAP fears that the Act will spawn similar efforts directed at AAP's online publishing. If the Act is not enjoined, AAP members will be forced either to risk criminal liability or to stop providing online access to constitutionally protected books and other related materials.

48

## The Comic Book Legal Defense Fund

167.    The Comic Book Legal Defense Fund ("CBLDF") represents over 1000 comic book authors, artists, retailers, distributors, publishers and readers located in Utah and the rest of the United States.  Comics are a graphic-based art form that has rapidly adapted it content and commerce for the Internet.  Today, the largest individual retailers of comic books in the United States are Internet-based, while hundreds of "web comics" artists are posting work every year. Some of their material involves frank sexual content or depictions of nudity. If the Act is not enjoined, CBLDF and its members are concerned that they will have either to risk criminal liability or self-censor constitutionally protected material.

## Freedom to Read Foundation, Inc.

168.    FTRF includes among its members librarians and public and non-public libraries that serve their patrons with access to and content on the Internet.  Almost all libraries provide their patrons with facilities to access to the Internet for free or at a low cost.  Most libraries also have their own websites and use the Internet for such things as posting catalogues of library materials, posting information about current events, sponsoring chat rooms, providing textual information or art and posting online versions of materials from their library collections.  Patrons can, for example, access the website of certain libraries from anywhere in the country to peruse the libraries' catalogues, review an encyclopedia reference or check a definition in a dictionary.

169.    Some of the materials provided or made available by libraries contain nudity or sexual conduct.  For example, FTRF member libraries' online card catalogues include such works as Forever by Judy Blume, Women on Top by Nancy Friday,

<u>Changing Bodies, Changing Lives</u> by Ruth Bell, <u>Our Bodies, Our Selves</u> by the Boston Women's Health Collective and <u>It's Perfectly Normal</u> by Robie Harris.

170.   If the Act is not enjoined, libraries will be inhibited from both posting and providing access to materials on the Internet that describe or depict nudity or sexual conduct.  Adult library patrons and Internet users would thus be deprived of access to these constitutionally protected library materials.  Given the global and unrestricted nature of the Internet and the past attempts by persons to bar literature and reference items from library collections, many of FTRF's members may choose not to post a substantial amount of expressive material at all—material that many adults might consider useful for themselves or their own children—rather than risk prosecution for posting material that might be illegal under the Act in Utah.

**Publishers Marketing Association**

171.   Publishers Marketing Association ("PMA") was founded in California in 1983 to represent and serve book, audio and video independent publishers.  It now has more than 3,900 publisher members in the United States and Canada, primarily publishers of non-fiction.  Thirty of its members are located in Utah.

172.   Plaintiff PMA sues on behalf of its members who are content providers and users of the Internet.  Although their businesses are primarily based on publishing, many of PMA's members are very actively involved in the Internet.  They communicate with authors and others, receive manuscripts, and edit, typeset, and design books electronically; transmit finished products to licensed end-user customers, communicate with bookstores and other wholesale and retail accounts; promote authors and titles; and market titles online.

50

173. Many of PMA's members have webpages and provide information to the world on the Internet. Some of the content provided by PMA's members contains descriptions or depictions of nudity or sexual conduct. If the Act is not enjoined, members of PMA will be forced either to risk criminal liability or to stop providing online access to constitutionally protected books and other related materials.

## CAUSES OF ACTION

### COUNT I

**Violation of Adults' Rights Under the First and Fourteenth
Amendments of the United States Constitution**

174. Plaintiffs repeat and re-allege paragraphs 1 – 173 as if set forth entirely herein.

175. The Act violates the First and Fourteenth Amendments to the United States Constitution on its face and as applied because it effectively bans and/or unduly burdens constitutionally protected speech by and between adults.

176. The Act violates the First and Fourteenth Amendments because it is not the least restrictive means of accomplishing any compelling governmental purpose.

177. The Act violates the First and Fourteenth Amendments because it is substantially overbroad.

### COUNT II

**Violation of Minors' Rights Under the First and
Fourteenth Amendments of the United States Constitution**

178. Plaintiffs repeat and re-allege paragraphs 1 – 173 as if set forth entirely herein.

179.     The Act violates the First and Fourteenth Amendments to the United States Constitution because it interferes with the rights of minors to access and view material that to them is protected by the First Amendment.

