## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE KING'S ENGLISH, INC.; SAM WELLER'S ZION BOOKSTORE; NATHAN FLORENCE; W. ANDREW MCCULLOUGH; IPNS OF UTAH, LLC; RIGIDTECH.COM, INC.; THE SEXUAL HEALTH NETWORK, INC.; UTAH PROGRESSIVE NETWORK EDUCATION FUND, INC.; AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION; AMERICAN CIVIL LIBERTIES UNION OF UTAH; ASSOCIATION OF AMERICAN PUBLISHERS, INC.; COMIC BOOK LEGAL DEFENSE FUND; FREEDOM TO READ FOUNDATION; and PUBLISHERS MARKETING ASSOCIATION, <br><br>       Plaintiffs, <br><br>       V. <br><br> MARK SHURTLEFF, in his official capacity as ATTORNEY GENERAL OF THE STATE OF UTAH; VON J. CHRISTIANSEN, STEPHEN HADFIELD, N. GEORGE DAINES, GENE E. STRATE, BRYAN SIDWELL, TROY RAWLINGS, STEPHEN FOOTE, DAVID A. BLACKWELL, BARRY L. HUNTINGTON, HAPPY J. MORGAN, SCOTT F. GARRETT, JARED W. ELDRIDGE, JOHN E. HUMMEL, RICHARD WADDINGHAM, JANN L. FARRIS, MARVIN D. BAGLEY, GEORGE W. "JUDD" PRESTON, LOHRA L. MILLER, CRAIG C. HALLS, ROSS C. BLACKHAM, DALE EYRE, DAVID R. BRICKEY, DOUGLAS HOGAN, JOANN STRINGHAM, JEFFREY BUHMAN, THOMAS L. LOW, BROCK R. BELNAP, MARVIN D. BAGLEY and MARK R. DECARIA, in their official capacities as UTAH DISTRICT and COUNTY ATTORNEYS, <br><br>       Defendants. | Civil No. 2:05cv00485 |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.    The Internet has revolutionized our society, representing the most participatory marketplace of mass speech yet developed – it is in many ways a far more speech-enhancing medium than radio or television, print, the mails, or even the village green.  Hundreds of millions of people can now engage in interactive communication on a national and global scale via computer networks that are connected to the Internet. The Internet enables average citizens, with a few simple tools and at a very low cost, to participate in local or worldwide conversations, publish an online newspaper, distribute an electronic pamphlet, and communicate with a broader audience than ever before possible.  The Internet provides millions of users with access to a vast range of information and resources.  Internet users are far from passive listeners – rather, they are empowered by the Internet to seek out exactly the information they need and to respond with their own communication, if desired.

2.    The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it.  Unlike television, cable, radio, newspapers, magazines or books, the Internet provides the average citizen with an affordable means for communicating with, accessing and posting content to a worldwide audience.

3.    In 2005, the State of Utah enacted a broadly restrictive censorship law that imposes severe content-based restrictions on the availability, display and dissemination of constitutionally-protected speech on the Internet.  House Bill 260, enacted on March 2, 2005, and signed by Governor Jon Huntsman, Jr. on March 21, 2005 (the "Act"), among other things:

2

- Expands existing Utah law with respect to distribution to minors of harmful to minors material and pornographic material to include Internet content and Internet service providers ("ISPs").

- Requires the Attorney General to create a public "Adult Content Registry" of websites that he has unilaterally declared to include constitutionally-protected harmful to minors material, without any judicial review.

- Requires ISPs either to block access to websites included in the registry and other constitutionally-protected content or to provide filtering software to users.

- Requires Utah-connected content providers to self-evaluate and label the content of their speech, at the risk of criminal punishment.

A copy of the Act is attached hereto as Appendix A.

4.     The Act infringed the liberties of the residents of the State of Utah, imposing the restrictive hand of the State to supplant the power and responsibility of parents to control that which may be viewed by their children. It also infringed the liberties of millions of persons outside Utah who are affected by these restrictions.

5.     Portions of the Act took effect on March 21, 2005, the date of the Governor's signature. The remaining provisions became effective at various times in 2006. The portions of the Act challenged in this lawsuit, however, were enjoined first by a stipulated order entered by the Court on November 28, 2005, and then by a superseding preliminary injunction entered by the Court on August 25, 2006. Pursuant to these and other orders, most proceedings in this case were generally stayed – at the request of the defendants – to give defendants and the Utah legislature opportunities in both 2006 and 2007 to repeal or otherwise correct the challenged provisions of the Act.

6.     On February 28, 2007, the Utah legislature, in response to plaintiffs' claims in this lawsuit and in an attempt to remedy some of the unconstitutional provisions imposed by the Act, passed House Bill 5, which was signed by the Governor on March

19, 2007.  A copy of H.B. 5 is attached hereto as Appendix B.  Among other things, H.B. 5 repealed the provisions of the Act with respect to the Adult Content Registry. While the provisions of H.B. 5, by the terms of the bill, took effect on the date of signature by the Governor, as to the amendments to §§ 76-10-1205, –1206, -1231, and -1233, they have as yet no practical effect by reason of the preliminary injunction entered by this Court on August 25, 2006.

7.    While certain portions of H.B. 5 made changes to the provisions of H.B. 260 that are challenged in this action, apart from the fully repealed Adult Content Registry, the changes made by H.B. 5 do not cure the constitutional defects in the resulting statutory provisions.

8.    This action seeks to have the Act, as amended by H.B. 5 (the "Amended Act") declared facially unconstitutional and void, and to have the State enjoined from enforcing the Amended Act, by reason of the First, Fifth, and Fourteenth Amendments to, and the Commerce Clause of, the United States Constitution.

9.    With respect to the application to the Internet of the criminal provisions relating to distribution to minors of harmful to minors materials, 18 federal judges, including three Courts of Appeal and one State Supreme Court, have struck down as unconstitutional laws in Arizona, Michigan, New Mexico, New York, South Carolina, Vermont, Virginia, and Wisconsin similar to the Act.  In addition, the United States Supreme Court invalidated a similar federal law on First Amendment grounds in Reno v. ACLU, 521 U.S. 844 (1997), aff'g 929 F. Supp. 824 (E.D.Pa. 1996), and, only weeks ago, the U.S. District Court for the Eastern District of Pennsylvania invalidated the

subsequent federal statute (<u>ACLU v. Gonzales</u>, ___ F. Supp.2d ___, No. 98-5591 (E.D. Pa. Mar. 22, 2007)).

10. While the application of restrictions on the distribution of harmful to minors materials over the Internet is limited by the terms of the preliminary injunction, ambiguity is raised by the amendment of § 76-10-1201(4)(a) by H.B. 5 (the "Of/with Amendment"). That amendment changed Utah's harmful to minors statute from addressing a "prurient interest in sex <u>of</u> minors" to addressing a "prurient interest in sex <u>with</u> minors." It is not clear whether this change is meant to limit "harmful to minors" materials to (a) descriptions or representations of nudity, sexual conduct, sexual excitement or sadomasochistic abuse ("Explicit Sex") where one or both of the participants is a minor; (b) descriptions or representations of Explicit Sex where neither of the participants is a minor but which appeals to the prurient interest of a minor in sex with or among minors; or (c) some other category of materials. Under any explanation as to the meaning of the statute as amended by the "Of/with Amendment," the resulting statute violates the First Amendment.

11. With respect to requiring ISPs to block access to particular websites on the Internet, the U.S. District Court for the Eastern District of Pennsylvania invalidated a similar Pennsylvania state law, finding the law to be unconstitutional on both First Amendment and Commerce Clause grounds. <u>Center for Democracy & Technology v. Pappert</u>, 337 F. Supp. 2d 606 (E.D. Pa. 2004). In that case, the court found that as a result of the ISPs' attempts to comply with blocking orders requiring ISPs to block access to fewer than 400 websites, the ISPs unavoidably <u>also</u> blocked access to more

than one million completely unrelated websites. Id. at 624, 642 (Findings of Facts ¶¶ 77, 189).

12.    Since essentially all speech on the Internet is accessible in Utah, regardless of the geographical location of the person who posted it, the Act threatened Internet users nationwide and even worldwide. Moreover, because blocking a website often results in blocking wholly unrelated websites communicating constitutionally protected speech, the Act threatened an enormous array of websites and their users.

13.    Because of the way the Internet works, the Amended Act's prohibition on distributing to minors material by the Internet that is "harmful to minors" effectively bans distribution of that same material to adults.

14.    The speech targeted by the Amended Act – material that is asserted to be "harmful to minors" – is or includes that which is constitutionally protected for adults. This includes, for example, valuable works of literature and art, safer sex information, examples of popular culture, and a wide range of robust human discourse about current issues and personal matters that may include provocative or sexually oriented language and images.

15.    The Amended Act inevitably means that Internet content providers will limit the range of their speech, because there are no reasonable technological means that enable users of the Internet to ascertain the age of persons who access their communications, or to restrict or prevent access by minors to certain content. Consequently, the Amended Act reduces adult speakers and users in cyberspace to reading and communicating only material that is suitable for young children.

16.   In addition, the Amended Act prohibits speech that is valuable and constitutionally protected for minors, especially older minors.

17.   To the extent any ISPs comply with certain sections of the Amended Act by blocking access to certain websites, the Amended Act inevitably means that access to other unrelated and wholly innocent websites will also be blocked.  Moreover, the blocking of websites (both those targeted by the Amended Act and the unrelated websites) will in most cases prevent all customers of an ISP, both in Utah and elsewhere in the country, from accessing the websites.  In some other cases, an ISP will not have the technical capability to block their customers' access to specified websites on the Internet.

18.   The Amended Act violates the First Amendment and Commerce Clause rights of plaintiffs, their members, their users and tens of millions of other speakers and users of the Internet, and threatens them with irreparable harm.

19.   In addition, the Amended Act violates the Commerce Clause of the United States Constitution because it regulates commerce occurring wholly outside of the State of Utah, because it imposes an impermissible burden on interstate and foreign commerce, and because it subjects interstate use of the Internet to inconsistent state regulations.  An online content provider outside of Utah cannot know whether someone in Utah might download his or her content posted on the Web; consequently, the content provider must comply with Utah law or face the threat of criminal prosecution.

20.   Plaintiffs seek permanent injunctive relief prohibiting enforcement of the Amended Act.

## JURISDICTION AND VENUE

21.   This case arises under the U.S. Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).  It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and F.C.R.P. 65.

22.   Venue is proper in this district under 28 U.S.C. § 1391(b).

## THE PARTIES

23.   Plaintiffs represent a broad range of individuals and entities who are speakers, content providers and access providers on the Internet.  Plaintiffs post and discuss content including resources on sexual advice for disabled persons, AIDS prevention, visual art and images, literature and books and resources for gay and lesbian youth.

24.   Plaintiffs have a direct interest in representing, and providing services to, their members and users, including in their ability to send First Amendment-protected content through the Internet.

25.   Plaintiff THE KING'S ENGLISH, INC. is a 30-year-old, locally-owned independent book store in Salt Lake City.  The King's English Bookshop carries a broad range of books, publishes a newsletter with book reviews and other news about books and hosts frequent readings and signings by a variety of authors.  It maintains a website at kingsenglish.booksense.com and distributes a monthly Internet newsletter.  The King's English, Inc. has its principal place of business in Salt Lake City, Utah.  It sues on its own behalf and on behalf of users of its website.

26. Plaintiff SAM WELLER'S ZION BOOKSTORE was established in Salt Lake City in 1929. Sam Weller's Zion Bookstore carries a wide variety of new, used and rare books, and maintains an extensive online collection available through its website, www.samwellers.com, as well as through a number of other third party websites. It also publishes its newsletter on the website. Sam Weller's has its principal place of business in Salt Lake City, Utah. It sues on its own behalf and on behalf of users of its website.

27. Plaintiff NATHAN FLORENCE is a Salt Lake City artist who sells and displays his artwork on the World Wide Web, as well as in local and regional galleries. Some of Mr. Florence's art depicts nude figures in a tradition that is centuries old. Mr. Florence maintains a website at www.nflorencefineart.com. He sues on his own behalf and on behalf of users of his website.

28. Plaintiff W. ANDREW MCCULLOUGH was a candidate for Attorney General of Utah in the 2004 election, and operates a campaign website at www.andrewmccullough.org. He anticipates running for state-wide office again in the future, and therefore continues to maintain his website. Mr. McCullough's website is dedicated to legal issues that are of interest to him and his supporters. His website shares an Internet Protocol Address with more than 45,000 other, unrelated sites, some of which contain material that may be deemed harmful to minors. Mr. McCullough sues on his own behalf and on behalf of users of www.andrewmccullough.org on the World Wide Web.

29. Plaintiff IPNS OF UTAH, LLC, the successor to COMPUTER SOLUTIONS INTERNATIONAL, INC., d/b/a CSolutions ("CSolutions"), is an Internet service provider that provides Internet access and web hosting services to customers in and outside of

9

the state of Utah. CSolutions is organized in Utah and has its principal place of business in Salt Lake City. CSolutions sues on its own behalf, and on behalf of its customers, who are both users of the Internet and publishers of content available on the Internet.

30. Plaintiff RIGIDTECH.COM, INC. ("RigidTech") is an Internet service provider that provides Internet access and web hosting services to customers in and outside of the state of Utah. RigidTech is incorporated in Utah and has its principal place of business in Salt Lake City, Utah. RigidTech sues on its own behalf, and on behalf of its customers, who are both users of the Internet and publishers of content available on the Internet.

31. Plaintiff THE SEXUAL HEALTH NETWORK, INC. ("The Sexual Health Network") is a small, Internet-based company incorporated in the State of Connecticut. It maintains a Web site at www.sexualhealth.com. The Sexual Health Network was founded in May 1996, by Dr. Mitchell Tepper while he was working on his doctoral dissertation at the University of Pennsylvania Program in Human Sexuality Education. Dr. Tepper also has a Master in Public Health degree from the Yale University School of Medicine. Dr. Tepper is currently the President of the Sexual Health Network. The Sexual Health Network is dedicated to providing easy access to sexuality information, education and other sexuality resources for people with disability, chronic illness or other health-related problems. The Sexual Health Network sues on its own behalf and on behalf of users of sexualhealth.com on the World Wide Web.

32. Plaintiff UTAH PROGRESSIVE NETWORK EDUCATION FUND, INC. ("UPNet") is a coalition of organizations and individuals committed to promoting social,

10

racial, economic and environmental justice. The groups involved in the coalition are committed to civil rights and liberties and use communication to unite people around a better understanding of issues. UPNet operates a website at www.upnet.org that serves as a resource for the community on a wide range of issues. Its website shares an Internet Protocol Address with more than 1700 other, unrelated websites, some of which contain material harmful to minors. UPNet sues on its own behalf, on behalf of its members, and on behalf of users of its website.

33. Plaintiff AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION ("ABFFE") was organized as a not-for-profit organization by the American Booksellers Association in 1990 to inform and educate booksellers, other members of the book industry and the public about the dangers of censorship, and to promote and protect the free expression of ideas, particularly freedom in the choice of reading materials. ABFFE is incorporated in Delaware and has its principal place of business in New York City. ABFFE, most of whose members are bookstores in the United States, sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the patrons of their member bookstores.

34. Plaintiff AMERICAN CIVIL LIBERTIES UNION OF UTAH ("ACLU of Utah") is the Utah affiliate of the American Civil Liberties Union, a nationwide, nonpartisan organization of nearly 300,000 members dedicated to defending the principles of liberty and equality embodied in the Constitution, including the Bill of Rights. The ACLU of Utah has more than 2,300 members, is incorporated in Utah and has its principal place of business in Salt Lake City. The ACLU of Utah sues on its own behalf, and on behalf

11

of its members who use online computer communications systems. The ACLU of Utah maintains a website at www.acluutah.org.

35.    Plaintiff ASSOCIATION OF AMERICAN PUBLISHERS, INC. ("AAP") is the national association of the United States book publishing industry. AAP's approximately 300 members include most of the major commercial book publishers in the United States, as well as smaller and non-profit publishers, university presses and scholarly associations. AAP members publish hardcover and paperback books in every field, scholarly journals, and a range of educational materials for the elementary, secondary, post-secondary and professional markets. Members of AAP produce computer software and electronic products and services. AAP is incorporated in New York, and has its principal places of business in New York City and in the District of Columbia. AAP represents an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment. AAP sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the readers of its members' books.

36.    Plaintiff COMIC BOOK LEGAL DEFENSE FUND ("CBLDF") is a non-profit corporation dedicated to defending the First Amendment Rights of the comic book industry. CBLDF, which has its principal place of business in New York, New York, represents over 1,000 comic book authors, artists, retailers, distributors, publishers, librarians and readers located in Utah, throughout the country and the world. Some of the comic books created, published, distributed and offered for sale by CBLDF's members, though constitutionally protected, could be deemed to be harmful to minors and therefore subject to the Amended Act. The First Amendment rights of CBLDF and

its members will be adversely affected unless the Amended Act is enjoined. CBLDF sues on its own behalf, on behalf of its members, and on behalf of the readers of their materials.