180.     The Act is unconstitutional because it prohibits the dissemination to all minors of any material that is deemed "harmful to minors" of any age, despite the fact that some of the material has value for older minors.

181.     The Act violates the First and Fourteenth Amendment rights of minors because it is substantially overbroad.

## COUNT III

### Prior Restraint

182.     Plaintiffs repeat and re-allege paragraphs 1 – 173 as if set forth entirely herein.

183.     The Act operates as an unconstitutional prior restraint, and thereby deprive Plaintiffs and their members and customers of (a) access to constitutionally protected content, and (b) the ability to publish constitutionally protected content on the Internet, in violation of the First Amendment to the United States Constitution.

## COUNT IV

### Inadequate Procedures

184.     Plaintiffs repeat and re-allege paragraphs 1 – 173 as if set forth entirely herein.

185.     The Act affords ISPs, Internet content publishers, and Internet users, including Plaintiffs and their members and customers, inadequate procedural protection of their rights, in violation of the First and Fourteenth Amendments to the United States Constitution.

## COUNT V

**Violation of the Right to Communicate and Access Information Anonymously Under the First and Fourteenth Amendments of the United States Constitution**

186.    Plaintiffs repeat and re-allege paragraphs 1 – 173 as if set forth entirely herein.

187.    The Act violates the First and Fourteenth Amendment right to communicate and access information anonymously, insofar as it effectively requires Internet users to identify themselves in order to gain access to constitutionally-protected speech.

## COUNT VI

**Compelled Speech**

188.    Plaintiffs repeat and re-allege paragraphs 1 – 173 as if set forth entirely herein.

189.    Section 9 of the Act requires Utah-located or connected Internet content publishers, including Plaintiffs and their members and customers, to label their speech as "harmful to minors," in violation of the First and Fourteenth Amendments to the United States Constitution.

## COUNT VII

**Violation of the Commerce Clause Of the United States Constitution**

190.    Plaintiffs repeat and re-allege paragraphs 1 – 173 as if set forth entirely herein.

191.    The Act violates the Commerce Clause because it regulates communications that take place wholly outside of the State of Utah.

192.    The Act violates the Commerce Clause because it constitutes an unreasonable and undue burden on interstate and foreign commerce.

193.    The Act violates the Commerce Clause because it subjects interstate use of the Internet to inconsistent regulations.

## COUNT VIII

### Preemption Under 47 U.S.C. § 230(c)(1)

194.    Plaintiffs repeat and re-allege paragraphs 1 – 173 as if set forth entirely herein.

195.    Portions of the Act violate 47 U.S.C. § 230(c)(1) and as such are preempted pursuant § 230(e)(3) of that statute.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court:

A.    Declare that sections 2 and 4 through 9 of H.B. 260 violate the First, Fifth and Fourteenth Amendments to and the Commerce Clause of the United States Constitution, and that section 2 of the Act violates 47 U.S.C. § 230(c)(1);

B.    Preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from enforcing such provisions;

C.    Award Plaintiffs their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D.   Grant Plaintiffs such other and further relief as the Court deems just

and proper.

Respectfully submitted,

Wesley D. Felix (USB #6539)
Bendinger, Crockett, Peterson,
  Greenwood & Casey
170 South Main, Suite 400
Salt Lake City, Utah 84101
(801) 533-8383

Michael A. Bamberger (Pro Hac Vice pending)
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

John B. Morris, Jr. (Pro Hac Vice pending)
Center for Democracy & Technology
1634 Eye Street, NW # 1100
Washington, DC 20006
(202) 637-9800

Margaret D. Plane (USB # 9550)
ACLU of Utah Foundation Inc.
355 North 300 West
Salt Lake City, UT 84103
(801) 521-9862