37. Plaintiff FREEDOM TO READ FOUNDATION, INC. ("FTRF") is a non-profit membership organization established in 1969 by the American Library Association to promote and defend First Amendment rights, to foster libraries as institutions fulfilling the promise of the First Amendment for every citizen, to support the rights of libraries to include in their collections and make available to the public any work they may legally acquire and to set legal precedent for the freedom to read on behalf of all citizens. FTRF is incorporated in Illinois and has its principal place of business in Chicago. FTRF sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the patrons of its member libraries.

38. Plaintiff PUBLISHERS' MARKETING ASSOCIATION ("PMA") is a nonprofit trade association representing more than 4,200 publishers across the United States and Canada. The PMA represents predominantly nonfiction publishers and assists members in their marketing efforts to the trade. PMA is incorporated in California, and has its principal office in Manhattan Beach, California. PMA sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of readers of its members' publications.

39. Defendant MARK SHURTLEFF is the Attorney General of the State of Utah and is sued in his official capacity as such. He is the chief law enforcement officer of the State of Utah. In addition to specific duties given to him under the Amended Act, pursuant to Utah Code § 67-5-1, defendant Shurtleff shall "prosecute...all causes to

13

which the state…is a party" and shall "exercise supervisory powers over the district and county attorneys of the state in all matters."

40. Defendants VON J. CHRISTIANSEN, STEPHEN HADFIELD, N. GEORGE DAINES, GENE E. STRATE, BRYAN SIDWELL, TROY RAWLINGS, STEPHEN FOOTE, DAVID A. BLACKWELL, BARRY L. HUNTINGTON, HAPPY J. MORGAN, SCOTT F. GARRETT, JARED W. ELDRIDGE, JOHN E. HUMMEL, RICHARD WADDINGHAM, JANN L. FARRIS, MARVIN D. BAGLEY, GEORGE W. "JUDD" PRESTON, LOHRA L. MILLER, CRAIG C. HALLS, ROSS C. BLACKHAM, DALE EYRE, DAVID R. BRICKEY, DOUGLAS HOGAN, JOANN STRINGHAM, JEFFREY BUHMAN, THOMAS L. LOW, BROCK R. BELNAP, MARVIN D. BAGLEY and MARK R. DECARIA are District and County Attorneys for all of the counties in Utah and are sued in their official capacity as such. They have authority to prosecute criminal violations in their respective counties.

## FACTS

41. Many of the claims raised in this Amended Complaint arise because of the specific technical aspects of Internet communications and the capabilities (or lack of capabilities) of Internet content providers and Internet service providers. The facts in this Amended Complaint are organized into four major sections. First, the Amended Complaint provides a general overview of Internet communications. Second, the Amended Complaint describes a number of technical details about how Internet content providers make content available as part of the "World Wide Web," and how the Web and other communications flow over the Internet. Third, the different elements of the

14

Amended Act challenged in this Amended Complaint are identified. And fourth, the Amended Complaint details the impact of the Amended Act on Internet communications in general, and on the rights of the Plaintiffs in particular.

## A. An Overview of Internet Communications

42. The Internet is a decentralized, local medium of communication that links people, institutions, corporations and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. Although estimates are difficult due to its constant and rapid growth, the Internet is currently believed to connect more than 888 million users worldwide. In addition, in 2002, 31 billion email messages were sent per day. It is expected that by 2006, this number should reach 60 billion email messages per day.

43. Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the Internet or limits the ability of others to access such materials. Rather, the range of digital information available to Internet users – which includes text, images, sound and video – is individually created, maintained, controlled and located on millions of separate individual computers around the world.

### How People Access the Internet

44. Individuals have several easy means of gaining access to the Internet. Many educational institutions and businesses, including Plaintiffs, as well as local communities provide a variety of ways to allow users to easily access the Internet.

45. Almost all libraries provide their patrons with free access to the Internet through computers located at the library. Some libraries also host online discussion

groups and chat rooms. Many libraries also post their card catalogs and online versions of material from their collections.

46. In the United States, most people access the Internet through companies known as Internet service providers ("ISPs"). Home Internet users are likely to contract on a monthly or annual basis with an ISP, and will access that ISP's network over a "dial-up" telephone line, or a higher-speed connection such as a cable "DSL," or wireless circuit. Some ISPs charge a monthly fee ranging from $15-50 monthly, but some provide their users with free or very low-cost Internet access. National "commercial online services," such as America Online, serve as ISPs and also provide subscribers with additional services, including access to extensive content within their own proprietary networks.

47. Similarly, businesses in the United States commonly contract with an ISP to provide Internet access to their employees, or to connect their internal computer network to the ISP's network (which is in turn connected to the greater Internet). Many businesses connect to their ISP's networks (and the Internet) over dedicated high-speed connections, while other businesses access the Internet over dial-up telephone lines.

**Ways of Exchanging Information on the Internet**

48. Users need not identify themselves to access most of the information on the Internet. Although in many (but not all) cases, users identify themselves to their ISPs (or their schools, employers or other entities providing Internet access), once connected to the Internet, the users generally do not need to identify themselves further in order to be able to access content on the Internet. Further, the user names or email addresses selected by many Internet users for their Internet communications seldom, if ever,

16

provide enough information to indicate the users' real identities. Indeed, many user names are pseudonyms or pen names that often provide users with a distinct online identity and help to preserve their anonymity and privacy. America Online, for example, allows every subscriber to use up to six different "screen names," which may be used for different family members or for separate pseudonyms for a single individual.

49. Once an individual is connected to the Internet, there are a wide variety of methods for obtaining information, and for communicating with other users.

50. **Email.** The simplest and perhaps most widely used method of communication on the Internet is via electronic mail, commonly referred to as "email." Using one of many available "mailers" – software capable of reading and writing an email – a user is able to address and transmit via computer a message to a specific individual or group of individuals who have email addresses.

51. **Discussion Groups.** Online discussion groups are another of the most popular forms of communication via computer networks. Discussion groups allow users to post messages onto a public computerized "bulletin board" and to read and respond to messages posted by others in the discussion group. Discussion groups have been organized on many different computer networks and cover virtually every topic imaginable. Discussion groups can be formed by individuals, institutions or organizations or by particular computer networks.

52. "USENET" newsgroups are a popular set of discussion groups available on the Internet and other networks. Currently there are USENET newsgroups on more than 30,000 different subjects, and over 100,000 new messages are posted to these groups each day.

53.  "Web logs" or "blogs" are another very popular form of discussion forum, in which one or a small number of "bloggers" can lead discussions on whatever topics concern the bloggers or the discussion group.  Estimates of how many blogs exist today range from 10 to 50 million separate blogs available on the Internet.

54.  **Mailing Lists.**  Similarly, users also can communicate within a group by subscribing to automated electronic mailing lists that allow any subscriber to a mailing list to post a particular message that is then automatically distributed to all of the other subscribers on that list.  These lists are sometimes called "mail exploders" or "listservs."

55.  **Chat Rooms.**  "Chat rooms" also allow users to engage in simultaneous conversations with another user or group of users by typing messages and reading the messages typed by others participating in the "chat."  Chat rooms are available on the Internet and on commercial online services.  Although chat rooms are often set up by particular organizations or networks, any individual user can start an online "chat."

56.  Users of any of the above methods of Internet communication can send or view images as well as text, and images are frequently distributed via these media to users throughout the world.

57.  Online discussion groups, mailing lists, and chat rooms create an entirely new global public forum – a cyberspace village green – where people can associate and communicate with others who have common interests and engage in discussion or debate on every imaginable topic.

**The World Wide Web**

58.  The World Wide Web (the "Web") is the most popular way to provide and retrieve information on the Internet.  Anyone with access to the Internet and proper

18

software can create "webpages" or "homepages" which may contain many different types of digital information – text, images, sound and even video. The Web comprises hundreds of millions of separate "websites" and "webpages" that display content provided by particular persons or organizations. Any Internet user anywhere in the world with the proper software can create her own webpage, view webpages posted by others, and then read text, look at images and video and listen to sounds posted on these websites.

59. The Web serves in part as a global, online repository of knowledge, containing information from a diverse array of independent and distributed sources that are easily accessible to Internet users around the world. Though information on the Web is contained on millions of independent computers, each of these computers is connected to the Internet through communications "protocols" that allow the information on the Web to become part of an interconnected body of knowledge accessible by all webusers.

60. Many large corporations, banks, brokerage houses, newspapers and magazines now provide online editions of their publications and reports on the Web or operate independent websites. Many government agencies and courts also use the Web to disseminate information to the public. For example, defendants Mark Shurtleff and the District Attorney of Salt Lake County have posted Internet websites containing information available to the public, as have all of the plaintiffs. In addition, many individual users and small community organizations have established individualized homepages on the Web that provide information of interest to members of the particular organization, communities and to other individuals.

19

61.    To gain access to the information available on the Web, a person generally uses a Web "browser" – software such as Internet Explorer or Mozilla Firefox – to display, print and download documents that are formatted in the standard Web formatting language.  Generally, each document on the Web has an address that allows users to find and retrieve it, but some websites dynamically create addresses so that a given document may not always have the same address.

62.    Most Web documents also contain "links."  These are short sections of text or image that refer and link to another document.  Typically the linked text is blue or underlined when displayed, and when selected by the user on her computer screen, the referenced document is automatically displayed, wherever in the world it actually is stored.  Links, for example, are used to lead from overview documents to more detailed documents on the same website, from tables of contents to particular pages, and from text to cross-references, footnotes, and other forms of information.  For example, plaintiff Utah ACLU's Web homepage provides links to several other webpages, including publications, press releases and legislative information.

63.    Links may also take the user from the original website to another website on a different computer connected to the Internet, a computer that may be located in a different area of the country, or even the world.  For example, plaintiff Utah ACLU's website links to the website of the National ACLU.  This link appears seamless from the user's point of view; in fact the national website is located on an entirely separate computer that is not maintained or controlled by the Utah ACLU.

64.    Through the use of these links from one computer to another, a user can move from one document to another, unifying the diverse and voluminous information

made available by millions of users on the Internet into a single body of knowledge that can be searched and accessed.

65.   A number of "search engines" and directories – such as Google and Yahoo – are available free of charge to help users navigate the World Wide Web.  Once a user has accessed the search service, he or she simply types a word or string of words as a search request, and the search engine provides a list of websites that contain or relate to the search string.

## The Interactive Character of Communication Over the Internet

66.   As can be seen from the various ways that people can exchange information and communicate via this new technology, the Internet is "interactive" in ways that distinguish it from traditional communication media.  For instance, users are not passive receivers of information as with television and radio; rather, a user can easily respond to the material he or she receives or views online.  In addition, "interactivity" means that Internet users must actively seek out with specificity the information they wish to retrieve and the kinds of communications in which they wish to engage.  For example, to gain access to material on the World Wide Web, a user must know and type the address of a relevant website or find the website by typing a relevant search string in one of several available search engines or activate a website link. Similarly, a user wishing to view text posted to a newsgroup must log on to the Internet and then connect to a USENET server, select the relevant group, review the relevant header lines – which provide brief content descriptions – for each message and then access a particular message to read its content.

21

## The Range of Content Available on the Internet

67. The information made available on the Internet is as diverse as human thought. Content on the Internet is provided by the millions of Internet users worldwide, and the content ranges from academic writings, to humor, to art, to literature, to medical information, to music, to news, to movie clips and to human sexuality. For example, on the Internet one can view the full text of the Bible, all of the works of Shakespeare and numerous other classic works of literature. One can browse through paintings from museums around the world, view in detail images of the ceiling of the Sistine Chapel, watch or download motion pictures or hear selections from the latest rap music albums. At any one time, the Internet serves as the communication medium for literally hundreds of thousands of global conversations, political debates and social dialogues. It is a global art museum, movie theater, bookstore, research facility and Hyde Park.

68. Although the overwhelming majority of the websites on the Internet do not involve nudity or sexual activity, such material is available on the Internet. For example, an Internet user can read online John Cleland's eighteenth-century novel, Fanny Hill: Memoirs of a Woman of Pleasure; view sixteenth-century Italian paintings of nude women, eighteenth-century Japanese erotic prints, and twentieth-century images; text discussing ways for married couples to improve their physical relationships, portraying methods of practicing safer sex, and depicting the method for conducting a breast self-examination and breast feeding; as well as commercial pornography. Much of this material is similar, if not identical, to material that is routinely discussed in cafes and on the street corners and distributed through libraries, bookstores, record stores and newsstands.

22

## B.  Technical Details About Internet and Web Communications

69.  As discussed above, most people access the Internet through ISPs.  A network of a typical ISP is in turn connected, directly or indirectly, to all other ISPs in the world, which are in turn connected to their customers.  Collectively, all of these ISPs and their customers comprise the global Internet.

70.  For accessing content on the World Wide Web, the most common sequence is for a user to request content from a website and for the website to return individual webpages to the user.  This sequence is illustrated as follows, with the initial request shown by the arrows on the left, and the response shown by the arrows on the right:



71.  In the vast majority of cases, the user's ISP is different from the website's ISP.  Thus, the user's ISP does not typically have any knowledge of or relationship with the actual owner of the website.

72.  Individuals, businesses, governments and other institutions (hereafter "web publishers") that want to make content broadly available over the Internet can do so by creating a website on the World Wide Web.

73.  To make a website available on the World Wide Web, a web publisher must place the content or "webpages" onto a computer running specialized "web server"

23

software. This computer, known as a "web server," transmits the requested webpages in response to requests sent by users on the Internet.

74. Web publishers have a variety of options for making a website available over a web server. First, a web publisher can own and operate a web server on the web publisher's premises (including, possibly, the web publisher's home). In this case, a web publisher would contract with an ISP for Internet access, and through that connection would connect the web server to the Internet.

75. Second, and far more commonly today, a web publisher may contract with a "web host" (or an ISP that also operates as a "web host") to own and operate the necessary web server on the web host's premises (or third party premises arranged by the web host). A web host will typically operate one or more web servers that can store the web pages for customers and make those web pages generally available to users on the Internet.

76. Typically, when creating a website, a web publisher obtains a "domain name" that can be used to designate and locate the website. For example, plaintiff THE SEXUAL HEALTH NETWORK, INC., obtained the domain name "sexualhealth.com" for use with its website.

77. A domain name can be coupled with additional information to create a "Uniform Resource Locator," or "URL," which represents a more complete way to designate the location of certain content or other resources on the Internet.

78. A URL is the commonly used textual designation of an Internet website's "address." Thus, for example, the URL of plaintiff's website referenced above is "http://www.sexualhealth.com." The "http" indicates that the "Hypertext Transfer

Protocol" (the main protocol used to transmit World Wide Web pages) is to be used. The "www.sexualhealth.com" indicates a name that can be used to locate the specific web server(s) that can contain the content for the requested website.

79.    A web page accessed by a URL like "http://www.sexualhealth.com" is commonly referred to as the "homepage" of the website. A URL could also contain a reference to a specific "sub-page" that is contained in a website (such as "http://www.sexualhealth.com/aboutus.php"). A single website can contain thousands of different webpages. Although in many cases the same web publisher is responsible for all pages and sub-pages on a website, in other situations (including but not limited to that described in the following paragraph) wholly different and independent web publishers are responsible for different sub-pages on a single website.

80.    Beyond the methods described immediately above, web publishers can use another common method to make webpages available on the World Wide Web. A web publisher can place content with a service provider that operates a "community" of users on the Internet and offers to host webpages of the users as part of its service (hereafter "Online Community"). This type of Online Community exists only in "cyberspace," and does not relate to any particular physical community. In the United States, for example, GeoCities is a popular Online Community, and GeoCities hosts webpages of its tens of thousands of users (which commonly are individuals, or very small businesses or organizations). There are also smaller Online Communities that individuals might host out of their homes. A key difference with publishing web content through an Online Community is that web publishers' webpages do not typically have their own domain name. For example, the Green Party of Ogden, Utah, is part of the

GeoCities Online Community, and its webpages are available at the URL "http://www.geocities.com/greenpartyogden."

81. Although a URL such as http://www.sexualhealth.com or http://www.geocities.com/greenpartyogden provides enough information for a human user to access the desired Internet website, the URLs alone are not sufficient for the user's computer to locate the website. The user's computer must first determine the numeric "Internet Protocol Address" or "IP Address" of the desired website. When a user seeks to access a particular URL, the user's computer does a "look up" through a hierarchy of global databases to determine the IP Address of the computer server that can provide the desired webpages.

82. In the most commonly used method, IP Addresses are expressed as a series of four numbers separated by periods. Thus, for example, the IP Address of the website designated by http://www.sexualhealth.com is 72.3.225.42. This numeric IP Address provides a user's computer with a precise address of the web server to which the user's computer must send a request for web pages with the URL http://www.sexualhealth.com.

83. Most ISPs receive and forward Internet communications based solely on the IP Address of the destination of the communication, wholly without regard to the specific content of the communication. Thus, a typical ISP would handle an email message addressed to a specific IP Address in exactly the same way that it would handle a webpage that is being sent to the same IP Address.