Attorneys for Plaintiffs

Dated:    June 9, 2005

# Appendix A

# AMENDMENTS RELATED TO PORNOGRAPHIC

# AND HARMFUL MATERIALS

2005 GENERAL SESSION

STATE OF UTAH

## Chief Sponsor:  John  Dougall

Senate Sponsor:  Curtis S. Bramble

| | | |
|---|---|---|
| Sheryl L. Allen | Fred R. Hunsaker | Paul  Ray |
| Bradley M. Daw | Rebecca D. Lockhart | Aaron  Tilton |
| Margaret  Dayton | Ronda Rudd Menlove | Peggy  Wallace |
| Brent H. Goodfellow | Michael E. Noel | Richard W. Wheeler |
| Gregory H. Hughes | Curtis  Oda | |

## LONG TITLE

**General Description:**

> This bill addresses pornographic materials and material harmful to minors.

**Highlighted Provisions:**

> This bill:

> ‣ requires the Division of Consumer Protection to make public service
announcements;

> ‣ requires the attorney general to establish and maintain a database, called the adult
content registry, of certain Internet sites containing material harmful to minors;

> ‣ defines terms;

> ‣ subjects a person dealing in material harmful to minors to criminal liability for
certain distributions of material harmful to minors if the person negligently or
recklessly fails to determine the proper age of a minor;

> ‣ increases criminal penalties for distributing and inducing acceptance of
pornographic materials;

> ‣ requires a service provider to prevent certain access to Internet material harmful to
minors, if requested by the consumer;

> ‣ requires the Division of Consumer Protection to test the effectiveness of a service

provider's procedures to block material harmful to minors at least annually;

▸   requires a service provider, under certain circumstances, to block material on the adult
content registry;

▸   requires Internet content providers that create or host data in Utah to properly rate the
data;

▸   allows the attorney general to seek a civil fine against a service provider that fails to
properly block material harmful to minors;

▸   provides criminal penalties for certain violations of the provisions requiring a service
provider to block material harmful to minors;

▸   provides a criminal penalty for a content provider's failure to properly rate content;
and

▸   makes technical changes.

**Monies Appropriated in this Bill:**

This bill appropriates:

▸   $100,000 from the General Fund to the Division of Consumer Protection, for fiscal
year 2005-06 only, for public service announcements;

▸   $50,000 from the General Fund to the Division of Consumer Protection, for fiscal
year 2005-06 only, to conduct a research project; and

▸   $100,000 from the General Fund to the attorney general, for fiscal year 2005-06 only,
to establish the adult content registry.

**Other Special Clauses:**

This bill provides an effective date.

**Utah Code Sections Affected:**

AMENDS:

**76-10-1204**, as last amended by Chapters 93 and 163, Laws of Utah 1990

**76-10-1205**, as last amended by Chapter 163, Laws of Utah 1990

**76-10-1206**, as last amended by Chapter 53, Laws of Utah 2000

ENACTS:

**13-2-9**, Utah Code Annotated 1953

**67-5-19**, Utah Code Annotated 1953

**76-10-1230**, Utah Code Annotated 1953

**76-10-1231**, Utah Code Annotated 1953

**76-10-1232**, Utah Code Annotated 1953

**76-10-1233**, Utah Code Annotated 1953

*Be it enacted by the Legislature of the state of Utah:*

Section 1. Section **13-2-9** is enacted to read:

**13-2-9. Internet -- Consumer education.**

(1) The Division of Consumer Protection shall, subject to appropriation, contract with a person to make public service announcements advising consumers about the dangers of using the Internet, especially:

(a) material harmful to minors;

(b) steps a consumer may take to learn more about the dangers of using the Internet;

(c) information about how a service provider can help a consumer learn more about the dangers of using the Internet, including the service provider's duties created by this bill; and

(d) how a consumer can monitor the Internet usage of family members.

(2) Monies appropriated under Subsection (1) shall be paid by the Division of Consumer Protection to a person only if:

(a) the person is a nonprofit organization; and

(b) the person agrees to spend private monies amounting to two times the amount of monies provided by the Division of Consumer Protection during each fiscal year in accordance with Subsection (1).

(3) In administering any monies appropriated for use under this section, the Division of Consumer Protection shall comply with Title 63, Chapter 56, Utah Procurement Code.