84. Indeed, for most ISPs, the network does not "read" or analyze the content of the communication in order to be able to determine whether the communication was

an email, a webpage or some other type of Internet communication. Moreover, the networks of most ISPs do not include the physical equipment that would be necessary to analyze every communication passing through the network, and do not have the ability to take any action based on the content of the communication.

85.   Although a specific URL in general refers only to one specific website, the same is not true for IP Addresses – there is not a one-to-one correlation between URLs and IP Addresses. An individual web server computer – with a single IP Address – can "host" tens, hundreds, thousands or even hundreds of thousands of different websites. Thus, many different websites (each with their own unique URLs) can be hosted on the same physical web server, and all can share the same IP Address of that web server.

86.   For example, 216.185.128.200 is the IP Address of the website www.andrewmccullough.org. But that exact same numeric IP Address is also used by more than 34,000 other wholly unrelated websites (including, for example, the websites of a  Valley winemaker, , a Phoenix bookstore, www.anasazibooks.com, a Wisconsin scuba diving club, www. 4seasonsscubadivers.com, and a Missouri religious ministry site, www. 70x7ministries.org). If a user on the Internet seeks to access the www.andrewmccullough.org website, the user's ISP knows only that the user is sending a communication to 216.185.128.200. The user's ISP does not "open" or "read" the communication to determine which specific website is actually being requested.

87.   Although ISPs transport most Internet communications without looking at any information other than the IP Address, a web server that supports multiple websites does "read" the full web request in order to determine which website is being requested. In the example of www.andrewmccullough.org, the web server located at

27

216.185.128.200 will read any web request it receives to determine which of the thousands of websites located at that address should be provided.

## C. The Provisions of the Amended Act

88. The Amended Act has a number of different coordinating and overlapping provisions. The Complaint challenges four components as detailed below:

89. **Extension of Utah Harmful-to-Minors Materials Law to the Internet.** Section 5 (amending Utah Code § 76-10-1206) expands existing Utah law with respect to distribution to minors of "harmful to minors" material to include Internet content publishers and ISPs. Plaintiffs challenge this section as unconstitutional.

90. As noted above, H.B. 5 amended the language of § 76-10-1206 by changing a reference to a "prurient interest in sex of minors" to a "prurient interest in sex with minors." This change creates significant confusion as to the meaning of that statutory section, but in any event is unconstitutional.

91. **Mandatory Labeling.** Section 9 enacts Utah Code § 76-10-1233, which requires Utah-connected Internet content providers to self-evaluate and label the content of their speech, at the risk of criminal punishment. Plaintiffs challenge this section as unconstitutional. This provision was not altered by H.B. 5.

92. **Mandated ISP Blocking of "Pornographic" Material as Determined by the ISP's Customers.** Section 4 amends Utah Code § 76-10-1205 and effectively requires ISPs to block access to "any pornographic material or material reasonably believed by [a customer] to be pornographic." Plaintiffs challenge this section as unconstitutional.

28

93. H.B. 5 amended § 76-10-1205 but did so in such a way as to broaden its unconstitutional reach. As originally amended by H.B. 260, § 76-10-1205 unconstitutionally applied to Internet Service Providers. As amended by H.B. 5, § 76-10-1205 unconstitutionally applies to both Internet Service Providers and Web Hosting providers. Plaintiffs challenge both aspects of the revised § 76-10-1205 as unconstitutional.

94. **Mandated ISP Blocking of Harmful-to-Minors Material.** Section 7 enacts Utah Code § 76-10-1231, which requires ISPs to block access to "harmful to minors" material. Plaintiffs challenge this section as unconstitutional.

95. H.B. 5 amended § 76-10-1231 by incorporating language suggested by plaintiffs to ensure that the First Amendment rights of customers of ISPs are not violated pursuant to this section. As amended, however, § 76-10-1231 continues to violate the Commerce Clause of the U.S. Constitution and is challenged here as unconstitutional.

96. Since plaintiffs were successful in having the provisions relating to the Adult Content Registry repealed, plaintiffs' challenge of those provisions in the Complaint is now moot.

97. Some but not all of the challenged sections that impose obligations on ISPs to block access to certain content are triggered by the affirmative requests of individual customers of the ISPs. Because of the technical realities of the Internet and the operations of most ISPs, in many circumstances the ISPs will implement any blocking across their entire network and thus the access to lawful websites by non-requesting customers will also be blocked. For this and other reasons, the "customer choice" approach does not cure the constitutional defects raised in this Complaint.

98.   Many of the obligations imposed on ISPs by the Amended Act can be satisfied if an ISP provides to a requesting customer filtering software that the customer can install on his or her own computer.  Although plaintiffs believe that governmental promotion of the voluntary use of such filtering software is a constitutionally less restrictive alternative to the challenged sections of the Amended Act, ISPs are specifically given the option by the Amended Act of blocking access to websites using technical means that will also block access to unrelated sites.  For this and other reasons, the inclusion of the "filtering software option" does not eliminate the overall unconstitutional impact of the challenged sections under both the First Amendment to and the Commerce Clause of, the U.S. Constitution.

## D.   Impact of the Amended Act on Internet Speech and Communications in General, and on the Plaintiffs in Particular

99.   The harmful impacts of the Amended Act on Internet speech in general, and on the plaintiffs in particular, are far reaching.  Because the Amended Act is multi-faceted, the impacts on speech are discussed below with regard to each of the four different facets of the Amended Act challenged in this Amended Complaint.  Following that is a discussion of the impact on interstate commerce that flows from all of the challenged sections of the Amended Act.  Concluding is a discussion of the impact on the individual plaintiffs.

## The Amended Act's Impact on Internet Speech

### Extension of Utah Harmful-to-Minors Materials Law to the Internet (Section 5, Utah Code § 76-10-1206)

100.  Because of the nature of the Internet, this section of the Amended Act bans certain constitutionally-protected speech among adults and substantially burdens the

dissemination and receipt of other constitutionally protected speech. The exact nature of the ban and burden depends on the meaning of the Of/with Amendment. The uncertainty of the meaning of the Of/with Amendment raises issues of unconstitutional vagueness.

101. The United States Congress and the states of Arizona, Michigan, New Mexico, New York, South Carolina, Vermont, Virginia and Wisconsin previously enacted laws similar to these sections of the Amended Act (other than the Of/with Amendment), which either were held unconstitutional or enjoined on First Amendment and Commerce Clause grounds.

102. Speech on the Internet is generally available to anyone with access to basic communications technology. Anyone who posts content to the Web, chat rooms, mailing lists or discussion groups makes that content automatically available to all users worldwide, including minors. Because minors have access to all of these fora, any "harmful to minors" communication in these fora could be punishable under the Amended Act. Knowledge that the recipient is a minor is not required under the Amended Act, and knowledge of the "character and content" of the material is presumed. Due to the very nature of the Internet, virtually every communication on the Internet may potentially be received by a minor and therefore may potentially be the basis for prosecution.

103. Because many of the terms in the Amended Act are overbroad, the Amended Act further chills the speech of content providers on the Web. For example, the Amended Act fails to distinguish between material that is "harmful" for older as opposed to younger minors. And the meaning of the Of/with Amendment is unclear.

104. Further, the reference to "prevailing standards in the adult community [in the State of Utah] as a whole with respect to what is suitable material for minors" is overbroad because, due to the borderless nature of the Internet, it effectively imposes Utah standards on content providers and users in all other states even if other states have more liberal standards regarding what is considered "harmful to minors." As a consequence, content providers and users of the Web will likely err on the side of caution and not post content on the Web that they would otherwise have posted. In this way, the Amended Act chills speech on the Web and thus causes irreparable harm to the First Amendment freedoms of online speakers.

105. Many of the hundreds of millions of users of the Internet, including Plaintiffs and their members and users, are speakers and content providers subject to the Amended Act. Anyone who sends an email, participates in a discussion group or chat room, or maintains a homepage on the Web potentially is subject to the Amended Act, because his or her communication might be accessed by a minor in the State of Utah. Given the technology of the Internet, there are no reasonable means for these speakers to ascertain the age of persons who access their messages, or for restricting or preventing access by minors to certain content. From the perspective of these speakers, the information they make available on the public spaces of the Internet either must be made available to all users of the Internet, including users who may be minors, or it will not be made available at all.

106. For instance, when a user posts a message to a USENET discussion group, it is automatically distributed to hundreds of thousands of computers around the world, and the speaker has no ability to control who will access his or her message from

those computers. Similarly, users who communicate on mailing lists have no way to determine the ages of other subscribers to the list. Finally, content providers on the Web have no reasonable way to verify the age of persons who access their websites. For these reasons, there is no practical way for content providers to withhold material that may be "harmful to minors" – as prohibited by the Amended Act – from people younger than 18 years old.

107. Moreover, the Amended Act is overbroad because it allows prosecution even if the sender had no knowledge or reason to know of the recipient's age. Although knowledge of the "character and content" of the material is required, knowledge that the recipient is a minor is not required; simple negligence is sufficient.

108. Because Internet speakers have no means to restrict minors in Utah from accessing their communications, the Amended Act effectively requires almost all discourse on the Internet – whether among citizens of Utah or among users anywhere in the world – to be at a level suitable for young children. The Amended Act therefore bans an entire category of constitutionally protected speech between and among adults on the Internet.

109. In addition, any person who disagrees with, or objects to, sexual content on the Internet could cause a speaker to be prosecuted under the Amended Act by having a minor view the online speech, resulting in a "heckler's veto" of Internet speech. Further, any person who disagrees with sexual content on the Internet could cause a speaker to fear prosecution under the Amended Act by claiming to be a minor, whether or not the person actually is one.

110. The Amended Act also prohibits older minors from communicating and accessing protected speech. Even if some depictions or discussions of nudity and sexual conduct may be considered by some to be inappropriate or "harmful" for younger minors, many depictions and discussions – including safer sex resources – are valuable, at least for older minors.

111. Even if there were means by which speakers on the Internet could ascertain or verify the age of persons who receive their content (and there are no such means), requiring users to identify themselves and to disclose personal information in order to allow verification of age would prevent Internet users from maintaining their privacy and anonymity on the Internet.

112. Because of the global nature of the Internet, defendants cannot demonstrate that these sections of the Amended Act are likely to reduce the availability in Utah of material that may be "harmful to minors" on the Internet.

113. It is estimated that in excess of 40% of the content provided on the Internet originates abroad. All of the content on the global Internet is equally available to all Internet users worldwide and may be accessed as easily and as cheaply as content that originates locally. Because it is not technologically possible to prevent content posted abroad from being available to Internet users in the State of Utah, these sections of the Amended Act will not accomplish their purported purpose of keeping inappropriate content from minors in Utah.

114. Conversely, there are many alternative means that are more effective at assisting parents in limiting a minor's access to certain material, if desired.

115. Some ISPs and commercial online services like America Online provide features that subscribers may use to prevent children from accessing chat rooms and to block access to websites and news groups based on keywords, subject matter, or other designations. These services also offer screening software that blocks messages containing certain words and tracking and monitoring software to determine which resources a particular online user, such as a child, has accessed. They also offer children-only discussion groups that are closely monitored by adults.

116. Online users also can purchase special software applications, known as user-based filtering software, that enable them to control access to online resources. These applications allow users to block access to certain websites and resources, to prevent children from giving personal information to strangers by email or in chat rooms and to keep a log of all online activity that occurs on the home computer.

117. User-based blocking programs are not perfect, both because they fail to screen all inappropriate material and because they inadvertently block valuable Internet websites. However, a voluntary decision by concerned parents to use these products for their children constitutes a far less restrictive alternative than the Amended Act's imposition of criminal penalties for protected speech upon the universe of Internet users. Moreover, the Amended Act itself demonstrates that the voluntary use by customers of filtering software would satisfy the governmental interests sought to be advanced by the Amended Act.

## Mandated ISP Blocking of "Pornographic" Material as Determined by the ISP's Customers (Section 4, Utah Code § 76-10-1205)

118. Although the meaning of Section 76-10-1205 as amended is far from clear, the section appears to permit (a) individual customers of an ISP to designate websites to be blocked by the ISP (so long as the customers "reasonably believed" the website to be "pornographic"), and (b) individual Internet users to require a web host to block access to a particular site (again, so long as the users "reasonably believed" the site to be "pornographic"). Allowing individual customers to impose blocking obligations on ISPs creates significant constitutional problems.

119. Most ISPs cannot as a technical matter effectively comply with a requirement to block specific websites designated by individual customers by blocking content based on the specific URL of a website or a webpage. To effectively comply with the blocking requirement, most ISPs can only block access to a website by blocking access to the numeric Internet Protocol Address ("IP Address") of the website.

120. To effectively comply with the blocking requirement, most ISPs would be forced to create an "exception" in a "routing table" in order to "null route" or "mis-route" Internet traffic associated with the IP Address.

121. Blocking access to an IP Address will block access to all websites that use that IP Address, including websites that are wholly unrelated to any URLs designated by a customer.

122. The sharing of IP Addresses among wholly unrelated websites is a very common practice on the Internet today.

36

123. According to recent research, over 85% of all Internet websites that have domain names ending in ".com," ".net" or ".org" share their IP Addresses with at least one other Internet website.

124. According to recent research, over 66% of all Internet websites that have domain names ending in ".com," ".net" or ".org" share their IP Addresses with at least fifty other Internet websites.

125. In some cases, hundreds, thousands and even hundreds of thousands of websites share a single IP Address.

126. In most cases, the websites that share their IP Address with dozens or hundreds of other websites have no affiliation or relationship with the other websites that share their IP Address.

127. Internet websites that carry hard core pornographic sexual content can share their IP Address with unrelated non-sexual websites.

128. IP Address 69.46.230.80 provides a good illustration of IP Address sharing. That IP Address is used by over 16,000 unrelated websites including a variety of hardcore sexually oriented websites, such as:

    www.4dirtypics.com
    www.adultlovecam.com
    www. adulttoystore.org
    www.aqua-sex.com
    www. asian-women-schoolgirls-pussy-pics-free-sex-porn-pics.com

as well as a diversity of websites that are wholly non-sexual, including:

    www.abqmennonite.org (church in New Mexico)
    www.adirondackprinters.com (printer repair in New York)
    www.african-drums.com (online drum store)
    www.alicebrentano.net (real estate agent in Kansas)
    www.alphabetmoon.com (children's accessories store in Texas)

37

www.amazinggraceministries.net (missionary organization in Massachusetts)
www.arkansasfoosball.com (marketing a foosball book)
www.attorneypaulgold.com (attorney in Kentucky)
www.bagelsandbeyond.com (bagel store in Massachusetts)
www bedrijvenparknieuwland.com (industrial park in the Netherlands).

129. If any one of the 16,000+ websites that use IP Address 69.46.230.80 is
designated by a customer, the actions of ISPs to comply with their blocking obligation
would block access to all 16,000+ websites. Thus, a requirement to block access to, for
example, "www.4dirtypics.com" would result in the blocking of
"www.amazinggraceministries.net," "www.bagelsandbeyond.com" and thousands of
other unrelated websites.

130. Blocking obligations imposed on most ISPs targeting any particular URL are
very likely to lead to the blocking of access to wholly unrelated websites that share the
IP Address of the targeted URL.

131. As an alternative to blocking by Internet Protocol Address, the Amended
Act permits ISPs to block by "domain name." If ISPs sought to comply with the
Amended Act by blocking by domain name, they would "spoil" or manipulate a data
table used in the "domain name lookup" process.

132. Such an approach would still result in the blocking of access to lawful
Internet content, because under such an approach the ISP would have to block access
to all portions of a website, even if only one portion of a website was designated by a
customer. For example, the Geocities Online Community has thousands of unrelated
websites all hosted under the www.geocities.com domain name. Thus, if an ISP were
required to block access to hardcore or adult oriented websites in the Geocities
community (such as http://www.geocities.com/prinfostes/prinfostes.htm,

http://www.geocities.com/webcamsexian/lesbian-hot-sex-cams.html and
www.geocities.com/penelope4515/six_sex_scenes/index.htm), the ISP would also block
access to thousands of unrelated websites, including for example
www.geocities.com/ldsdemocrats/index.html (a political website aimed at Mormons) and
www.geocities.com/saltlakeseagullsafc/saltlakeseagulls.html (a Salt Lake City sports
club).

133. Although many ISPs could attempt to block access to a website by its IP
Address or possibly by its domain name, some ISPs – for some or all of their customers
– have no technical means by which they could attempt to block access to a website.

134. For many regional or national ISPs, any action taken to comply with
blocking obligations under the Amended Act will affect the Internet access of customers
both in Utah and in other states around the country (and in some cases in other
countries). In other words, content blocked as a result of the Amended Act will be
blocked far outside of Utah's borders.

135. Specifically, the blocking of websites challenged in this Amended Complaint
would have a direct and significant harmful effect on interstate and foreign commerce
and communications. In almost all (if not all) cases, the blocking provisions challenged
in this Amended Complaint interfere with the ability of Internet users located outside of
Utah to access content also located outside of Utah. In most cases, the
communications obstructed by the Amended Act would have taken place (but for the
Amended Act) entirely outside of the borders of Utah.