Section 2. Section **67-5-19** is enacted to read:

**67-5-19. Adult content registry.**

(1) As used in this section:

(a) "Access restricted" means access restricted as defined in Section 76-10-1230.

(b) "Consumer" means a consumer as defined in Section 76-10-1230.

(c) "Content provider" means a content provider as defined in Section 76-10-1230.

(d) "Hosting company" means a hosting company as defined in Section 76-10-1230.

(e) "Service provider" means a service provider as defined in Section 76-10-1230.

(2) The attorney general, in consultation with other entities as the attorney general considers appropriate, shall:

(a) create a database, called the adult content registry, consisting of a list of content providers' sites, that shall be based on a Uniform Resource Locator address, domain name, and Internet Protocol address or a similar addressing system, that:

(i) are added to the database under Subsection (2)(b); and

(ii) provide material harmful to minors that is not access restricted;

(b) add a content provider site to the adult content registry only if the attorney general determines that the content provider is providing content that contains material harmful to minors that is not access restricted;

(c) when the attorney general determines that a content provider site should be placed on the adult content registry, if the content provider lists e-mail contact information, the attorney general shall notify the content provider and hosting company, if available, by e-mail:

(i) that the content provider is providing content that contains material harmful to minors that is not access restricted;

(ii) that the attorney general will place the content provider site on the adult content registry five business days after the notice is sent;

(iii) that the content provider can avoid being placed on the adult content registry if any material harmful to minors is access restricted; and

(iv) of the steps necessary for the content provider or hosting company to apply to be removed from the adult content registry;

(d) (i) if notification is required under Subsection (2)(c), place a content provider site on

the adult content registry five business days after the day on which the division makes the required notification; or

(ii) if notification is not required under Subsection (2)(c), place a content provider site on the adult content registry five business days after the day on which the attorney general determines that the content provider should be placed on the adult content registry; and

(e) if requested by a content provider, remove a content provider from the adult content registry within two business days from the day on which the attorney general determines that the content provider no longer provides material harmful to minors that is not access restricted.

(3) The attorney general shall make the adult content registry available for public dissemination in a readily accessible access restricted electronic format.

(4) The attorney general shall establish a system for the reporting of material transmitted to a consumer in violation of Section 76-10-1232.

Section 3. Section **76-10-1204** is amended to read:

**76-10-1204. Distributing pornographic material.**

(1) A person is guilty of distributing pornographic material when he knowingly:

(a) sends or brings any pornographic material into the state with intent to distribute or exhibit it to others;

(b) prepares, publishes, prints, or possesses any pornographic material with intent to distribute or exhibit it to others;

(c) distributes or offers to distribute, exhibits or offers to exhibit any pornographic material to others;

(d) writes, creates, or solicits the publication or advertising of pornographic material;

(e) promotes the distribution or exhibition of material he represents to be pornographic; or

(f) presents or directs a pornographic performance in any public place or any place exposed to public view or participates in that portion of the performance which makes it pornographic.

(2) Each distributing of pornographic material as defined in Subsection (1) is a separate

offense.

(3) It is a separate offense under this section for:

(a) each day's exhibition of any pornographic motion picture film; and

(b) each day in which any pornographic publication is displayed or exhibited in a public place with intent to distribute or exhibit it to others.

[(4) Each separate offense under this section is a class A misdemeanor punishable by:]

[(a) a minimum mandatory fine of not less than $100 plus $10 for each article exhibited up to the maximum allowed by law; and]

[(b) incarceration, without suspension of sentence in any way, for a term of not less than seven days, notwithstanding any provisions of Section 77-18-1.]

[(5) If a defendant has already been convicted once under this section, each separate further offense]

(4) (a) An offense under this section is a third degree felony punishable by:

(i) a minimum mandatory fine of not less than $1,000 plus $10 for each article exhibited up to the maximum allowed by law; and [by]

(ii) incarceration, without suspension of sentence in any way, for a term of not less than 30 days.

(b) This Subsection (4) supersedes Section 77-18-1.