136. Wholly innocent and completely lawful websites on the Internet would be
blocked if ISPs comply with the Amended Act by blocking access to websites.

137. In addition to constitutional problems raised by the application of § 76-10-1205 to Internet Service Providers, a separate set of problems are raised by application of this section to Web Hosting companies (including plaintiffs). Although the intent of the legislature in extending § 76-10-1205 to either ISPs or Web Hosts is unclear, the section, as amended, appears to enable users in Utah to demand that a web hosting company remove a sexually oriented web site from its web servers.

138. Such an obligation violates the constitutional rights of the web hosting company, of web sites, and of Internet users (both in and outside of Utah) whose access to web sites would be blocked pursuant to this section.

## Mandated ISP Blocking of Harmful-to-Minors Material
### (Section 7, Utah Code § 76-10-1231)

139. The effective blocking obligation imposed under this section will have all of the impacts described above with reference to § 76-10-1205, except that, under Section 7, the ISP will be required to block access to vast numbers of websites on the Internet. Thus, it is unavoidable that a significant amount of constitutionally-protected non-harmful-to-minors content also will be blocked. Moreover, the actions of many ISPs to block access to harmful to minors content will result in blocking access for all of the customers of the ISP.

## Mandatory Labeling (Section 9, Utah Code § 76-10-1233)

140. Section 9 of the Amended Act effectively requires that Utah-located or connected websites and other Internet content publishers either to technically block access by minors to content that is harmful to minors, or to "label" material that is

40

harmful to minors as being harmful to minors. The obligation to block access by minors suffers from all of the same problems discussed above with regard to Sections 3 and 5 of the Amended Act. In addition, the obligation to "label" material as harmful to minors constitutes "compelled speech" in violation of the First Amendment.

**The Amended Act's Burden on Interstate Commerce**

141. The Amended Act impacts the speech of online speakers across the nation – not just in the State of Utah – because it is impossible for Internet users to determine the geographic location of persons who access their information. Internet users elsewhere have no way to determine whether information posted to the Web, discussion groups, or chat rooms will be accessed by persons residing in the State of Utah. The various websites on the Internet can be accessed by anyone in the world; therefore, there is no way for speakers to ensure that residents of Utah will not receive their communications. Thus, all users, even if they do not reside in Utah or intend to communicate with residents of Utah, must comply with the Amended Act.

142. The Amended Act unjustifiably burdens interstate commerce and regulates conduct that occurs wholly outside the State of Utah. The Amended Act chills speakers outside of Utah and curtails speech that occurs wholly outside the borders of Utah, thereby causing irreparable harm. Like the nation's railways and highways, the Internet is by its nature an instrument of interstate commerce. Just as goods and services travel over state borders by train and truck, information flows across state (and national) borders on the Internet. Internet content providers that are located outside of Utah, such as The Sexual Health Network, as well as people participating in chat rooms, newsgroups or mail exploders, have no feasible way to determine whether their

information will be accessed or downloaded by someone who is located in Utah. Just as a user of the Internet cannot identify the age of another user of the Internet, one also cannot identify where a particular user or speaker resides, or from where a particular user may be accessing or downloading information on the Internet.

143. Due to the nature of the technology, a non-Utahan, even if he or she has no desire to reach anyone in Utah, will be forced to self-censor his or her speech on the Internet in order to comply with the Amended Act and avoid the possibility that a minor from Utah will gain access to this information, thereby subjecting the speaker to prosecution in Utah. In addition, because more than one website is often on a server, blocking a single website will often block many more non-offending websites. As a regional or national ISP typically cannot restrict blocking to Utah users only, such non-offending websites also will be blocked as to users of that ISP in the rest of the United States. Therefore, the Amended Act interferes significantly with the interstate flow of information and with interstate commerce.

144. Moreover, interstate and international computer communications networks – like the nation's railroads – constitute an area of the economy and society that particularly demands uniform rules and regulations. The states of New York, New Mexico, Arizona, Wisconsin, Vermont, Virginia, Pennsylvania, Michigan and South Carolina previously enacted laws similar to the Amended Act, which were enjoined on Commerce Clause grounds because of the inconsistent obligations imposed on online speakers across the country.

145. Because the definition of "harmful to minors" in Utah Code § 76-10-1201(4) depends in part upon "prevailing standards in the adult community" in the State of Utah

42

as a whole, the Amended Act effectively imposes regulations on interstate speech that conflict with the community standards of other States and their local communities. If each state implements its own regulations, as Utah has done, regarding what information can be legally distributed via this new technology, interstate commerce will be greatly inhibited and disrupted as persons around the world try to discern what can and cannot be communicated in the many different jurisdictions connected to these networks.

### The Amended Act's Impact on the Plaintiffs

146. Plaintiffs interact with and use the Internet in a wide variety of ways, including as content providers, access providers and users. The Amended Act burdens plaintiffs in all of these capacities. Plaintiffs who are users and content providers are subject to the Amended Act. These plaintiffs fear prosecution under the Amended Act for communicating, sending, displaying or distributing material that might be deemed by some to be "harmful to minors" under the Amended Act. They also fear liability for material posted by others to their online discussion groups, chat rooms, mailing lists and websites. Plaintiffs have no way to avoid prosecution under the Amended Act and are left with two equally untenable alternatives: (i) risk prosecution under the Amended Act, or (ii) attempt to engage in self-censorship and thereby deny adults and older minors access to constitutionally protected material.

### The King's English Bookshop

147. Plaintiff The King's English Bookshop was founded in Salt Lake City in 1978. The King's English website, kingsenglish.booksense.com, provides information about books, including pictures of bookcovers and detailed descriptions of book

43

contents provided by Booksense, a national service for independent booksellers.  The website also includes the store's newsletter which offers book reviews, photos, information about upcoming events and other local items.

148.  The King's English sells books covering a variety of topics, some of which contain sexual content.  It carries, recommends and sells, for instance, such classics as D. H. Lawrence's Lady Chatterly's Lover and Gustave Flaubert's Madame Bovary; contemporary classics from Henry Miller's Tropic of Capricorn to Doris Lessing's The Golden Notebooks to Vladimir Nabokov's Lolita; more recent fiction such as Isabel Allende's The Stories of Eva Luna, Margaret Atwood's The Handmaid's Tale, Michael Ondaatje's The English Patient, Mark Spragg's The Fruit of Stone; and non-fiction, an example of which is Our Bodies Ourselves put out by the Boston Women's Collective and recently re-issued.  These and other books that the King's English carries, when recommended on-line, could be described in ways that depict nudity and/or sexual conduct; an example is Margaret Atwood's most recent novel Oryx and Crake, which John Updike called "brilliant," and the Christian Science Monitor described as 'bewitching"; the cover features two nude female torsos joined as one.  If the Amended Act is not enjoined, the store will be inhibited from posting constitutionally protected material on its website and may have to reconsider use of Booksense or any similar national web service.  The King's English Bookshop fears prosecution under the Amended Act if it does not self-censor.

149.  Because of how the online Booksense system operates, it would be practically impossible for The King's English to review and "label" all of the content on its website.

44

## Sam Weller's Zion Bookstore

150. Plaintiff Sam Weller's Zion Bookstore was established in Salt Lake City in 1929. The World Wide Web provides Sam Weller's Zion Bookstore with the opportunity to offer its books for sale over the Internet. In addition to selling books over the Internet, Sam Weller's also publishes a bi-monthly newsletter about books, book reviews and lists store events on its website.

151. Some of the books made available through www.samwellers.com contain references to nudity and sexual conduct. If the Amended Act is not enjoined, Sam Weller's would be forced to risk criminal prosecution for providing constitutionally protected speech on the Internet about books that it routinely sells from its store, or to self-censor its website to remove all references to nudity and sexual conduct. Sam Weller's is considering joining a national web service, such as Booksense, but is concerned as to whether it will subject the firm to prosecution under the Amended Act. This would prevent, for example, individuals looking for information about sexual health or gay and lesbian issues from obtaining access to valuable resources available through the Internet.

152. Because of the volume and dynamic nature of the content on its website, it would be extremely burdensome if not impossible for Sam Weller's to review and "label" all of the content on its website.

## Nathan Florence

153. Plaintiff Nathan Florence believes that the World Wide Web provides a unique and low-cost opportunity to exhibit his work to both local communities and to the

world. Some of his art depicts nude figures in a tradition that is centuries old. For example, some of his paintings depict nude women in various positions.

154. Mr. Florence uses his website to display his art, and is worried that some of the depictions of nude figures, as well as other aspects of his art, might be considered in violation of provisions of the Amended Act. Because he is uncertain what will be considered in violation of the Amended Act, he would have to self-censor, shut down his website entirely, or risk criminal prosecution for providing constitutionally-protected artistic expression.

## W. Andrew McCullough

155. Plaintiff Andrew McCullough has been, and likely will be again, a candidate for Attorney General of Utah, and operates a campaign website at www.andrewmccullough.org. This website contains no content that could be considered harmful to minors. The website is, however, hosted on a Web Server located at IP Address 216.185.128.200, along with more than 34,000 other unrelated websites, including sexually oriented websites such as www.adultozone.com, www.247porn.net, adult-sex-videos-toys.com and www.adultdvddeals.com. If an ISP takes technical action to block access to these or other sexually oriented websites located at IP Address 216.185.128.200, it is very likely that access to www.andrewmccullough.org will also be blocked. Thus, McCullough fears that his website will be blocked as a result of actions by ISPs to comply with the Amended Act.

## CSolutions

156. Plaintiff IPNS of Utah, LLC is both an Internet service provider and a hosting company as defined in the Amended Act. As such, all of the challenged

provisions of the Amended Act apply to or affect CSolutions. Complete compliance with Utah Code §§ 76-10-1204, 76-10-1205, 76-10-1206, and 76-10-1231 as enacted or amended by the Amended Act may not be possible, and thus CSolutions reasonably fears prosecution under or application of any of those sections to CSolutions. If compliance with those sections is possible, it would be burdensome and costly, and would adversely harm the ability of CSolutions' customers to access constitutionally protected content on the Internet.

157. As a hosting company, the web hosting customers of CSolutions would be subject to Utah Code § 76-10-1233. That section harms CSolutions' ability to compete for and retain customers, and it harms the customers' constitutional rights to post content on the Internet.

**RigidTech.com, Inc.**

158. Plaintiff RigidTech.com, Inc. ("RigidTech") is both an Internet service provider and a hosting company as defined in the Amended Act. As such, all of the challenged provisions of the Amended Act apply to or affect RigidTech. Complete compliance with Utah Code §§ 76-10-1204, 76-10-1205, 76-10-1206, and 76-10-1231, as enacted or amended by the Amended Act may not be possible, and thus RigidTech reasonably fears prosecution under or application of any of those sections to RigidTech. If compliance with those sections is possible, it would be burdensome and costly, and would adversely harm the ability of RigidTech customers to access constitutionally protected content on the Internet.

159. As a hosting company, the web hosting customers of RigidTech would be subject to Utah Code § 76-10-1233. That section harms RigidTech ability to compete

for and retain customers, and it harms the customers' constitutional rights to post content on the Internet.

**The Sexual Health Network**

160. Plaintiff The Sexual Health Network's Web website (sexualhealth.com) includes a wide array of sex education materials for people with disabilities and chronic diseases. Some resources are written specifically for The Sexual Health Network, while other materials are adapted from a variety of sources. Topics covered include both general matters (such as information about the effects of aging on sexuality, or ideas to help increase women's sexual pleasure), to disability-specific issues (such as sexual positions that may enhance intercourse for individuals with particular disabilities, or advice on dealing with low sexual self-esteem that may accompany a disability).

161. The articles and other information available on sexualhealth.com necessarily involve the use of sexually explicit language and visual images. Frank, detailed explanations are given in order for the information that the website provides to be useful to its viewers.

162. Sexual Health Network publishes a monthly newsletter that is sent to thousands of subscribers.

163. The Sexual Health Network's website offered co-branded content, such as webcasts that are produced by Healthology (a health-related website), that are accessible by clicking on links or banners on Sexual Health Network's website.

164. The Sexual Health Network's website also provides links to other sexuality-related websites such as the Sinclair Intimacy Institute (producers of explicit educational videos designed to help couples improve their sex lives).

165. The Sexual Health Network fears that making the materials on the sexualhealth.com website available online could be alleged to constitute "distribution" of "harmful to minors" material and thus subject it to prosecution under the Amended Act.

166. If the Amended Act is not enjoined, the Sexual Health Network must choose between risking criminal prosecution or curtailing its speech by removing from its website any material that could be alleged to be "harmful to minors."

## Utah Progressive Network Education Fund, Inc.

167. Plaintiff Utah Progressive Network Education Fund, Inc. ("UPNet") is a coalition of organizations and individuals committed to promoting social, racial, economic and environmental justice, and operates a website at www.upnet.org. This website contains no content that could be considered "harmful to minors." The website is, however, hosted on a web server located at IP Address 216.194.122.30, along with more than 1,500 other unrelated websites, including sexually oriented websites such as www.second-cumming.com. If an ISP takes technical action to block access to this or other sexually oriented websites located at IP Address 216.194.122.30, it is very likely that access to www.upnet.org will also be blocked. Thus, UPNet fears that its website will be blocked as a result of actions by ISPs to comply with the Amended Act.

## American Booksellers Foundation for Free Expression

168. Plaintiff ABFFE has hundreds of bookseller members who are located from coast to coast, as well as in the State of Utah, many of whom sell materials that contain descriptions or depictions of nudity or sexual conduct, and which deal frankly with the subject of human sexuality. ABFFE's members are not "adult bookstores." Many member bookstores use the Internet and electronic communications to obtain

information and excerpts of books from publishers. For example, member booksellers may review current popular titles such as Nymph by Francesa Lia Block, Pictures & Passion: A History of Homosexuality in the Visual Arts by James W. Saslow, American Pastoral by Philip Roth and The Joy of Sex, which include passages or images describing nudity and sexual conduct. Some member bookstores also have their own webpages that discuss the contents of books sold in stores.

169. ABFFE members' right to learn about, acquire and distribute material describing or depicting nudity and sexual conduct, and their patrons' right to purchase such materials, will be seriously infringed by the Amended Act if it is not enjoined because ABFFE members and the publishers with whom they transact business will be forced to self-censor or risk prosecution under the Amended Act.

**American Civil Liberties Union of Utah**

170. Plaintiff ACLU of Utah not only works to uphold the Bill of Rights, but also devotes considerable resources to public education about civil liberties. The ACLU of Utah maintains a website (www.acluutah.org) that offers electronic copies of the affiliate's publications, reports, legal documents, press releases and other material related to its legal, legislative, educational and advocacy work. The website is updated at least weekly, and often daily. Some of the ACLU of Utah's online resources contain sexual subject matter. Examples include copies of ACLU of Utah and ACLU court briefs in cases involving arts censorship, obscenity, sex education, privacy rights and discrimination against gays and lesbians. Additionally, the ACLU of Utah's website links to national ACLU's extensive online resources.

171. The ACLU of Utah does not moderate its computer communications systems because such editing or censorship would be antithetical to the organization's belief in freedom of speech. Furthermore, the ACLU of Utah considers minors to be an important audience for its online resources. If the Amended Act is not enjoined, the ACLU of Utah fears that it would be compelled either to refrain from offering constitutionally protected civil liberties materials or to face potential criminal prosecution.

**Association of American Publishers, Inc.**

172. Plaintiff AAP sues on behalf of its members who are content providers and users of the Internet. Although their businesses are primarily based on print publishing, AAP's members are very actively involved in the Internet. AAP's members create electronic products to accompany and supplement their printed books and journals; create custom educational material on the Internet; communicate with authors and others, receive manuscripts, and edit, typeset, and design books electronically; transmit finished products to licensed end-user customers, communicate with bookstores and other wholesale and retail accounts; and promote authors and titles online.

173. Many of AAP's members have webpages and provide information to the world on the Internet. Some of the content provided by AAP's members contains nudity or sexual conduct. Many of the efforts to ban books in various communities have been directed at books published by AAP's members, and AAP fears that the Amended Act will spawn similar efforts directed at AAP's online publishing. If the Amended Act is not enjoined, AAP members will be forced either to risk criminal liability or to stop providing online access to constitutionally protected books and other related materials.

**The Comic Book Legal Defense Fund**

174. The Comic Book Legal Defense Fund ("CBLDF") represents over 1000 comic book authors, artists, retailers, distributors, publishers and readers located in Utah and the rest of the United States. Comics are a graphic-based art form that has rapidly adapted its content and commerce for the Internet. Today, the largest individual retailers of comic books in the United States are Internet-based, while thousands of "web comics" artists are posting work every year. Some of their material involves frank sexual content or depictions of nudity. If the Amended Act is not enjoined, CBLDF and its members are concerned that they will have either to risk criminal liability or self-censor constitutionally protected material.