(5) A service provider, as defined in Section 76-10-1230, complies with this section if it complies with Sections 76-10-1231 and 76-10-1232.

Section 4.  Section **76-10-1205** is amended to read:

**76-10-1205.   Inducing acceptance of pornographic material.**

(1) A person is guilty of inducing acceptance of pornographic material when he knowingly:

(a) requires or demands as a condition to a sale, allocation, consignment, or delivery for resale of any newspaper, magazine, periodical, book, publication, or other merchandise that the purchaser or consignee receive any pornographic material or material reasonably believed by the purchaser or consignee to be pornographic; or

(b) denies, revokes, or threatens to deny or revoke a franchise, or to impose any penalty, financial or otherwise, because of the failure or refusal to accept pornographic material or material reasonably believed by the purchaser or consignee to be pornographic.

[(2) A violation of this section is a class A misdemeanor punishable by a fine of not less than $500 and by incarceration, without suspension of sentence in any way, for a term of not less than 14 days.]

(2) (a) An offense under this section is a third degree felony punishable by:

(i) a minimum mandatory fine of not less than $1,000 plus $10 for each article exhibited up to the maximum allowed by law; and

(ii) incarceration, without suspension of sentence in any way, for a term of not less than 30 days.

(b) This Subsection (2) supersedes Section 77-18-1.

(3) A service provider, as defined in Section 76-10-1230, complies with this section if it complies with Sections 76-10-1231 and 76-10-1232.

Section 5. Section **76-10-1206** is amended to read:

**76-10-1206.  Dealing in material harmful to a minor.**

(1) A person is guilty of dealing in material harmful to minors when, knowing that a person is a minor, or having negligently or recklessly failed to [exercise reasonable care in ascertaining] determine the proper age of a minor, he:

(a) intentionally distributes or offers to distribute, exhibits or offers to exhibit to a minor any material harmful to minors;

(b) intentionally produces, presents, or directs any performance before a minor, that is harmful to minors; or

(c) intentionally participates in any performance before a minor, that is harmful to minors.

(2) (a) Each separate offense under this section is a third degree felony punishable by:

(i) a minimum mandatory fine of not less than $300 plus $10 for each article exhibited up to the maximum allowed by law; and [by]

(ii) incarceration, without suspension of sentence [in any way], for a term of not less than 14 days.

(b) This section supersedes Section 77-18-1.

(3) (a) If a defendant has already been convicted once under this section, each separate further offense is a second degree felony punishable by:

(i) a minimum mandatory fine of not less than $5,000 plus $10 for each article exhibited up to the maximum allowed by law; and [by]

(ii) incarceration, without suspension of sentence [in any way], for a term of not less than one year.

(b) This section supersedes Section 77-18-1.

(4) (a) A service provider, as defined in Section 76-10-1230, complies with this section if it complies with Sections 76-10-1231 and 76-10-1232.

(b) A content provider, as defined in Section 76-10-1230, complies with this section if it complies with Section 76-10-1233.

Section 6.  Section **76-10-1230** is enacted to read:

**76-10-1230.  Definitions.**

As used in Sections 76-10-1231, 76-10-1232, and 76-10-1233:

(1)  "Access restricted" means that a content provider limits access to material harmful to minors by:

(a)  properly rating content;

(b)  providing an age verification mechanism designed to prevent a minor's access to material harmful to minors, including requiring use of a credit card, adult access code, or digital certificate verifying age; or

(c)  any other reasonable measures feasible under available technology.

(2)  "Adult content registry" means the adult content registry created by Section 67-5-19.

(3)  "Consumer" means a natural person residing in this state who subscribes to a service provided by a service provider for personal or residential use.

(4)  "Content provider" means a person that creates, collects, acquires, or organizes

electronic data for electronic delivery to a consumer with the intent of making a profit.

(5) (a) "Hosting company" means a person that provides services or facilities for storing or distributing content over the Internet without editorial or creative alteration of the content.

(b) A hosting company may have policies concerning acceptable use without becoming a content provider under Subsection (4).

(6) (a) "Internet service provider" means a person engaged in the business of providing a computer and communications facility through which a consumer may obtain access to the Internet.