**Freedom to Read Foundation, Inc.**

175. FTRF includes among its members librarians and public and non-public libraries that serve their patrons with access to and content on the Internet. Almost all libraries provide their patrons with facilities to access the Internet for free or at a low cost. Most libraries also have their own websites and use the Internet for such things as posting catalogues of library materials, posting information about current events, sponsoring chat rooms, providing textual information or art and posting online versions of materials from their library collections. Patrons can, for example, access the website of certain libraries from anywhere in the country to peruse the libraries' catalogues, review an encyclopedia reference or check a definition in a dictionary.

176. Some of the materials provided or made available by libraries contain nudity or sexual conduct. For example, FTRF member libraries' online card catalogues include such works as Forever by Judy Blume, Women on Top by Nancy Friday, Changing

Bodies, Changing Lives by Ruth Bell, Our Bodies, Our Selves by the Boston Women's Health Collective and It's Perfectly Normal by Robie Harris.

177. If the Amended Act is not enjoined, libraries will be inhibited from both posting and providing access to materials on the Internet that describe or depict nudity or sexual conduct. Adult library patrons and Internet users would thus be deprived of access to these constitutionally protected library materials. Given the global and unrestricted nature of the Internet and the past attempts by persons to bar literature and reference items from library collections, many of FTRF's members may choose not to post a substantial amount of expressive material at all – material that many adults might consider useful for themselves or their own children – rather than risk prosecution for posting material that might be illegal under the Amended Act in Utah.

### Publishers' Marketing Association

178. Publishers Marketing Association ("PMA") was founded in California in 1983 to represent and serve book, audio and video independent publishers. It now has more than 3,900 publisher members in the United States and Canada, primarily publishers of non-fiction. Thirty of its members are located in Utah.

179. Plaintiff PMA sues on behalf of its members who are content providers and users of the Internet. Although their businesses are primarily based on publishing, many of PMA's members are very actively involved in the Internet. They communicate with authors and others, receive manuscripts, and edit, typeset, and design books electronically; transmit finished products to licensed end-user customers, communicate with bookstores and other wholesale and retail accounts; promote authors and titles; and market titles online.

180. Many of PMA's members have webpages and provide information to the world on the Internet. Some of the content provided by PMA's members contains descriptions or depictions of nudity or sexual conduct. If the Amended Act is not enjoined, members of PMA will be forced either to risk criminal liability or to stop providing online access to constitutionally protected books and other related materials.

## CAUSES OF ACTION

### COUNT I

### Violation of Adults' Rights Under the First and Fourteenth Amendments of the United States Constitution

181. Plaintiffs repeat and re-allege paragraphs 1 – 180 as if set forth entirely herein.

182. The Amended Act violates the First and Fourteenth Amendments to the United States Constitution on its face and as applied because it effectively bans and/or unduly burdens constitutionally protected speech by and between adults.

183. The Amended Act violates the First and Fourteenth Amendments because it is not the least restrictive means of accomplishing any compelling governmental purpose.

184. The Amended Act violates the First and Fourteenth Amendments because it is substantially overbroad.

## COUNT II

### Violation of Minors' Rights Under the First and
### Fourteenth Amendments of the United States Constitution

185. Plaintiffs repeat and re-allege paragraphs 1 – 180 as if set forth entirely herein.

186. The Amended Act violates the First and Fourteenth Amendments to the United States Constitution because it interferes with the rights of minors to access and view material that to them is protected by the First Amendment.

187. The Amended Act is unconstitutional because it prohibits the dissemination to all minors of any age of any material that is deemed "harmful to minors," despite the fact that some of the material has value for older minors.

188. The Amended Act violates the First and Fourteenth Amendment rights of minors because it is substantially overbroad.

## COUNT III

### Prior Restraint

189. Plaintiffs repeat and re-allege paragraphs 1 – 180 as if set forth entirely herein.

190. The Amended Act operates as an unconstitutional prior restraint, and thereby deprives Plaintiffs and their members, users and customers of (a) access to constitutionally protected content, and (b) the ability to publish constitutionally protected content on the Internet, in violation of the First Amendment to the United States Constitution.

## COUNT IV

### Inadequate Procedures

191. Plaintiffs repeat and re-allege paragraphs 1 – 180 as if set forth entirely herein.

192. The Amended Act affords ISPs, Internet content publishers, and Internet users, including Plaintiffs and their members, users and customers, inadequate procedural protection of their rights, in violation of the First and Fourteenth Amendments to the United States Constitution.

## COUNT V

### Violation of the Right to Communicate and Access Information Anonymously Under the First and Fourteenth Amendments of the United States Constitution

193. Plaintiffs repeat and re-allege paragraphs 1 – 180 as if set forth entirely herein.

194. The Amended Act violates the First and Fourteenth Amendment right to communicate and access information anonymously, insofar as it effectively requires Internet users to identify themselves in order to gain access to constitutionally-protected speech.

## COUNT VI

### Compelled Speech

195. Plaintiffs repeat and re-allege paragraphs 1 – 180 as if set forth entirely herein.

196. Section 9 of the Amended Act requires Utah-located or connected Internet content publishers, including Plaintiffs and their members, users and customers, to label

their speech as "harmful to minors," in violation of the First and Fourteenth Amendments to the United States Constitution.

## COUNT VII

### Violation of the Commerce Clause
### Of the United States Constitution

197. Plaintiffs repeat and re-allege paragraphs 1 – 180 as if set forth entirely herein.

198. The Amended Act violates the Commerce Clause because it regulates communications that take place wholly outside of the State of Utah.

199. The Amended Act violates the Commerce Clause because it constitutes an unreasonable and undue burden on interstate and foreign commerce.

200. The Amended Act violates the Commerce Clause because it subjects interstate use of the Internet to inconsistent regulations.

## COUNT VIII

### Preemption Under 47 U.S.C. § 230(c)(1)

201. Plaintiffs repeat and re-allege paragraphs 1 – 180 as if set forth entirely herein.

202. Portions of the Amended Act violate 47 U.S.C. § 230(c)(1) and as such are preempted pursuant to § 230(e)(3) of that statute.

## COUNT IX

### Unconstitutional Vagueness

203. Plaintiffs repeat and reallege paragraphs 1- 180 as if set forth entirely herein.

204. The fact that the meaning of the definition of "harmful to minors" is unclear because of the ambiguity of the Of/with Amendment causes those provisions of the Amended Act which refer to "harmful to minors" materials to be unconstitutionally vague.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court:

A.    Declare that sections 4 through 7 and 9 of H.B. 260, as amended by H.B. 5, violate the First, Fifth and Fourteenth Amendments to and the Commerce Clause of the United States Constitution, and that the Amended Act violates 47 U.S.C. § 230(c)(1);

B.    Preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from enforcing such provisions;

C.    Award Plaintiffs their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D.   Grant Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

Wesley D. Felix (USB # 6539)
Howrey LLP
170 South Main, Suite 400
Salt Lake City, Utah 84101
(801) 533-8383

Michael A. Bamberger (Pro Hac Vice)
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

John B. Morris, Jr. (Pro Hac Vice)
Center for Democracy & Technology
1634 Eye Street, NW # 1100
Washington, DC 20006
(202) 637-9800

Attorneys for Plaintiffs

Dated:    April 30, 2007

# APPENDIX A

Download Zipped Enrolled WordPerfect HB0260.ZIP
[Introduced][Amended][Status][Bill Documents][Fiscal Note][Bills Directory]

# H.B. 260 Enrolled

## AMENDMENTS RELATED TO PORNOGRAPHIC

## AND HARMFUL MATERIALS

### 2005 GENERAL SESSION

### STATE OF UTAH

**Chief Sponsor: John Dougall**

Senate Sponsor: Curtis S. Bramble

Sheryl L. Allen
Bradley M. Daw
Margaret Dayton
Brent H. Goodfellow
Gregory H. HughesFred R. Hunsaker
Rebecca D. Lockhart
Ronda Rudd Menlove
Michael E. Noel
Curtis OdaPaul Ray
Aaron Tilton
Peggy Wallace
Richard W. Wheeler

**LONG TITLE**
**General Description:**
    This bill addresses pornographic materials and material harmful to minors.
**Highlighted Provisions:**
    This bill:
    .  requires the Division of Consumer Protection to make public service
announcements;
    .  requires the attorney general to establish and maintain a database, called the adult
content registry, of certain Internet sites containing material harmful to minors;
    .  defines terms;
    .  subjects a person dealing in material harmful to minors to criminal liability for
certain distributions of material harmful to minors if the person negligently or

recklessly fails to determine the proper age of a minor;
   .  increases criminal penalties for distributing and inducing acceptance of pornographic materials;
   .  requires a service provider to prevent certain access to Internet material harmful to minors, if requested by the consumer;
   .  requires the Division of Consumer Protection to test the effectiveness of a service

---

provider's procedures to block material harmful to minors at least annually;
   .  requires a service provider, under certain circumstances, to block material on the adult content registry;
   .  requires Internet content providers that create or host data in Utah to properly rate the data;
   .  allows the attorney general to seek a civil fine against a service provider that fails to properly block material harmful to minors;
   .  provides criminal penalties for certain violations of the provisions requiring a service provider to block material harmful to minors;
   .  provides a criminal penalty for a content provider's failure to properly rate content; and
   .  makes technical changes.

**Monies Appropriated in this Bill:**
This bill appropriates:
   .  $100,000 from the General Fund to the Division of Consumer Protection, for fiscal year 2005-06 only, for public service announcements;
   .  $50,000 from the General Fund to the Division of Consumer Protection, for fiscal year 2005-06 only, to conduct a research project; and
   .  $100,000 from the General Fund to the attorney general, for fiscal year 2005-06 only, to establish the adult content registry.

**Other Special Clauses:**
This bill provides an effective date.

**Utah Code Sections Affected:**
AMENDS:
   **76-10-1204**, as last amended by Chapters 93 and 163, Laws of Utah 1990
   **76-10-1205**, as last amended by Chapter 163, Laws of Utah 1990
   **76-10-1206**, as last amended by Chapter 53, Laws of Utah 2000
ENACTS:

---

**13-2-9**, Utah Code Annotated 1953
   **67-5-19**, Utah Code Annotated 1953
   **76-10-1230**, Utah Code Annotated 1953
   **76-10-1231**, Utah Code Annotated 1953
   **76-10-1232**, Utah Code Annotated 1953
   **76-10-1233**, Utah Code Annotated 1953

*Be it enacted by the Legislature of the state of Utah:*
Section 1. Section **13-2-9** is enacted to read:
   _**13-2-9.** Internet — Consumer education._
   _(1) The Division of Consumer Protection shall, subject to appropriation, contract with a_

*person to make public service announcements advising consumers about the dangers of using the Internet, especially:*

*(a) material harmful to minors;*

*(b) steps a consumer may take to learn more about the dangers of using the Internet;*

*(c) information about how a service provider can help a consumer learn more about the dangers of using the Internet, including the service provider's duties created by this bill; and*

*(d) how a consumer can monitor the Internet usage of family members.*

*(2) Monies appropriated under Subsection (1) shall be paid by the Division of Consumer Protection to a person only if:*

*(a) the person is a nonprofit organization; and*

*(b) the person agrees to spend private monies amounting to two times the amount of monies provided by the Division of Consumer Protection during each fiscal year in accordance with Subsection (1).*

*(3) In administering any monies appropriated for use under this section, the Division of Consumer Protection shall comply with Title 63, Chapter 56, Utah Procurement Code.*

Section 2. Section **67-5-19** is enacted to read:

__67-5-19.__ **Adult content registry.**

*(1) As used in this section:*

*(a) "Access restricted" means access restricted as defined in Section 76-10-1230.*

*(b) "Consumer" means a consumer as defined in Section 76-10-1230.*

*(c) "Content provider" means a content provider as defined in Section 76-10-1230.*

*(d) "Hosting company" means a hosting company as defined in Section 76-10-1230.*

*(e) "Service provider" means a service provider as defined in Section 76-10-1230.*

*(2) The attorney general, in consultation with other entities as the attorney general considers appropriate, shall:*

*(a) create a database, called the adult content registry, consisting of a list of content providers' sites, that shall be based on a Uniform Resource Locator address, domain name, and Internet Protocol address or a similar addressing system, that:*

*(i) are added to the database under Subsection (2)(b); and*

*(ii) provide material harmful to minors that is not access restricted;*

*(b) add a content provider site to the adult content registry only if the attorney general determines that the content provider is providing content that contains material harmful to minors that is not access restricted;*

*(c) when the attorney general determines that a content provider site should be placed on the adult content registry, if the content provider lists e-mail contact information, the attorney general shall notify the content provider and hosting company, if available, by e-mail:*

*(i) that the content provider is providing content that contains material harmful to minors that is not access restricted;*

*(ii) that the attorney general will place the content provider site on the adult content registry five business days after the notice is sent;*

*(iii) that the content provider can avoid being placed on the adult content registry if any material harmful to minors is access restricted; and*

*(iv) of the steps necessary for the content provider or hosting company to apply to be*

*removed from the adult content registry;*
 *(d) (i) if notification is required under Subsection (2)(c), place a content provider site on*

*the adult content registry five business days after the day on which the division makes the required notification; or*
 *(ii) if notification is not required under Subsection (2)(c), place a content provider site on the adult content registry five business days after the day on which the attorney general determines that the content provider should be placed on the adult content registry; and*
 *(e) if requested by a content provider, remove a content provider from the adult content registry within two business days from the day on which the attorney general determines that the*

*content provider no longer provides material harmful to minors that is not access restricted.*
 *(3) The attorney general shall make the adult content registry available for public dissemination in a readily accessible access restricted electronic format.*
 *(4) The attorney general shall establish a system for the reporting of material transmitted to a consumer in violation of Section 76-10-1232 .*

Section 3. Section **76-10-1204** is amended to read:

**76-10-1204. Distributing pornographic material.**

(1) A person is guilty of distributing pornographic material when he knowingly:

(a) sends or brings any pornographic material into the state with intent to distribute or exhibit it to others;

(b) prepares, publishes, prints, or possesses any pornographic material with intent to distribute or exhibit it to others;

(c) distributes or offers to distribute, exhibits or offers to exhibit any pornographic material to others;

(d) writes, creates, or solicits the publication or advertising of pornographic material;

(e) promotes the distribution or exhibition of material he represents to be pornographic; or

(f) presents or directs a pornographic performance in any public place or any place exposed to public view or participates in that portion of the performance which makes it pornographic.

(2) Each distributing of pornographic material as defined in Subsection (1) is a separate

offense.

(3) It is a separate offense under this section for:

(a) each day's exhibition of any pornographic motion picture film; and

(b) each day in which any pornographic publication is displayed or exhibited in a public place with intent to distribute or exhibit it to others.

[(4) Each separate offense under this section is a class A misdemeanor punishable by:]

[(a) a minimum mandatory fine of not less than $100 plus $10 for each article exhibited up to the maximum allowed by law; and]

[(b) incarceration, without suspension of sentence in any way, for a term of not less than seven days, notwithstanding any provisions of Section 77-18-1-;]

[(5) If a defendant has already been convicted once under this section, each separate further offense]

*(4) (a) An offense under this section* is a third degree felony punishable by*:*

*(i) a minimum mandatory fine of not less than $1,000 plus $10 for each article exhibited*

up to the maximum allowed by law; and [by]
(ii) incarceration, without suspension of sentence in any way, for a term of not less than 30 days.
(b) This Subsection (4) supersedes Section 77-18-1 .
(5) A service provider, as defined in Section 76-10-1230 , complies with this section if it complies with Sections 76-10-1231 and 76-10-1232 .
Section 4. Section 76-10-1205 is amended to read:
**76-10-1205. Inducing acceptance of pornographic material.**
(1) A person is guilty of inducing acceptance of pornographic material when he knowingly:
(a) requires or demands as a condition to a sale, allocation, consignment, or delivery for resale of any newspaper, magazine, periodical, book, publication, or other merchandise that the

purchaser or consignee receive any pornographic material or material reasonably believed by the

purchaser or consignee to be pornographic; or

---

(b) denies, revokes, or threatens to deny or revoke a franchise, or to impose any penalty, financial or otherwise, because of the failure or refusal to accept pornographic material or material reasonably believed by the purchaser or consignee to be pornographic.
[(2) A violation of this section is a class A misdemeanor punishable by a fine of not less than $500 and by incarceration, without suspension of sentence in any way, for a term of not less than 14 days.]
(2) (a) An offense under this section is a third degree felony punishable by:
(i) a minimum mandatory fine of not less than $1,000 plus $10 for each article exhibited up to the maximum allowed by law; and
(ii) incarceration, without suspension of sentence in any way, for a term of not less than 30 days.
(b) This Subsection (2) supersedes Section 77-18-1 .
(3) A service provider, as defined in Section 76-10-1230 , complies with this section if it complies with Sections 76-10-1231 and 76-10-1232 .
Section 5. Section 76-10-1206 is amended to read:
**76-10-1206. Dealing in material harmful to a minor.**
(1) A person is guilty of dealing in material harmful to minors when, knowing that a person is a minor, or having negligently or recklessly failed to [exercise reasonable care in ascertaining] determine the proper age of a minor, he:
(a) intentionally distributes or offers to distribute, exhibits or offers to exhibit to a minor any material harmful to minors;
(b) intentionally produces, presents, or directs any performance before a minor, that is harmful to minors; or
(c) intentionally participates in any performance before a minor, that is harmful to minors.
(2) (a) Each separate offense under this section is a third degree felony punishable by:
(i) a minimum mandatory fine of not less than $300 plus $10 for each article exhibited up to the maximum allowed by law; and [by]

_(ii)_ incarceration, without suspension of sentence [~~in any way~~], for a term of not less than 14 days.