(b) "Internet service provider" does not include a common carrier if it provides only telecommunications service.

(7) "Properly rated" means content using a labeling system to label material harmful to minors provided by the content provider in a way that:

(a) accurately apprises a consumer of the presence of material harmful to minors; and

(b) allows the consumer the ability to control access to material harmful to minors based on the material's rating by use of reasonably priced commercially available software, including software in the public domain.

(8) (a) Except as provided in Subsection (8)(b), "service provider" means:

(i) an Internet service provider; or

(ii) a person who otherwise provides an Internet access service to a consumer.

(b) "Service provider" does not include a person who does not terminate a service in this state, but merely transmits data through:

(i) a wire;

(ii) a cable; or

(iii) an antenna.

(c) "Service provider," notwithstanding Subsection (8)(b), includes a person who meets the requirements of Subsection (8)(a) and leases or rents a wire or cable for the transmission of data.

Section 7. Section **76-10-1231** is enacted to read:

**76-10-1231.** **Data service providers -- Internet content harmful to minors.**

(1) (a)  Upon request by a consumer, a service provider shall filter content to prevent the transmission of material harmful to minors to the consumer.

(b)  A service provider complies with Subsection (1)(a) if it uses a generally accepted and commercially reasonable method of filtering.

(2)  At the time of a consumer's subscription to a service provider's service, or at the time this section takes effect if the consumer subscribes to the service provider's service at the time this section takes effect, the service provider shall notify the consumer in a conspicuous manner that the consumer may request to have material harmful to minors blocked under Subsection (1).

(3) (a)  A service provider may comply with Subsection (1) by:

(i)  providing in-network filtering to prevent receipt of material harmful to minors; or

(ii)  providing software for contemporaneous installation on the consumer's computer that blocks, in an easy-to-enable and commercially reasonable manner, receipt of material harmful to minors.

(b) (i)  Except as provided in Subsection (3)(b)(ii), a service provider may not charge a consumer for blocking material or providing software under this section, except that a service provider may increase the cost to all subscribers to the service provider's services to recover the cost of complying with this section.

(ii)  A service provider with fewer than 7,500 subscribers may charge a consumer for providing software under Subsection (3)(a)(ii) if the charge does not exceed the service provider's cost for the software.

(4)  If the attorney general determines that a service provider violates Subsection (1) or (2), the attorney general shall:

(a)  notify the service provider that the service provider is in violation of Subsection (1) or (2); and

(b)  notify the service provider that the service provider has 30 days to comply with the provision being violated or be subject to Subsection (5).

(5)  A service provider that violates Subsection (1) or (2) is:

(a) subject to a civil fine of $2,500 for each separate violation of Subsection (1) or (2), up to $10,000 per day; and

(b) guilty of a class A misdemeanor if:

(i) the service provider knowingly or intentionally fails to comply with Subsection (1); or

(ii) the service provider fails to provide the notice required by Subsection (2).

(6) A proceeding to impose a civil fine under Subsection (5)(a) may only be brought by the attorney general in a court of competent jurisdiction.

(7) (a) The Division of Consumer Protection within the Department of Commerce shall, in consultation with other entities as the Division of Consumer Protection considers appropriate, test the effectiveness of a service provider's system for blocking material harmful to minors under Subsection (1) at least annually.

(b) The results of testing by the Division of Consumer Protection under Subsection (7)(a) shall be made available to:

(i) the service provider that is the subject of the test; and

(ii) the public.

(c) The Division of Consumer Protection shall make rules in accordance with Title 63, Chapter 46a, Utah Administrative Rulemaking Act, to fulfil its duties under this section.

Section 8. Section **76-10-1232** is enacted to read:

**76-10-1232. Data service providers -- Adult content registry.**

(1) (a) Upon request by a consumer, a service provider may not transmit material from a content provider site listed on the adult content registry created by Section 67-5-19 to a consumer.

(b) A service provider complies with Subsection (1)(a) if it uses a generally accepted and commercially reasonable method of filtering.