_(b)_ This section supersedes Section 77-18-1 .

(3) _(a)_ If a defendant has already been convicted once under this section, each separate further offense is a second degree felony punishable by:

_(i)_ a minimum mandatory fine of not less than $5,000 plus $10 for each article exhibited up to the maximum allowed by law; and [~~by~~]

_(ii)_ incarceration, without suspension of sentence [~~in any way~~], for a term of not less than one year.

_(b)_ This section supersedes Section 77-18-1 .

_(4) (a) A service provider, as defined in Section 76-10-1230 , complies with this section if it complies with Sections 76-10-1231 and 76-10-1232 ._

_(b) A content provider, as defined in Section 76-10-1230 , complies with this section if it complies with Section 76-10-1233 ._

Section 6. Section **76-10-1230** is enacted to read:

_**76-10-1230.** Definitions._

_As used in Sections 76-10-1231 , 76-10-1232 , and 76-10-1233 :_

_(1) "Access restricted" means that a content provider limits access to material harmful to minors by:_

_(a) properly rating content;_

_(b) providing an age verification mechanism designed to prevent a minor's access to material harmful to minors, including requiring use of a credit card, adult access code, or_ digital

_certificate verifying age; or_

_(c) any other reasonable measures feasible under available technology._

_(2) "Adult content registry" means the adult content registry created by Section 67-5-19 ._

_(3) "Consumer" means a natural person residing in this state who subscribes to a service provided by a service provider for personal or residential use._

_(4) "Content provider" means a person that creates, collects, acquires, or organizes_

---

_electronic data for electronic delivery to a consumer with the intent of making a profit._

_(5) (a) "Hosting company" means a person that provides services or facilities for storing or distributing content over the Internet without editorial or creative alteration of the_ content.

_(b) A hosting company may have policies concerning acceptable use without becoming a content provider under Subsection (4)._

_(6) (a) "Internet service provider" means a person engaged in the business of providing a computer and communications facility through which a consumer may obtain access to the Internet._

_(b) "Internet service provider" does not include a common carrier if it provides only telecommunications service._

_(7) "Properly rated" means content using a labeling system to label material harmful to minors provided by the content provider in a way that:_

_(a) accurately apprises a consumer of the presence of material harmful to minors; and_

_(b) allows the consumer the ability to control access to material harmful to minors based on the material's rating by use of reasonably priced commercially available software,_ including

_software in the public domain._

_(8) (a) Except as provided in Subsection (8)(b), "service provider" means:_

*(i) an Internet service provider; or*

*(ii) a person who otherwise provides an Internet access service to a consumer.*

*(b) "Service provider" does not include a person who does not terminate a service in this state, but merely transmits data through:*

*(i) a wire;*

*(ii) a cable; or*

*(iii) an antenna.*

*(c) "Service provider," notwithstanding Subsection (8)(b), includes a person who meets the requirements of Subsection (8)(a) and leases or rents a wire or cable for the transmission*

*of*

*data.*

Section 7. Section **76-10-1231** is enacted to read:

---

**76-10-1231. Data service providers -- Internet content harmful to minors.**

*(1) (a) Upon request by a consumer, a service provider shall filter content to prevent the transmission of material harmful to minors to the consumer.*

*(b) A service provider complies with Subsection (1)(a) if it uses a generally accepted and commercially reasonable method of filtering.*

*(2) At the time of a consumer's subscription to a service provider's service, or at the time this section takes effect if the consumer subscribes to the service provider's service at the*

*time*

*this section takes effect, the service provider shall notify the consumer in a conspicuous*

*manner*

*that the consumer may request to have material harmful to minors blocked under Subsection*

*(1).*

*(3) (a) A service provider may comply with Subsection (1) by:*

*(i) providing in-network filtering to prevent receipt of material harmful to minors; or*

*(ii) providing software for contemporaneous installation on the consumer's computer that blocks, in an easy-to-enable and commercially reasonable manner, receipt of material*

*harmful to*

*minors.*

*(b) (i) Except as provided in Subsection (3)(b)(ii), a service provider may not charge a consumer for blocking material or providing software under this section, except that a*

*service*

*provider may increase the cost to all subscribers to the service provider's services to recover*

*the*

*cost of complying with this section.*

*(ii) A service provider with fewer than 7,500 subscribers may charge a consumer for providing software under Subsection (3)(a)(ii) if the charge does not exceed the service provider's cost for the software.*

*(4) If the attorney general determines that a service provider violates Subsection (1) or (2), the attorney general shall:*

*(a) notify the service provider that the service provider is in violation of Subsection (1) or (2); and*

*(b) notify the service provider that the service provider has 30 days to comply with the provision being violated or be subject to Subsection (5).*

*(5) A service provider that violates Subsection (1) or (2) is:*

---

*(a) subject to a civil fine of $2,500 for each separate violation of Subsection (1) or (2), up to $10,000 per day; and*

*(b) guilty of a class A misdemeanor if:*

*(i) the service provider knowingly or intentionally fails to comply with Subsection (1); or*

*(ii) the service provider fails to provide the notice required by Subsection (2).*

*(6) A proceeding to impose a civil fine under Subsection (5)(a) may only be brought by the attorney general in a court of competent jurisdiction.*

*(7) (a) The Division of Consumer Protection within the Department of Commerce shall, in consultation with other entities as the Division of Consumer Protection considers appropriate,*

*test the effectiveness of a service provider's system for blocking material harmful to minors under*

*Subsection (1) at least annually.*

*(b) The results of testing by the Division of Consumer Protection under Subsection (7)(a) shall be made available to:*

*(i) the service provider that is the subject of the test; and*

*(ii) the public.*

*(c) The Division of Consumer Protection shall make rules in accordance with Title 63, Chapter 46a, Utah Administrative Rulemaking Act, to fulfil its duties under this section.*

Section 8. Section 76-10-1232 is enacted to read:

*__76-10-1232.__ Data service providers -- Adult content registry.*

*(1) (a) Upon request by a consumer, a service provider may not transmit material from a content provider site listed on the adult content registry created by Section 67-5-19 to a consumer.*

*(b) A service provider complies with Subsection (1)(a) if it uses a generally accepted and commercially reasonable method of filtering.*

*(c) At the time of a consumer's subscription to a service provider's service, or at the time this section takes effect if the consumer subscribes to the service provider's service at the time*

*this section takes effect, the service provider shall notify the consumer in a conspicuous manner*

*that:*

---

*(i) the consumer may request to have material on the adult content registry blocked under Subsection (1)(a); and*

*(ii) the consumer's request to have material harmful to minors blocked under Subsection (1)(a) may also result in blocking material that is not harmful to minors.*

*(2) (a) A service provider may comply with Subsection (1) by:*

*(i) providing in-network filtering to prevent receipt of material harmful to minors;*

*(ii) providing software for contemporaneous installation on the consumer's computer that blocks, in an easy-to-enable and commercially reasonable manner, receipt of material harmful to minors; or*

*(iii) complying with any federal law in effect that requires the blocking of content from a registry of sites containing material harmful to minors.*

*(b) A service provider may block material from the adult content registry by domain name or Internet Protocol address.*

*(c) (i) A service provider may not charge a consumer for blocking material or providing*

*software under this section, except that a service provider may increase the cost to all subscribers*

*to the service provider's services to recover the cost of complying with this section.*

*(ii) A service provider with fewer than 7,500 subscribers may charge a consumer for providing software under Subsection (2)(a)(ii) if the charge does not exceed the service provider's cost for the software.*

*(d) A service provider shall coordinate the service provider's list of content providers on the adult content registry with the attorney general's list of content providers on the adult content*

*registry at least weekly.*

*(3) If the attorney general determines that the service provider violates Subsection (1) or (2), the attorney general shall:*

*(a) notify the service provider that the service provider is in violation of Subsection (1) or (2); and*

*(b) notify the service provider that the service provider has 30 days to comply with the provision being violated or be subject to Subsection (4).*

*(4) A service provider that violates Subsection (1) or (2) is:*

*(a) subject to a civil fine of $2,500 for each separate violation of Subsection (1) or (2), up to $10,000 per day; and*

*(b) guilty of a class A misdemeanor if the service provider knowingly or intentionally fails to comply with Subsection (1) or (2).*

*(5) A proceeding to impose a civil fine under Subsection (4)(a) may only be brought by the attorney general in a court of competent jurisdiction.*

Section 9. Section **76-10-1233** is enacted to read:

**76-10-1233. Content providers -- Material harmful to minors.**

*(1) A content provider that is domiciled in Utah, or generates or hosts content in Utah, shall restrict access to material harmful to minors.*

*(2) The Division of Consumer Protection shall make rules in accordance with Title 63, Chapter 46a, Utah Administrative Rulemaking Act, to establish acceptable rating methods to be*

*implemented by a content provider under Subsection (1).*

*(3) If the attorney general determines that a content provider violates Subsection (1), the attorney general shall:*

*(a) notify the content provider that the content provider is in violation of Subsection (1); and*

*(b) notify the content provider that the content provider has 30 days to comply with Subsection (1) or be subject to Subsection (4).*

*(4) If a content provider violates this section more than 30 days after receiving the notice provided in Subsection (3), the content provider is guilty of a third degree felony.*

Section 10. **Appropriation.**

*(1) (a) There is appropriated for fiscal year 2005-06 only, $100,000 from the General Fund to the Division of Consumer Protection for public service announcements advising consumers about the dangers of using the Internet.*

*(b) It is the intent of the Legislature that the money appropriated in Subsection (1)(a) shall be used to publicize in various forms of media:*

*(i) the dangers of using the Internet, especially Internet pornography;*

*(ii) steps a consumer may take to learn more about the dangers of using the Internet;*

*(iii) information about how a service provider can help a consumer learn more about the dangers of using the Internet, including the service provider's duties created by this bill; and*

*(iv) how a consumer can monitor the Internet usage of family members.*

*(2) (a) There is appropriated for fiscal year 2005-06 only, $30,000 from the General Fund, and for fiscal year 2005-06 ongoing, $70,000 from the General Fund, to the attorney general to establish and maintain the Adult Content Registry created by this bill.*

*(b) It is the intent of the Legislature that the attorney general use existing technologies and systems to the extent possible in establishing the Adult Content Registry.*

*(3) (a) There is appropriated for fiscal year 2005-06, $50,000 from the General Fund to the Division of Consumer Protection.*

*(b) It is the intent of the Legislature that the Division of Consumer Protection use the monies appropriated for fiscal year 2005-06 in Subsection (3)(a) to research the effectiveness of:*

*(i) existing and emerging technologies for limiting access to material harmful to minors on the Internet;*

*(ii) obstacles to consumers limiting access to material harmful to minors on the Internet; and*

*(iii) methods of educating the public about the dangers of using the Internet.*

*(c) The Division of Consumer Protection shall report the findings of the research for which monies under Subsection (3)(a) are appropriated to the Utah Technology Commission before December 1, 2005.*

Section 11. **Effective date.**

*If approved by two-thirds of all the members elected to each house, this bill takes effect upon approval by the governor, or the day following the constitutional time limit of Utah Constitution Article VII, Section 8, without the governor's signature, or in the case of a veto, the*

*date of veto override, except that Section 76-10-1231 takes effect on January 1, 2006, and Sections 76-10-1232 and 76-10-1233 take effect on May 1, 2006.*

---

[Bill Documents][Bills Directory]

# APPENDIX B

Download Zipped Enrolled WordPerfect HB0005.ZIP
[Introduced][Amended][Status][Bill Documents][Fiscal Note][Bills Directory]

## H.B. 5 Enrolled

1
### INTERNET SEXUAL CONTENT - PROTECTION

2
### OF MINORS

3
2007 GENERAL SESSION

4
STATE OF UTAH

5
**Chief Sponsor: Paul Ray**

6
Senate Sponsor: Darin G. Peterson

7   Cosponsor:Bradley M. Daw     8
9   **LONG TITLE**
10   **General Description:**
11     This bill modifies the Criminal Code by amending the penalties for enticing a minor
12   over the Internet in order to commit a sexual offense. This bill also modifies Title 76,
13   Chapter 10, Part 12, Pornographic and Harmful Materials and Performances.
14   **Highlighted Provisions:**
15     This bill:
16     .  amends the penalty for enticing a minor to commit a first degree felony sexual
17   offense, so that the enticement offense is a second degree felony for the first
18   violation, and for any subsequent violation is a first degree felony with a specified
19   penalty;
20     .  includes enticing a minor over the Internet when subsequent contact is by electronic
21   or written means other than the use of a computer;
22     .  provides that if a defendant commits the offense of enticing a minor to commit any
23   felony sexual offense, and the defendant has previously committed a sexual offense
24   or kidnapping against a minor, the court may not shorten the prison sentence;
25     .  repeals the following sections:
26     .  repeals the section establishing an adult content registry and references to the
27   registry; and
28     .  repeals the section requiring that an Internet services provider must provide to
29   consumers the service of blocking material on the adult content registry;

30
.   provides a definition of "negligent" regarding material harmful to minors;
31          .   describes the circumstances under which an Internet service provider or a hosting
32      company is not guilty of criminal conduct involving distributing pornographic
33      material, inducing acceptance of pornographic material, or dealing in material
34      harmful to a minor;
35          .   increases the minimum mandatory fine for dealing in material harmful to a minor;
36          .   provides that a felony or class A offense of enticing a minor over the Internet is a
37      prior offense regarding sex offender lifetime registration;
38          .   clarifies the standard applicable to conduct of Internet service providers regarding
39      filtering of material harmful to minors from negligently or recklessly to a standard
40      of knowing or intentional conduct; and
41          .   amends the provisions regarding charging the consumer for software that blocks
42      material harmful to minors.
43      **Monies Appropriated in this Bill:**
44          None
45      **Other Special Clauses:**
46          This bill provides an immediate effective date.
47      **Utah Code Sections Affected:**
48      AMENDS:
49          **76-4-401**, as last amended by Chapter 164, Laws of Utah 2003
50          **76-10-1201**, as last amended by Chapter 9, Laws of Utah 2001
51          **76-10-1204**, as last amended by Chapter 281, Laws of Utah 2005
52          **76-10-1205**, as last amended by Chapter 281, Laws of Utah 2005
53          **76-10-1206**, as last amended by Chapter 281, Laws of Utah 2005
54          **76-10-1230**, as enacted by Chapter 281, Laws of Utah 2005
55          **76-10-1231**, as enacted by Chapter 281, Laws of Utah 2005
56          **77-27-21.5**, as last amended by Chapters 189, 269 and 334, Laws of Utah 2006
57      REPEALS:

---

58
**67-5-19**, as enacted by Chapter 281, Laws of Utah 2005
59          **76-10-1232**, as enacted by Chapter 281, Laws of Utah 2005
60
61      *Be it enacted by the Legislature of the state of Utah:*
62          Section 1. Section **76-4-401** is amended to read:
63          **76-4-401. Enticing a minor over the Internet -- Elements -- Penalties.**
64          (1) *(a)* A person commits enticement of a minor over the Internet when the person
65      knowingly uses a computer to solicit, seduce, lure, or entice, or attempts to use a
computer to
66      solicit, seduce, lure, or entice a minor or a person the defendant believes to be a minor to
67      engage in any sexual activity which is a violation of state criminal law.
68          *(b) A person commits enticement of a minor over the Internet when the person*
69      *knowingly uses a computer to initiate contact with a minor or a person the defendant*
believes
70      *to be a minor and subsequently, by any electronic or written means, solicits, seduces,*
lures, or
71      *entices, or attempts to solicit, seduce, lure, or entice the minor or a person the defendant*
72      *believes to be the minor to engage in any sexual activity which is a violation of state*
criminal

73      *law.*
74          (2) It is not a defense to the crime of enticing a minor under Subsection (1), or an
75      attempt to commit this offense, that a law enforcement officer or an undercover operative
who
76      is working with a law enforcement agency was involved in the detection or investigation
of the
77      offense.
78          (3) An enticement of a minor under Subsection (1) with the intent to commit:
79          (a) a first degree felony is a*:*
80          *(i) second degree felony upon the first conviction for violation of this Subsection*
81      *(3)(a); and*
82          *(ii) first degree felony punishable by imprisonment for an indeterminate term of not*
83      *fewer than three years and which may be for life, upon a second or any subsequent*
conviction
84      *for a violation of this Subsection (3)(a);*
85          (b) a second degree felony is a third degree felony;