(c) At the time of a consumer's subscription to a service provider's service, or at the time this section takes effect if the consumer subscribes to the service provider's service at the time this section takes effect, the service provider shall notify the consumer in a conspicuous manner that:

(i) the consumer may request to have material on the adult content registry blocked under Subsection (1)(a); and

(ii) the consumer's request to have material harmful to minors blocked under Subsection (1)(a) may also result in blocking material that is not harmful to minors.

(2) (a) A service provider may comply with Subsection (1) by:

(i) providing in-network filtering to prevent receipt of material harmful to minors;

(ii) providing software for contemporaneous installation on the consumer's computer that blocks, in an easy-to-enable and commercially reasonable manner, receipt of material harmful to minors; or

(iii) complying with any federal law in effect that requires the blocking of content from a registry of sites containing material harmful to minors.

(b) A service provider may block material from the adult content registry by domain name or Internet Protocol address.

(c) (i) A service provider may not charge a consumer for blocking material or providing software under this section, except that a service provider may increase the cost to all subscribers to the service provider's services to recover the cost of complying with this section.

(ii) A service provider with fewer than 7,500 subscribers may charge a consumer for providing software under Subsection (2)(a)(ii) if the charge does not exceed the service provider's cost for the software.

(d) A service provider shall coordinate the service provider's list of content providers on the adult content registry with the attorney general's list of content providers on the adult content registry at least weekly.

(3) If the attorney general determines that the service provider violates Subsection (1) or (2), the attorney general shall:

(a) notify the service provider that the service provider is in violation of Subsection (1) or (2); and

(b) notify the service provider that the service provider has 30 days to comply with the provision being violated or be subject to Subsection (4).

(4) A service provider that violates Subsection (1) or (2) is:

(a) subject to a civil fine of $2,500 for each separate violation of Subsection (1) or (2), up to $10,000 per day; and

(b) guilty of a class A misdemeanor if the service provider knowingly or intentionally fails to comply with Subsection (1) or (2).

(5) A proceeding to impose a civil fine under Subsection (4)(a) may only be brought by the attorney general in a court of competent jurisdiction.

Section 9. Section **76-10-1233** is enacted to read:

**76-10-1233. Content providers -- Material harmful to minors.**

(1) A content provider that is domiciled in Utah, or generates or hosts content in Utah, shall restrict access to material harmful to minors.

(2) The Division of Consumer Protection shall make rules in accordance with Title 63, Chapter 46a, Utah Administrative Rulemaking Act, to establish acceptable rating methods to be implemented by a content provider under Subsection (1).

(3) If the attorney general determines that a content provider violates Subsection (1), the attorney general shall:

(a) notify the content provider that the content provider is in violation of Subsection (1); and

(b) notify the content provider that the content provider has 30 days to comply with Subsection (1) or be subject to Subsection (4).

(4) If a content provider violates this section more than 30 days after receiving the notice provided in Subsection (3), the content provider is guilty of a third degree felony.

Section 10. **Appropriation.**

(1) (a) There is appropriated for fiscal year 2005-06 only, $100,000 from the General Fund to the Division of Consumer Protection for public service announcements advising consumers about the dangers of using the Internet.

(b) It is the intent of the Legislature that the money appropriated in Subsection (1)(a) shall be used to publicize in various forms of media:

(i)  the dangers of using the Internet, especially Internet pornography;

(ii)  steps a consumer may take to learn more about the dangers of using the Internet;

(iii)  information about how a service provider can help a consumer learn more about the dangers of using the Internet, including the service provider's duties created by this bill; and

(iv)  how a consumer can monitor the Internet usage of family members.

(2) (a)  There is appropriated for fiscal year 2005-06 only, $30,000 from the General Fund, and for fiscal year 2005-06 ongoing, $70,000 from the General Fund, to the attorney general to establish and maintain the Adult Content Registry created by this bill.

(b)  It is the intent of the Legislature that the attorney general use existing technologies and systems to the extent possible in establishing the Adult Content Registry.

(3) (a)  There is appropriated for fiscal year 2005-06, $50,000 from the General Fund to the Division of Consumer Protection.