86
(c) a third degree felony is a class A misdemeanor;
87          (d) a class A misdemeanor is a class B misdemeanor; and
88          (e) a class B misdemeanor is a class C misdemeanor.
89          *(4) (a) When a person who commits a felony violation of this section has been*
90      *previously convicted of an offense under Subsection (4)(b), the court may not in any way*
91      *shorten the prison sentence, and the court may not:*
92          *(i) grant probation;*
93          *(ii) suspend the execution or imposition of the sentence;*
94          *(iii) enter a judgment for a lower category of offense; or*
95          *(iv) order hospitalization.*
96          *(b) The sections referred to in Subsection (4)(a) are:*
97          *(i) Section 76-4-401 , enticing a minor over the Internet;*
98          *(ii) Section 76-5-301.1 , child kidnapping;*
99          *(iii) Section 76-5-402 , rape;*
100         *(iv) Section 76-5-402.1 , rape of a child;*
101         *(v) Section 76-5-402.2 , object rape;*
102         *(vi) Section 76-5-402.3 , object rape of a child;*
103         *(vii) Subsection 76-5-403 (2), forcible sodomy;*
104         *(viii) Section 76-5-403.1 , sodomy on a child;*
105         *(ix) Section 76-5-404 , forcible sexual abuse;*
106         *(x) Section 76-5-404.1 , sexual abuse of a child and aggravated sexual abuse of a*
child:
107         *(xi) Section 76-5-405 , aggravated sexual assault;*
108         *(xii) any offense in any other state or federal jurisdiction which constitutes or would*
109     *constitute a crime in Subsections (4)(b)(i) through (xi); or*
110         *(xiii) the attempt to commit any of the offenses in Subsections (4)(b)(i) through (xii).*
111     Section 2. Section **76-10-1201** is amended to read:
112     **76-10-1201. Definitions.**
113     For the purpose of this part:

114

(1) "Contemporary community standards" means those current standards in the
115      vicinage where an offense alleged under this act has occurred, is occurring, or will occur.
116      (2) "Distribute" means to transfer possession of materials whether with or without
117      consideration.
118      (3) "Exhibit" means to show.
119      (4) "Harmful to minors" means that quality of any description or representation, in
120      whatsoever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse
when
121      it:
122      (a) taken as a whole, appeals to the prurient interest in sex [of] *with* minors;
123      (b) is patently offensive to prevailing standards in the adult community as a whole
with
124      respect to what is suitable material for minors; and
125      (c) taken as a whole, does not have serious value for minors. Serious value includes
126      only serious literary, artistic, political, or scientific value for minors.
127      (5) "Knowingly" means an awareness, whether actual or constructive, of the character
128      of material or of a performance. A person has constructive knowledge if a reasonable
129      inspection or observation under the circumstances would have disclosed the nature of the
130      subject matter and if a failure to inspect or observe is either for the purpose of avoiding
the
131      disclosure or is criminally negligent *as described in Section 76-2-103* .
132      (6) "Material" means anything printed or written or any picture, drawing, photograph,
133      motion picture, or pictorial representation, or any statue or other figure, or any recording
or
134      transcription, or any mechanical, chemical, or electrical reproduction, or anything which
is or
135      may be used as a means of communication. Material includes undeveloped photographs,
136      molds, printing plates, and other latent representational objects.
137      (7) "Minor" means any person less than [eighteen] *18* years of age.
138      *(8) "Negligently" means simple negligence, the failure to exercise that degree of care*
139      *that a reasonable and prudent person would exercise under like or similar*
*circumstances.*
140      [(8)] *(9)* "Nudity" means the showing of the human male or female genitals, pubic
area,
141      or buttocks, with less than an opaque covering, or the showing of a female breast with
less than

---

142
an opaque covering, or any portion thereof below the top of the nipple, or the depiction of
143      covered male genitals in a discernibly turgid state.
144      [(9)] *(10)* "Performance" means any physical human bodily activity, whether engaged
145      in alone or with other persons, including but not limited to singing, speaking, dancing,
acting,
146      simulating, or pantomiming.
147      [(10)] *(11)* "Public place" includes a place to which admission is gained by payment
of
148      a membership or admission fee, however designated, notwithstanding its being
designated a
149      private club or by words of like import.
150      [(11)] *(12)* "Sado-masochistic abuse" means flagellation or torture by or upon a person

151    who is nude or clad in undergarments, a mask, or in a revealing or bizarre costume, or the

152    condition of being fettered, bound, or otherwise physically restrained on the part of one so

153    clothed.

154    [(12)] *(13)* "Sexual conduct" means acts of masturbation, sexual intercourse, or any

155    touching of a person's clothed or unclothed genitals, pubic area, buttocks, or, if the person is a

156    female, breast, whether alone or between members of the same or opposite sex or between

157    humans and animals in an act of apparent or actual sexual stimulation or gratification.

158    [(13)] *(14)* "Sexual excitement" means a condition of human male or female genitals

159    when in a state of sexual stimulation or arousal, or the sensual experiences of humans engaging

160    in or witnessing sexual conduct or nudity.

161        Section 3. Section **76-10-1204** is amended to read:

162        **76-10-1204. Distributing pornographic material -- Exemptions for Internet**

163    **service providers and hosting companies.**

164        (1) A person is guilty of distributing pornographic material when he knowingly:

165        (a) sends or brings any pornographic material into the state with intent to distribute or

166    exhibit it to others;

167        (b) prepares, publishes, prints, or possesses any pornographic material with intent to

168    distribute or exhibit it to others;

169        (c) distributes or offers to distribute, exhibits or offers to exhibit any pornographic

170    material to others;

171        (d) writes, creates, or solicits the publication or advertising of pornographic material;

172        (e) promotes the distribution or exhibition of material he represents to be pornographic;

173    or

174        (f) presents or directs a pornographic performance in any public place or any place

175    exposed to public view or participates in that portion of the performance which makes it

176    pornographic.

177        (2) Each distributing of pornographic material as defined in Subsection (1) is a separate

178    offense.

179        (3) It is a separate offense under this section for:

180        (a) each day's exhibition of any pornographic motion picture film; and

181        (b) each day in which any pornographic publication is displayed or exhibited in a

182    public place with intent to distribute or exhibit it to others.

183        (4) (a) An offense under this section is a third degree felony punishable by:

184        (i) a minimum mandatory fine of not less than $1,000 plus $10 for each article

185    exhibited up to the maximum allowed by law; and

186        (ii) incarceration, without suspension of sentence in any way, for a term of not less than

187    30 days.

188        (b) This Subsection (4) supersedes Section 77-18-1 .

189        [(5) A service provider, as defined in Section 76-10-1230 , complies with this section if

190 ~~it complies with Sections 76-10-1231 and 76-10-1232 .~~]
191 *(5) (a) This section does not apply to an Internet service provider, as defined in*
*Section*
192 *76-10-1230 , if:*
193 *(i) the distribution of pornographic material by the Internet service provider occurs*
194 *only incidentally through the Internet service provider's function of:*
195 *(A) transmitting or routing data from one person to another person; or*
196 *(B) providing a connection between one person and another person;*
197 *(ii) the Internet service provider does not intentionally aid or abet in the distribution*
*of*

198
*the pornographic material; and*
199 *(iii) the Internet service provider does not knowingly receive funds from or through a*
200 *person who distributes the pornographic material in exchange for permitting the person*
*to*
201 *distribute the pornographic material.*
202 *(b) This section does not apply to a hosting company, as defined in Section*
203 *76-10-1230 , if:*
204 *(i) the distribution of pornographic material by the hosting company occurs only*
205 *incidentally through the hosting company's function of providing data storage space or*
*data*
206 *caching to a person;*
207 *(ii) the hosting company does not intentionally engage, aid, or abet in the distribution*
208 *of the pornographic material; and*
209 *(iii) the hosting company does not knowingly receive funds from or through a person*
210 *who distributes the pornographic material in exchange for permitting the person to*
*distribute,*
211 *store, or cache the pornographic material.*
212     Section 4. Section **76-10-1205** is amended to read:
213     **76-10-1205. Inducing acceptance of pornographic material -- Exemptions for**
214 **Internet service providers and hosting companies.**
215     (1) A person is guilty of inducing acceptance of pornographic material when he
216 knowingly:
217     (a) requires or demands as a condition to a sale, allocation, consignment, or delivery
218 for resale of any newspaper, magazine, periodical, book, publication, or other
merchandise that
219 the purchaser or consignee receive any pornographic material or material reasonably
believed
220 by the purchaser or consignee to be pornographic; or
221     (b) denies, revokes, or threatens to deny or revoke a franchise, or to impose any
222 penalty, financial or otherwise, because of the failure or refusal to accept pornographic
material
223 or material reasonably believed by the purchaser or consignee to be pornographic.
224     (2) (a) An offense under this section is a third degree felony punishable by:
225     (i) a minimum mandatory fine of not less than $1,000 plus $10 for each article

226
exhibited up to the maximum allowed by law; and

227    (ii) incarceration, without suspension of sentence in any way, for a term of not less than

228    30 days.

229    (b) This Subsection (2) supersedes Section 77-18-1 .

230    [(3) A service provider, as defined in Section 76-10-1230 , complies with this section if

231    it complies with Sections 76-10-1231 and 76-10-1232 .]

232    *(3) (a) This section does not apply to an Internet service provider, as defined in Section*

233    *76-10-1230 , if:*

234    *(i) the distribution of pornographic material by the Internet service provider occurs*

235    *only incidentally through the Internet service provider's function of:*

236    *(A) transmitting or routing data from one person to another person; or*

237    *(B) providing a connection between one person and another person;*

238    *(ii) the Internet service provider does not intentionally aid or abet in the distribution of*

239    *the pornographic material; and*

240    *(iii) the Internet service provider does not knowingly receive funds from or through a*

241    *person who distributes the pornographic material in exchange for permitting the person to*

242    *distribute the pornographic material.*

243    *(b) This section does not apply to a hosting company, as defined in Section*

244    *76-10-1230 , if:*

245    *(i) the distribution of pornographic material by the hosting company occurs only*

246    *incidentally through the hosting company's function of providing data storage space or data*

247    *caching to a person;*

248    *(ii) the hosting company does not intentionally engage, aid, or abet in the distribution*

249    *of the pornographic material; and*

250    *(iii) the hosting company does not knowingly receive funds from or through a person*

251    *who distributes the pornographic material in exchange for permitting the person to distribute,*

252    *store, or cache the pornographic material.*

253    Section 5. Section **76-10-1206** is amended to read:

254

**76-10-1206. Dealing in material harmful to a minor -- Exemptions for Internet**

255    **service providers and hosting companies.**

256    (1) A person is guilty of dealing in material harmful to minors when, knowing that a

257    person is a minor, or having negligently [or recklessly] failed to determine the proper age of a

258    minor, [he] *the person:*

259    (a) intentionally distributes or offers to distribute, exhibits or offers to exhibit to a

260    minor any material harmful to minors;

261    (b) intentionally produces, presents, or directs any performance before a minor, that is

262    harmful to minors; or

263    (c) intentionally participates in any performance before a minor, that is harmful to

264    minors.

265    (2) (a) Each separate offense under this section is a third degree felony punishable by:

266    (i) a minimum mandatory fine of not less than [$300] *$1,000* plus $10 for each article

267    exhibited up to the maximum allowed by law; and

268       (ii) incarceration, without suspension of sentence, for a term of not less than 14 days.

269    (b) This section supersedes Section 77-18-1 .

270    (3) (a) If a defendant has already been convicted once under this section, each separate

271    further offense is a second degree felony punishable by:

272       (i) a minimum mandatory fine of not less than $5,000 plus $10 for each article

273    exhibited up to the maximum allowed by law; and

274       (ii) incarceration, without suspension of sentence, for a term of not less than one year.

275    (b) This section supersedes Section 77-18-1 .

276    *(c) (i) This section does not apply to an Internet service provider, as defined in Section*

277    *76-10-1230 , if:*

278    *(A) the distribution of pornographic material by the Internet service provider occurs*

279    *only incidentally through the Internet service provider's function of:*

280    *(I) transmitting or routing data from one person to another person; or*

281    *(II) providing a connection between one person and another person;*

---

282

*(B) the Internet service provider does not intentionally aid or abet in the distribution of*

283    *the pornographic material; and*

284    *(C) the Internet service provider does not knowingly receive funds from or through a*

285    *person who distributes the pornographic material in exchange for permitting the person*

*to*

286    *distribute the pornographic material.*

287    *(ii) This section does not apply to a hosting company, as defined in Section*

288    *76-10-1230 , if:*

289    *(A) the distribution of pornographic material by the hosting company occurs only*

290    *incidentally through the hosting company's function of providing data storage space or*

*data*

291    *caching to a person;*

292    *(B) the hosting company does not intentionally engage, aid, or abet in the distribution*

293    *of the pornographic material; and*

294    *(C) the hosting company does not knowingly receive funds from or through a person*

295    *who distributes the pornographic material in exchange for permitting the person to*

*distribute,*

296    *store, or cache the pornographic material.*

297    (4) (a) A service provider, as defined in Section 76-10-1230 , [complies with] *is not*

298    *negligent under* this section if it complies with [Sections] *Section* 76-10-1231 [and

299    76-10-1232 ].

300    (b) A content provider, as defined in Section 76-10-1230 , [complies with] *is not*

301    *negligent under* this section if it complies with Section 76-10-1233 .

302    Section 6. Section **76-10-1230** is amended to read:

303    **76-10-1230. Definitions.**

304    As used in Sections 76-10-1231 [, 76-10-1232 ,] and 76-10-1233 :

305    (1) "Access restricted" means that a content provider limits access to material harmful

306    to minors by:

307    (a) properly rating content;

308    (b) providing an age verification mechanism designed to prevent a minor's access to

309    material harmful to minors, including requiring use of a credit card, adult access code, or

310     digital certificate verifying age; or
311          (c) any other reasonable measures feasible under available technology.
312          [(2) "Adult content registry" means the adult content registry created by Section
313     67-5-19-.]
314          [(3)] (2) "Consumer" means a natural person residing in this state who subscribes to a
315     service provided by a service provider for personal or residential use.
316          [(4)] (3) "Content provider" means a person [that] _domiciled in Utah or that generates_
317     _or hosts content in Utah, and that_ creates, collects, acquires, or organizes electronic data
for
318     electronic delivery to a consumer with the intent of making a profit.
319          [(5)] (4) (a) "Hosting company" means a person that provides services or facilities for
320     storing or distributing content over the Internet without editorial or creative alteration of
the
321     content.
322          (b) A hosting company may have policies concerning acceptable use without
becoming
323     a content provider under Subsection [(4)] (3).
324          [(6)] (5) (a) "Internet service provider" means a person engaged in the business of
325     providing a computer [and] communications facility _in Utah, with the intent of making a_
_profit,_
326     through which a consumer may obtain access to the Internet.
327          (b) "Internet service provider" does not include a common carrier if it provides only
328     telecommunications service.
329          [(7)] (6) "Properly rated" means content using a labeling system to label material
330     harmful to minors provided by the content provider in a way that:
331          (a) accurately apprises a consumer of the presence of material harmful to minors; and
332          (b) allows the consumer the ability to control access to material harmful to minors
333     based on the material's rating by use of reasonably priced commercially available
software,
334     including software in the public domain.
335          [(8)] (7) (a) Except as provided in Subsection [(8)] (7)(b), "service provider" means:
336          (i) an Internet service provider; or
337          (ii) a person who otherwise provides an Internet access service to a consumer _in Utah_

---

338     _with the intent of making a profit._
339          (b) "Service provider" does not include a person who does not terminate a service in
340     this state, but merely transmits data through:
341          (i) a wire;
342          (ii) a cable; or
343          (iii) an antenna.
344          (c) "Service provider," notwithstanding Subsection [(8)] (7)(b), includes a person who
345     meets the requirements of Subsection [(8)] (7)(a) and leases or rents a wire or cable for
the
346     transmission of data.
347          Section 7. Section 76-10-1231 is amended to read:
348          **76-10-1231. Data service providers -- Internet content harmful to minors.**
349          (1) (a) Upon request by a consumer, a service provider shall filter content to prevent
350     the transmission of material harmful to minors to the consumer.