(b)  It is the intent of the Legislature that the Division of Consumer Protection use the monies appropriated for fiscal year 2005-06 in Subsection (3)(a) to research the effectiveness of:

(i)  existing and emerging technologies for limiting access to material harmful to minors on the Internet;

(ii)  obstacles to consumers limiting access to material harmful to minors on the Internet; and

(iii)  methods of educating the public about the dangers of using the Internet.

(c)  The Division of Consumer Protection shall report the findings of the research for which monies under Subsection (3)(a) are appropriated to the Utah Technology Commission before December 1, 2005.

Section 11.  **Effective date.**

If approved by two-thirds of all the members elected to each house, this bill takes effect upon approval by the governor, or the day following the constitutional time limit of Utah Constitution Article VII, Section 8, without the governor's signature, or in the case of a veto, the date of veto override, except that Section 76-10-1231 takes effect on January 1, 2006, and Sections 76-10-1232 and 76-10-1233 take effect on May 1, 2006.

JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

See Attached.

**(b)** County of Residence of First Listed Plaintiff   **Salt Lake County**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

See Attached.

## DEFENDANTS

See Attached.

County of Residence of First Listed Defendant   Salt Lake County
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☒ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. section 1983

Brief description of cause:
Challenge to House Bill 260 as violative of the United States Constitution.

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $
- CHECK YES only if demanded in complaint:
- JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE
DOCKET NUMBER

DATE
06/09/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP

Judge Ted Stewart
DECK TYPE: Civil
DATE STAMP: 06/09/2005 @ 08:57:10
CASE NUMBER: 2:05CV00485  TS

# CIVIL COVER SHEET—ATTACHMENT

## I.(a) PLAINTIFFS

THE KING'S ENGLISH, INC.; SAM WELLER'S ZION BOOKSTORE; NATHAN FLORENCE; W. ANDREW MCCULLOUGH; COMPUTER SOLUTIONS INTERNATIONAL, INC.; MOUNTAIN WIRELESS UTAH, LLC.; THE SEXUAL HEALTH NETWORK, INC.; UTAH PROGRESSIVE NETWORK EDUCATION FUND, INC.; AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION; AMERICAN CIVIL LIBERTIES UNION OF UTAH; ASSOCIATION OF AMERICAN PUBLISHERS, INC.; COMIC BOOK LEGAL DEFENSE FUND; FREEDOM TO READ FOUNDATION; and PUBLISHERS MARKETING ASSOCIATION

## I.(C) ATTORNEYS

Wesley D. Felix (USB #6539)
Bendinger Crockett Peterson
170 South Main Street, Ste. 400
Salt Lake City, Utah 84101
(801) 533-8383

John B. Morris
Center for Democracy & Technology
1634 Eye Street, NW # 1100
Washington, DC 20006
(202) 637-9800

Michael A. Bamberger
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Margaret D. Plane (USB #9550)
American Civil Liberties Union
 of Utah Foundation, Inc.
355 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 521-9862

## I. DEFENDANTS

MARK SHURTLEFF, in his official capacity as ATTORNEY GENERAL OF THE STATE OF UTAH; VON J. CHRISTIANSEN, AMY F. HUGIE, N. GEORGE DAINES, GENE E. STRATE, DENNIS L. JUDD, MELVIN C. WILSON, KAREN ALLEN, DAVID A. BLACKWELL, WALLACE A. LEE, HAPPY J. MORGAN, SCOTT F. GARRETT, JARED W. ELDRIDGE, ERIC S. LIND, LERAY G. JACKSON, KELLY M. WRIGHT, MARVIN D. BAGLEY, GEORGE W. "JUDD" PRESTON, DAVID E. YOCOM, CRAIG C. HALLS, ROSS C. BLACKHAM, R. DON BROWN, DAVID R. BRICKEY, DOUGLAS J. AHLSTROM, JOANN STRINGHAM, CARLYLE KAY BRYSON, THOMAS L. LOW, BROCK R. BELNAP, MARVIN D. BAGLEY and MARK R. DECARIA, in their official capacities as UTAH DISTRICT and COUNTY ATTORNEYS