351    (b) A service provider complies with Subsection (1)(a) if it uses a generally accepted
352 and commercially reasonable method of filtering.
353    (2) At the time of a consumer's subscription to a service provider's service, or at the
354 time this section takes effect if the consumer subscribes to the service provider's service
at the
355 time this section takes effect, the service provider shall notify the consumer in a
conspicuous
356 manner that the consumer may request to have material harmful to minors blocked under
357 Subsection (1).
358    (3) (a) A service provider may comply with Subsection (1) by:
359    (i) providing in-network filtering to prevent receipt of material harmful to minors,
360 *provided that the filtering does not affect or interfere with access to Internet content for*
361 *consumers who do not request filtering under Subsection (1)*; or
362    (ii) providing software, *or engaging a third party to provide software,* for
363 contemporaneous installation on the consumer's computer that blocks, in an easy-to-
enable and
364 commercially reasonable manner, receipt of material harmful to minors.
365    [(b) (i) Except as provided in Subsection (3)(b)(ii), a service provider may not charge
a

366
consumer for blocking material or providing software under this section, except that a service
367 provider may increase the cost to all subscribers to the service provider's services to
recover the
368 cost of complying with this section.]
369    [(ii) A service provider with fewer than 7,500 subscribers may charge a consumer for
370 providing software under Subsection (3)(a)(ii) if the charge does not exceed the service
371 provider's cost for the software.]
372    *(b) A service provider may charge a consumer for providing filtering under*
Subsection
373    *(3)(a).*
374    (4) If the attorney general determines that a service provider violates Subsection (1) or
375 (2), the attorney general shall:
376    (a) notify the service provider that the service provider is in violation of Subsection
(1)
377 or (2); and
378    (b) notify the service provider that the service provider has 30 days to comply with the
379 provision being violated or be subject to Subsection (5).
380    (5) A service provider that violates Subsection (1) or (2) is:
381    (a) subject to a civil fine of $2,500 for each separate violation of Subsection (1) or (2),
382 up to $10,000 per day; and
383    (b) guilty of a class A misdemeanor if:
384    (i) the service provider knowingly or intentionally fails to comply with Subsection (1);
385 or
386    (ii) the service provider fails to provide the notice required by Subsection (2).
387    (6) A proceeding to impose a civil fine under Subsection (5)(a) may only be brought
by
388 the attorney general in a court of competent jurisdiction.
389    (7) (a) The Division of Consumer Protection within the Department of Commerce
390 shall, in consultation with other entities as the Division of Consumer Protection

considers
391     appropriate, test the effectiveness of a service provider's system for blocking material
harmful
392     to minors under Subsection (1) at least annually.
393         (b) The results of testing by the Division of Consumer Protection under Subsection

394
(7)(a) shall be made available to:
395         (i) the service provider that is the subject of the test; and
396         (ii) the public.
397         (c) The Division of Consumer Protection shall make rules in accordance with Title 63,
398     Chapter 46a, Utah Administrative Rulemaking Act, to fulfil its duties under this section.
399         Section 8. Section **77-27-21.5** is amended to read:
400         **77-27-21.5. Sex offender registration -- Information system -- Law enforcement**
401     **and courts to report -- Registration -- Penalty -- Effect of expungement.**
402         (1) As used in this section:
403         (a) "Department" means the Department of Corrections.
404         (b) "Division" means the Division of Juvenile Justice Services.
405         (c) "Employed" or "carries on a vocation" includes employment that is full time or
part
406     time, whether financially compensated, volunteered, or for the purpose of government or
407     educational benefit.
408         (d) "Notification" means a person's acquisition of information from the department
409     about a sex offender, including his place of habitation, physical description, and other
410     information as provided in Subsections (12) and (13).
411         (e) "Register" means to comply with the rules of the department made under this
412     section.
413         (f) "Sex offender" means any person:
414         (i) convicted by this state of:
415         (A) a felony or class A misdemeanor violation of Section 76-4-401 , enticing a minor
416     over the Internet;
417         (B) Section 76-5-301.1 , kidnapping of a child;
418         (C) a felony violation of Section 76-5-401 , unlawful sexual activity with a minor;
419         (D) Section 76-5-401.1 , sexual abuse of a minor;
420         (E) Section 76-5-401.2 , unlawful sexual conduct with a 16 or 17 year old;
421         (F) Section 76-5-402 , rape;

422
(G) Section 76-5-402.1 , rape of a child;
423         (H) Section 76-5-402.2 , object rape;
424         (I) Section 76-5-402.3 , object rape of a child;
425         (J) a felony violation of Section 76-5-403 , forcible sodomy;
426         (K) Section 76-5-403.1 , sodomy on a child;
427         (L) Section 76-5-404 , forcible sexual abuse;
428         (M) Section 76-5-404.1 , sexual abuse of a child or aggravated sexual abuse of a child;
429         (N) Section 76-5-405 , aggravated sexual assault;
430         (O) Section 76-5a-3 , sexual exploitation of a minor;
431         (P) Section 76-7-102 , incest;
432         (Q) Section 76-9-702.5 , lewdness involving a child;

433          (R) Section 76-10-1306 , aggravated exploitation of prostitution; or
434          (S) attempting, soliciting, or conspiring to commit any felony offense listed in
435   Subsection (1)(f)(i);
436          (ii) who has been convicted of any crime, or an attempt, solicitation, or conspiracy to
437   commit a crime in another state or by the United States government that is substantially
438   equivalent to the offenses listed in Subsection (1)(f)(i) and who is:
439          (A) a Utah resident; or
440          (B) not a Utah resident, but who is in the state for ten days, regardless of whether or
441   not the offender intends to permanently reside in this state;
442          (iii) who is required to register as a sex offender in any other state or United States
443   territory, is not a Utah resident, but who is in the state for ten days, regardless of whether
or not
444   the offender intends to permanently reside in this state;
445          (iv) who is a nonresident regularly employed, working, or a student in this state and
446   was convicted of one or more offenses listed in Subsection (1)(f)(i), or any substantially
447   equivalent offense in another state or by the United States government, and as a result of
the
448   conviction, is required to register in the person's state of residence;
449          (v) who is found not guilty by reason of insanity in this state, any other state, or by the

450
United States government of one or more offenses listed in Subsection (1)(f)(i); or
451          (vi) who is adjudicated delinquent based on one or more offenses listed in Subsection
452   (1)(f)(i) and who has been committed to the division for secure confinement and remains
in the
453   division's custody 30 days prior to the person's 21st birthday.
454          (2) The department, to assist in investigating sex-related crimes and in apprehending
455   offenders, shall:
456          (a) develop and operate a system to collect, analyze, maintain, and disseminate
457   information on sex offenders and sex offenses; and
458          (b) make information collected and developed under this section available to the
459   public.
460          (3) Any law enforcement agency shall, in the manner prescribed by the department,
461   inform the department of:
462          (a) the receipt of a report or complaint of an offense listed in Subsection (1)(f), within
463   three working days; and
464          (b) the arrest of a person suspected of any of the offenses listed in Subsection (1)(f),
465   within five working days.
466          (4) Upon convicting a person of any of the offenses listed in Subsection (1)(f), the
467   convicting court shall within three working days forward a copy of the judgment and
sentence
468   to the department.
469          (5) A sex offender in the custody of the department shall be registered by agents of the
470   department upon:
471          (a) being placed on probation;
472          (b) commitment to a secure correctional facility operated by or under contract to the
473   department;
474          (c) release from confinement to parole status, termination or expiration of sentence, or
475   escape;
476          (d) entrance to and release from any community-based residential program operated

by
477      or under contract to the department; or

478
(e) termination of probation or parole.
479      (6) A sex offender not in the custody of the department and who is confined in a
480      correctional facility not operated by or under contract to the department shall be
registered with
481      the department by the sheriff of the county in which the offender is confined upon:
482          (a) commitment to the correctional facility; and
483          (b) release from confinement.
484      (7) A sex offender in the custody of the division shall be registered with the
department
485      by the division prior to release from custody.
486      (8) A sex offender committed to a state mental hospital shall be registered with the
487      department by the hospital upon admission and upon discharge.
488      (9) A sex offender convicted by any other state or by the United States government is
489      required to register under Subsection (1)(f)(ii) and shall register with the department
within ten
490      days of entering the state, regardless of the length of stay.
491      (10) (a) Except as provided in Subsections (10)(b), (c), and (d), a sex offender shall,
for
492      the duration of the sentence and for ten years after termination of sentence or custody of
the
493      division, register annually during the month of the offender's birth and again within five
days of
494      every change of his place of habitation, vehicle information, or educational information
495      required to be submitted under Subsection (12).
496      (b) Except as provided Subsections (10)(c) and (d), a sex offender who is convicted of
497      an offense listed in Subsection (1)(f)(i) by another state shall register for the time period
498      required by the state where the offender was convicted if the state's registration period
for the
499      offense that the offender was convicted of is in excess of the ten years from completion
of the
500      sentence registration period that is required under Subsection (10)(a).
501      (c) (i) A sex offender convicted as an adult of any of the offenses listed in Subsection
502      (10)(c)(ii) shall, for the offender's lifetime, register annually during the month of the
offender's
503      birth and again within five days of every change of the offender's place of habitation,
vehicle
504      information, or educational information required to be submitted under Subsection (12).
This
505      registration requirement is not subject to exemptions and may not be terminated or
altered

506
during the offender's lifetime.
507      (ii) Offenses referred to in Subsection (10)(c)(i) are:
508          (A) any offense listed in Subsection (1)(f) if, at the time of the conviction, the

offender
509      has previously been convicted of an offense listed in Subsection (1)(f) or has previously
been
510      required to register as a sex offender for an offense committed as a juvenile;
511      [(B) Section 76-5-402.1 , rape of a child;]
512      [(C) Section 76-5-402.3 , object rape of a child;]
513      (B) Section 76-4-401 , enticing a minor over the Internet, if the offense is a class A or
514      felony violation;
515      (C) Section 76-5-301.1 , child kidnapping;
516      (D) Section 76-5-402 , rape;
517      (E) Section 76-5-402.1 , rape of a child;
518      (F) Section 76-5-402.2 , object rape;
519      (G) Section 76-5-402.3 , object rape of a child;
520      [(D)] (H) Section 76-5-403 , forcible sodomy;
521      [(E)] (I) Section 76-5-403.1 , sodomy on a child;
522      [(F) Section 76-5-405 , aggravated sexual assault;]
523      [(G) Section 76-5-301.1 , child kidnapping;]
524      [(H)] (J) Section 76-5-404.1 , sexual abuse of a child;
525      [(I)] (K) Subsection 76-5-404.1 (4), aggravated sexual abuse of a child;
526      [(J) Section 76-5a-3 , sexual exploitation of a minor;]
527      (L) Section 76-5-405 , aggravated sexual assault;
528      (M) Section 76-5a-3 , sexual exploitation of a minor; or
529      [(K)] (N) Section 76-7-102 , incest[;].
530      [(L) Section 76-5-402 , rape; or]
531      [(M) Section 76-5-402.2 , object rape;]
532      (d) Notwithstanding Subsections (10)(a), (b), and (c), a sex offender who is confined
in
533      a secure facility or in a state mental hospital is not required to register annually.

534
(e) A sex offender that is required to register annually under this Subsection (10) shall
535      surrender the sex offender's license certificate or identification card as required under
536      Subsection 53-3-216 (3) or 53-3-807 (4) and may apply for a license certificate or
identification
537      card as provided under Section 53-3-205 or 53-3-804 .
538      (11) An agency in the state that registers a sex offender on probation, a sex offender
539      who has been released from confinement to parole status or termination, or a sex
offender
540      whose sentence has expired shall inform the offender of the duty to comply with:
541      (a) the continuing registration requirements of this section during the period of
542      registration required in Subsection (10), including:
543      (i) notification to the state agencies in the states where the registrant presently resides
544      and plans to reside when moving across state lines;
545      (ii) verification of address at least every 60 days pursuant to a parole agreement for
546      lifetime parolees; and
547      (iii) notification to the out-of-state agency where the offender is living, whether or not
548      the offender is a resident of that state; and
549      (b) the driver license certificate or identification card surrender requirement under
550      Subsection 53-3-216 (3) or 53-3-807 (4) and application provisions under Section 53-3-
205 or

551  53-3-804 .
552      (12) A sex offender shall provide the department with the following information:
553      (a) all names or aliases the sex offender is or has been known by;
554      (b) the sex offender's name and residential address;
555      (c) a physical description, including the sex offender's age, height, weight, eye and
hair
556  color;
557      (d) the type of vehicle or vehicles the sex offender drives;
558      (e) a current photograph of the sex offender; and
559      (f) each educational institution in Utah at which the sex offender is employed, carries
560  on a vocation, or is a student, and any change of enrollment or employment status of the
sex
561  offender at any educational institution.

562
(13) The department shall:
563      (a) provide the following additional information when available:
564      (i) the crimes the sex offender was convicted of or adjudicated delinquent for; and
565      (ii) a description of the sex offender's primary and secondary targets; and
566      (b) ensure that the registration information collected regarding a sex offender's
567  enrollment or employment at an educational institution is:
568      (i) (A) promptly made available to any law enforcement agency that has jurisdiction
569  where the institution is located if the educational institution is an institution of higher
570  education; or
571      (B) promptly made available to the district superintendent of the school district where
572  the offender is enrolled if the educational institution is an institution of primary
education; and
573      (ii) entered into the appropriate state records or data system.
574      (14) (a) A sex offender who knowingly fails to register under this section is guilty of:
575      (i) a third degree felony and shall be sentenced to serve a term of incarceration for not
576  less than 90 days and also at least one year of probation if:
577      (A) the sex offender is required to register for a felony conviction of an offense listed
578  in Subsection (1)(f)(i); or
579      (B) the sex offender is required to register for the offender's lifetime under Subsection
580  (10)(c); or
581      (ii) a class A misdemeanor and shall be sentenced to serve a term of incarceration for
582  not fewer than 90 days and also at least one year of probation if the sex offender is
required to
583  register for a misdemeanor conviction of an offense listed in Subsection (1)(f)(i).
584      (b) Neither the court nor the Board of Pardons and Parole may release a person who
585  violates this section from serving the term required under Subsection (14)(a). This
Subsection
586  (14)(b) supersedes any other provision of the law contrary to this section.
587      (15) Notwithstanding Title 63, Chapter 2, Government Records Access and
588  Management Act, information in Subsections (12) and (13) collected and released under
this
589  section is public information.

590

(16) (a) If a sex offender is to be temporarily sent outside a secure facility in which he
591    is confined on any assignment, including, without limitation, firefighting or disaster control,
592    the official who has custody of the offender shall, within a reasonable time prior to removal
593    from the secure facility, notify the local law enforcement agencies where the assignment is to
594    be filled.
595    (b) This Subsection (16) does not apply to any person temporarily released under guard
596    from the institution in which he is confined.
597    (17) Notwithstanding Sections 77-18-9 through 77-18-14 regarding expungement, a
598    person convicted of any offense listed in Subsection (1)(f) is not relieved from the
599    responsibility to register as required under this section.
600    (18) Notwithstanding Section 42-1-1 , a sex offender:
601    (a) may not change his name:
602    (i) while under the jurisdiction of the department; and
603    (ii) until the registration requirements of this statute have expired; or
604    (b) may not change his name at any time, if registration is under Subsection (10)(c).
605    (19) The department may make rules necessary to implement this section, including:
606    (a) the method for dissemination of the information; and
607    (b) instructions to the public regarding the use of the information.
608    (20) Any information regarding the identity or location of a victim shall be redacted by
609    the department from information provided under Subsections (12) and (13).
610    (21) Nothing in this section shall be construed to create or impose any duty on any
611    person to request or obtain information regarding any sex offender from the department.
612    (22) The department shall post registry information on the Internet, and the website
613    shall contain a disclaimer informing the public of the following:
614    (a) the information contained on the site is obtained from sex offenders and the
615    department does not guarantee its accuracy;
616    (b) members of the public are not allowed to use the information to harass or threaten
617    sex offenders or members of their families; and

---

618    (c) harassment, stalking, or threats against sex offenders or their families are prohibited
619    and doing so may violate Utah criminal laws.
620    (23) The website shall be indexed by both the surname of the offender and by postal
621    codes.
622    (24) The department shall construct the website so that users, before accessing registry
623    information, must indicate that they have read the disclaimer, understand it, and agree to
624    comply with its terms.
625    (25) The department, its personnel, and any individual or entity acting at the request or
626    upon the direction of the department are immune from civil liability for damages for good faith
627    compliance with this section and will be presumed to have acted in good faith by reporting
628    information.
629    (26) The department shall redact information that, if disclosed, could reasonably
630    identify a victim.

631     (27) (a) Each sex offender required to register under Subsection (10), who is not
632     currently under the jurisdiction of the Department of Corrections, shall pay to the department
633     an annual fee of $75 each year the sex offender is subject to the registration requirements.
634     (b) The department shall deposit fees under this Subsection (27) in the General Fund as
635     a dedicated credit, to be used by the department for maintaining the sex offender registry under
636     this section and monitoring sex offender registration compliance, including the costs of:
637     (i) data entry;
638     (ii) processing registration packets;
639     (iii) updating registry information;
640     (iv) ensuring sex offender compliance with registration requirements under this
641     section; and
642     (v) apprehending offenders who are in violation of the sex offender registration
643     requirements under this section.
644     Section 9. **Repealer.**
645     This bill repeals:

646
Section 67-5-19, **Adult content registry.**
647     Section **76-10-1232, Data service providers -- Adult content registry.**
648     Section 10. **Effective date.**
649     *If approved by two-thirds of all the members elected to each house, this bill takes effect*
650     *upon approval by the governor, or the day following the constitutional time limit of Utah*
651     *Constitution Article VII, Section 8, without the governor's signature, or in the case of a veto,*
652     *the date of veto override.*

[Bill Documents][Bills Directory]

Questions/Comments | Utah State Home Page | Terms of Use/Privacy Policy