**HOWREY LLP**
Wesley D. Felix (6539)
Zachary J. Weyher (10846)
170 South Main Street, Suite 400
Salt Lake City, UT 84101
Telephone: (801) 533-8383
Facsimile: (801) 531-1486

**CENTER FOR DEMOCRACY &
TECHNOLOGY**
John Morris (*Admitted Pro Hac Vice*)
1634 Eye Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 637-9800
Facsimile: (202) 637-0968

**AMERICAN CIVIL LIBERTIES UNION
OF UTAH FOUNDATION, INC.**
Marina Baginsky Lowe (11482)
355 North 300 West
Salt Lake City, UT 84103
Telephone: (801) 521-9862
Facsimile: (801) 532-2850

**SONNENSCHEIN NATH &
ROSENTHAL LLP**
Michael A. Bamberger (*Admitted Pro Hac
Vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| THE KING'S ENGLISH, INC., et al., ) | |
| ) | |
| Plaintiffs, ) | Civil No. 2:05CV00485 DB |
| ) | |
| vs. ) | Judge Dee Benson |
| ) | |
| MARK SHURTLEF,F et al., ) | **ORAL ARGUMENT REQUESTED** |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

PROCEDURAL BACKGROUND ....................................................................v

STATUTORY MEANING ................................................................................vi

    "Harmful to minors" provision §76-10-1206 ...........................................vii

    Blocking provision § 76-10-1231..............................................................ix

    Blocking provision § 76-10-1205...............................................................xi

    Mandatory labeling provision § 76-10-1233...........................................xiii

STANDARD OF REVIEW...............................................................................xiv

THE TEST FOR STANDING IN FIRST
AMENDMENT CHALLENGES........................................................................xv

ARGUMENT......................................................................................................1

I.      DEFENDANTS' EMPHASIS ON FILTERING
       MISSES THE POINT OF BOTH PLAINTIFFS'
       CLAIMS AND THE COPA CASE ITSELF....................................1

II.    PLAINTIFFS HAVE STANDING TO CHALLENGE
       THE HARMFUL TO MINORS PROVISION (§ 76-10-1206)............2

III    PLAINTIFFS HAVE STANDING TO CHALLENGE
       THE TWO BLOCKING PROVISIONS (§ 76-10-1231
       and § 76-10-1205)..........................................................................6

       A.    Plaintiffs Have Standing to Challenge § 76-10-1231
            on Commerce Clause Grounds..........................................6

       B.    Plaintiffs Have Standing to Challenge § 76-10-1205
            on First Amendment and Commerce Clause Grounds ............8

IV    PLAINTIFFS HAVE STANDING TO CHALLENGE THE
       MANDATORY LABELING PROVISION (§ 76-10-1233)..............9

CONCLUSION...................................................................................................11

# TABLE OF AUTHORITIES
## CASES

*ACLU v.Goddard*
Civ. 00-0505 TUC AM (D. Ariz., Aug. 11, 2004)...............................................................viii

*ACLU v. Gonzales,*
478 F. Supp. 2d 775 (E.D. Pa. 2007)..................................................... viii, xiv, 1, 10

*ACLU v. Johnson,*
194 F.3d 1003 (10th Cir. 1999) .................................................................... viii, 1, 7

*American. Booksellers Fdn. v. Dean,*
342 F.3d 86 (2d Cir. 2003) ......................................................................................... vii

*American Library Association v. Pataki,*
969 F. Supp. 160 (S.D.N.Y. 1997) ....................................................................... viii, 7

*Ashcroft v. American Civil Liberties Union,*
542 U.S. 656 (2004) .....................................................................................................1,

*Babbitt v. United Farm Workers National Union,*
442 U.S. 289 (1979) ....................................................................................................xv,

*Center for Democracy & Technology v. Pappert,*
337 F. Supp. 2d 606 (E.D. Pa. 2004)......................................................................vi, 6

*Colautti v. Franklin,*
439 U.S. 379 (1979) .....................................................................................................xii

*Cyberspace Communications, Inc. v. Engler,*
238 F.3d 420 (6th Cir. 2000) ..................................................................................... vii

*Entertainment Software Association v. Blagojevich,*
469 F.3d 641 (7th Cir. 2006) ......................................................................................11

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
528 U.S. 167 (2000) .....................................................................................................xv

*Initiative and Referendum Institute v. Walker,*
450 F.3d 1082 (10th Cir. 2006) ..............................................................................xiv, 4

*Reno v. ACLU,*
521 U.S. 844 (1997) .................................................................................................. viii

*Riley v. National Federation of the Blind of N.C., Inc.,*
487 U.S. 781 (1988) .....................................................................................................11

*PSInet v. Chapman*
    342 F.3d 227 (4ᵗʰ Cir. 2004) ................................................................ vii

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47,(2006) ............................................................................... 10

*Southeast Booksellers Association v. McMaster,*
    371 F. Supp. 2d 773 (D.S.C. 2005) ................................................... viii

*Virginia v. America Booksellers Association,*
    484 U.S. 383 (1988) .....................................................................xv, xvi

*W. Va. Board of Education v. Barnette,*
    319 U.S. 624 (1943) .............................................................................. 11

*Warth v. Seldin,*
    422 U.S. 490(1975), ..........................................................................xv, 4

*Wooley v. Maynard,*
    430 U.S. 705 (1977) .............................................................................. 11

## STATUTES

Utah Code Annon § 76-10-1206.................................... .........v, vi, vii, viii, ix xiii, xiv, 11, 12

Utah Code Annon § 76-10-1233 ................................... v, vii, viii, ix, 2, 3, 5, 9, 10, 11, 12

Utah Code Annon § 76-10-1231 ..................................v, vi, ix, x, xi, xii, xiii, 6, 7, 8, 11, 12

Utah Code Annon § 76-10-1232 ........................................................ v, vi, xi, xii, 6

Utah Code Annon § 76-10-1205 ....................................v, vi, xi, xii, xiii, 6, 8, 9, 11, 12

Utah Code Annon § 67-5-19 .............................................................................v

Utah Code Annon § 76-10-1201 ................................................................. viii, 4

Utah Code Annon § 76-10-1230 ...................................................... ix, xi, xiv, 10

## MISCELLANEOUS

2005 in House Bill 260.................................................................................xi

Plaintiffs respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (the "Motion").

In the Motion, Defendants maintain that none of the 14 Plaintiffs have standing to bring the claims asserted in the Amended Complaint. As set forth below, Plaintiffs' standing to challenge the legislation at issue has not been affected by the amendments made by the Utah State Legislature in 2007 (the "2007 Amendments"). Despite Defendants' attempt to characterize the legislation as applying only to certain entities doing business in the state of Utah, the plain language of the legislation is not so narrowly drawn. In fact, as Defendants point out, the amendments create new ambiguities in the legislation which only bolster Plaintiffs' standing to bring their claims, including their claim that the "harmful to minors" provision is unconstitutionally vague.

Plaintiffs represent a broad range of individuals and entities who are speakers, content providers and access providers on the Internet, as well as their members and users. Plaintiffs have a direct interest in representing, and providing services to, their members and users, including in their members' and users' ability to post and discuss First Amendment-protected content on the Internet such as resources on sexual advice for disabled persons, AIDS prevention, visual art and images, and literature and resources for gay and lesbian youth. The restrictions imposed by the amended legislation constitute a significant burden on Plaintiffs who have no way to avoid prosecution and are left with two equally untenable alternatives: (1) risk prosecution or (2) attempt to engage in self-censorship and thereby deny adults and older minors access to constitutionally protected material.

# PROCEDURAL BACKGROUND

Plaintiffs filed their original Complaint in this action on June 9, 2005, challenging the constitutionality of five specific provisions of Utah House Bill 260, which was enacted in the 2005 legislative session (the "2005 Amendments"):

**Provisions restricting the distribution of "harmful to minors" material:**

1. Amending existing Utah Code § 76-10-1206 to expand Utah law with respect to the distribution to minors of "harmful to minors" material to apply to distribution on the Internet, including by content publishers and ISPs;

**Provisions requiring ISPs and others to block access to certain content or web sites:**

2. Enacting new Utah Code § 76-10-1231 to require ISPs to block access to all "harmful to minors" material upon customers' requests;

3. Enacting new Utah Code § 76-10-1232 to require ISPs to block access to certain websites identified by Defendant Utah Attorney General Shurtleff material in an "Adult Content Registry" created by new Utah Code § 67-5-19 (which was also enacted in House Bill 260);

4. Amending existing Utah Code § 76-10-1205 to require that Internet Service Providers ("ISPs") and others block access to specific "pornographic" sites designated by any customer of such service; and

**Provision requiring certain Internet content providers to "label" their content or restrict access to it:**

5. Enacting new Utah Code § 76-10-1233 to require Utah-connected Internet content providers to self-evaluate and label the content of their speech, or to restrict access to the speech.

Immediately upon filing of the Complaint, the parties entered into discussions that resulted in a Stipulated Order entered by this Court ordering the Defendants not to enforce the Utah Code sections listed above.

The goal of this agreement by the parties was to allow Defendants an opportunity to have the Utah Legislature repeal or otherwise correct the Utah Code sections challenged in this action.

In the 2006 legislative session, the original sponsor of House Bill 260 did introduce House Bill 187 (which would have fully resolved Plaintiffs' concerns about two of the five challenged sections – § 76-10-1205 and § 76-10-1232). The Legislature did not, however, pass House Bill 187 or any other "fixes" to House Bill 260.

Following this inaction in the 2006 legislative session, Plaintiffs commenced with discovery in this case. Defendants again sought to defer full litigation in this case to permit the 2007 Legislature an opportunity to fix House Bill 260. Plaintiffs agreed on the condition that the Court entered a robust Preliminary Injunction against the law during the pendency of this action. The Court entered such a stipulated Preliminary Injunction on August 25, 2006.

In its 2007 legislative session, the Utah Legislature did enact House Bill 5, which contained a number of changes affecting the claims in this action (the "2007 Amendments"). That bill (a) wholly repealed one of the five challenged sections (§ 76-10-1232 creating the Adult Content Registry[1]), (b) addressed many but not all of Plaintiffs' concerns about a second section (§ 76-10-1231), (c) changed but did not improve two sections (§ 76-10-1205 and § 76-10-1206), and (d) did not alter or even discuss one section (§ 76-10-1233). In light of these changes, Plaintiffs filed an Amended Complaint challenging four of the originally challenged five Utah Code sections.

## STATUTORY MEANING

The meaning of the statutory language is of course the starting point for the Court's analysis of the Motion. This is all the more important in light of the fact that certain of the

---

[1] The repealed section was very similar to a Pennsylvania statute that was overturned as unconstitutional in *Center for Democracy & Technology v. Pappert*, 337 F. Supp. 2d 606 (E.D. Pa. 2004).

challenged Utah Code sections (as enacted and/or amended by the 2005 and 2007 Amendments) are misdescribed by Defendants. In particular,

1. The Act as amended <u>does</u> apply to persons not based in Utah; and

2. There continue to be provisions providing for blocking of specific websites.

Plaintiffs discuss in detail the meaning of each of the four challenged Utah Code sections.

### "Harmful to minors" provision § 76-10-1206

Defendants mischaracterize the Amended Act as applying only to three types of entities: Internet Service Providers, hosting companies and content providers, all doing business or located in Utah.[2] This simply is not accurate. Plaintiffs all can be subject to the restrictions imposed by the Amended Act irrespective of their location or what type of services they provide to their members or users through the Internet.

Prior to the 2005 Amendments, it was not clear whether or not the restriction on the distribution or exhibition of "harmful to minors" material to minors applied to material distributed by or exhibited on the Internet. While § 76-10-1206 applies to all "persons" without any geographical or other limitation (despite Defendants' assertions otherwise, *see, e.g.*, Def. Mem. at 12-14), the 2005 Amendments added "safe harbor" provisions for Internet service providers and Internet content-providers. This amendment made it clear that the legislature intended § 76-10-1206 to extend to the Internet. (The federal courts have found similar provisions in the laws of seven other states unconstitutional under the First Amendment and the Commerce Clause.[3])

---

[2] *See* Defendants' Memorandum in Support of their Motion to Dismiss ("Def. Mem.") at 3.

[3] *PSInet v. Chapman*, 342 F.3d 227 (4th Cir. 2004); *Amer. Booksellers Fdn. v. Dean*, 342 F.3d 86 (2d Cir. 2003); *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir.

The 2007 Amendments complicated the matter further. They amend the "safe harbors" created in the 2005 Amendments to limit their availability only to Utah entities, and they add a new exemption for in-state "Internet service providers" and "hosting companies" whether located in Utah or elsewhere. Curiously, however, the new exemptions relate to "pornographic material," not "harmful to minors" material. Thus, if a hosting company or a Utah ISP complies with the exemptive provisions as to pornographic material, it is exempted from § 76-10-1206 even if the distribution of "harmful to minors" materials is one of its major functions, it intentionally aids and abets in the distribution of such materials, and it is paid for permitting such materials to be distributed. Neither the 2005 safe harbors or the 2007 exemptions are available to non-Utah-based content providers or ISPs.

Finally, there is the amendment that puzzles even the Attorney General and the prosecutor Defendants. The Utah definition of "harmful to minors" prior to the 2007 amendments followed the three-pronged approach required by U.S. Supreme Court precedent, the second of which being that the material appeals to minors' prurient interest in sex. In the 2007 Amendments, this was changed to a requirement that the material appeal to anyone's prurient interest in sex <u>with</u> minors (§ 76-10-1201(4)(a)). It is not clear whether this change is meant to limit "harmful to minors" materials to (a) descriptions or representations of nudity, sexual conduct, sexual excitement or sadomasochistic abuse ("Explicit Sex") where one or both of the participants is a minor; (b) descriptions or representations of Explicit Sex where neither of

---

2000); *ACLU v. Johnson*, 194 F.3d 1003 (10th Cir. 1999); *Southeast Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773 (D.S.C. 2005); *ACLU v. Goddard*, Civ. 00-0505 TUC AM(D. Ariz. August 11, 2004)(mediacoalition.org/legal/goddard/index.htm) (Attached hereto as Appendix B.); *Amer. Library Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997). *See also, ACLU v. Gonzales*, 478 F. Supp. 2d 775 (E.D. Pa. 2007); *Reno v. ACLU*, 521 U.S. 844 (1997).

the participants is a minor but which appeals to the prurient interest of a minor in sex with or among minors; or (c) some other category of materials.

The puzzlement is compounded by the position taken by Lohra L. Miller, District Attorney for Salt Lake County (who is a Defendant in this action), in *State v. Haltom*, Case No. 00193808, Third District Court, Salt Lake County. In her Memorandum in Opposition (which is attached hereto as Appendix A), District Attorney Miller indicates that the amendment was initially recommended by the Attorney General's Office (Ex. A to App. A), but that the amendment was an "error that was subsequently recognized by the bill's proponents" (App. A, at 8), likely to be corrected in the 2008 legislative session.

As discussed more fully below, Plaintiffs have standing to challenge § 76-10-1206 (whatever it may mean) under the First and Fourteenth Amendments and the Commerce Clause of the U.S. Constitution.

### Blocking provision § 76-10-1231

Utah Code § 76-10-1231 requires ISPs to block access by individual customers to "harmful to minors" material upon request by the customers. Generally speaking, the "harmful" material to be blocked is material that is located elsewhere on the Internet; in other words, in the vast majority of cases, the material is not material that is being "hosted" or offered by the ISP itself.

On its face, § 76-10-1231 applies to "service providers," which in turn in §§ 76-10-1230(5) and (7) is defined as a person who provides – in Utah – a service that allows a consumer access to the Internet. Section 76-10-1230 further limits "service provider" to persons who provide such Internet access "with the intent of making a profit." *Id.* This definition would

reach both entities that are wholly located in Utah, and entities (such as national or regional ISPs) that provide service both in and outside of Utah.

Section 76-10-1231 specifies two specific methods by which an ISP can block individual customers' access to "harmful to minors" material. First, under § 76-10-1231(3)(a)(ii), an ISP can provide (for a fee) software to the customer that can be installed on the customer's own computer and that can block access on that computer to "harmful to minors" material. Such software shall be referred to in this Memorandum as "In-Home Filtering Software."

Second, under § 76-10-1231(3)(a)(i), an ISP can provide "in-network filtering" of content so that the individual requesting customers are unable to access the "harmful" material. The term "in-network" refers to filtering actions that are implemented in the ISPs facilities, rather than in the customers' own computers (as with In-Home Filtering Software).

To address the risk that such "in-network" filtering might restrict access by <u>both</u> customers that request the filtering *and* customers that do not request the filtering, House Bill 5 includes a language (originally suggested by Plaintiffs) that this Memorandum will refer to as the "Overblocking Safeguard:" "the [in-network] filtering [must] not affect or interfere with access to Internet content for consumers who do not request filtering." Utah Code § 76-10-1231(3)(a)(i).

Because both of these options – the In-Home Filtering Software and the in-network filtering as qualified by the Overblocking Safeguard – should only affect the Internet access of the individual consumers who themselves request the filtering, the 2007 Amendments to § 76-10-1231 fully address Plaintiffs' First Amendment-based challenges to the original § 76-10-1231 as enacted in the 2005 Amendments. However, these amendments do not cure the Commerce Clause objections to § 76-10-1231, which are asserted in the Amended Complaint.

x

### Blocking provision § 76-10-1205

Utah Code § 76-10-1205 is the most perplexing of the challenged provisions to determine its meaning in the Internet context.[4] Prior to the 2005 Amendments, § 76-10-1205 on "Inducing acceptance of pornographic material" almost certainly had absolutely nothing to do with the Internet. The pre-amendment statute addressed the entirely "off-line" situation of when a magazine distributor would attempt to force a retailer to carry an adult magazine (say, Hustler magazine) as a condition of being able to carry a non-adult magazine (say, Time magazine). Under § 76-10-1205, Utah state law made it illegal for the magazine distributor to force a retailer to buy copies of Hustler in order to be able to buy copies of Time. As far as Plaintiffs are aware, the pre-amendment text of § 76-10-1205 did not in any way apply to the Internet or Internet Service Providers.

In 2005 in House Bill 260, however, the Utah Legislature added to § 76-10-1205 an entirely new section that specifically focuses on Internet Service Providers:

> (3) A service provider, as defined in Section 76-10-1230, complies with this section if it complies with Sections 76-10-1231 and 76-10-1232.

Although the Legislature explains how "service providers" (which includes Utah ISPs) could comply with § 76-10-1205, the Legislature did not explain how § 76-10-1205 applied to ISPs in the first place.

In the 2007 Amendments, the Legislature increased, rather than decreased, the uncertainty about the meaning of § 76-10-1205. The 2007 Amendments removed the above language added by the 2005 Amendments, and added *two* Internet-focused provisions to § 76-10-

---

[4] Plaintiffs note that in Defendants' Memorandum in Support of their Motion to Dismiss Defendants almost completely ignore Section § 76-10-1205, and do not offer any explanation as to its meaning as applied to the Internet.

1205: subsection (3)(a) specifies how Utah ISPs could avoid the dictates of the section, and subsection (3)(b) specifies how "hosting companies" (which host or serve World Wide Web content on the Internet) could avoid the dictates of § 76-10-1205. Again, the Legislature failed to illuminate or explain how § 76-10-1205 applies to ISPs or hosting companies in the first place.

In attempting to understand § 76-10-1205, as amended, the Court is of course guided by the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (warning that no part of a statute can be rendered "redundant or largely superfluous"). To avoid rendering the new Internet-focused parts of § 76-10-1205 entirely superfluous, the inescapable conclusion is that the pre-amendment prohibitions found in § 76-10-1205(1) must directly apply to ISPs and World Wide Web hosting companies.

As a threshold matter, Plaintiffs challenge the amended § 76-10-1205 based on its complete vagueness as to how it applies in the Internet context. As Plaintiffs read the language of § 76-10-1205(1), Plaintiffs believe that the only way to translate the requirements into the Internet context is an interpretation along the following lines: an ISP or hosting company cannot force any Utah customer or user to receive access to any website deemed by the customer to be "pornographic" as a condition of receiving access to non-pornographic web sites. Under this interpretation, an ISP or web hosting company is required to block a customers' or users' access to any websites identified by the customer or user as "pornographic" – a requirement that is directly analogous to the now-repealed "Adult Content Registry" created in the 2005 Amendments in § 76-10-1232 (except that in § 76-10-1205 it is the customer, not the Attorney General, who specifies which web sites to block). Because the 2005 Amendments contained two

other ISP-blocking provisions (§ 76-10-1231 and § 76-10-1232), it is not unreasonable to understand § 76-10-1205 to be a third blocking provision.

Two other points about the meaning of § 76-10-1205 are significant: First, although the Utah Legislature included in the 2007 Amendments the "Overblocking Safeguard" language in § 76-10-1231 (as discussed above), the Legislature did *not* include similar language in § 76-10-1205. Thus, although when complying with § 76-10-1231 ISPs cannot "affect or interfere with access to Internet content for consumers who do not request filtering," it appears that there is no such constraint on the actions of ISPs who must comply with blocking demands made under § 76-10-1205.

Second, it is important to note that § 76-10-1205 applies to *all* ISPs and web hosting companies, whether located in Utah, in another state, or elsewhere in the world. Section 76-10-1205 applies to any "person" without limitation as to where that person is located. This is all the more clear because in the 2007 Amendments, the Utah Legislature specifically defined certain terms to apply only to entities operating in Utah, but the Legislature failed to impose any such limit on the reach of § 76-10-1205. Although the term "Internet Service Provider" is focused on Utah entities, that term is only used to define who can take advantage of the affirmative defense set out in § 76-10-1205(3)(a), and thus that geographic limit does not act to limit the intended scope of the broader provisions of § 76-10-1205.

As discussed more fully below, Plaintiffs have standing to challenge § 76-10-1205 under the First and Fourteenth Amendments and the Commerce Clause of the U.S. Constitution.

## Mandatory labeling provision § 76-10-1233

Utah Code § 76-10-1233 requires Utah-connected Internet content providers to self-evaluate and label the content of their speech, or to restrict access to the speech, and was completely unaffected by the 2007 Amendments.

Section 76-10-1233(1) requires Utah content providers to "restrict access to materials harmful to minors." The definitions of "Access restricted" in § 76-10-1230(1) gives a content provider two specific options to comply with § 76-10-1233, by either:

(a) properly rating content;

(b) providing an age verification mechanism designed to prevent a minor's access to material harmful to minors, including requiring use of a credit card, adult access code, or digital certificate verifying age; or

(c) any other reasonable measures feasible under available technology.

Because as a practical matter there are no viable and effective technologies that content providers can use to "restrict access to materials harmful to minors,"[5] the net effect of § 76-10-1233 is to require Utah content providers to "rate" and "label" any material that is "harmful to minors."

As discussed more fully below, Plaintiffs have standing to challenge § 76-10-1233 under the First and Fourteenth Amendments and the Commerce Clause of the U.S. Constitution.

## STANDARD OF REVIEW

As the 10th Circuit Court of Appeals recently said in circumstances similar to this:

This case arises in the procedural context of a motion to dismiss on the pleadings. When evaluating a plaintiff's standing at this stage, 'both the trial

---

[5]      Subparts (b) and (c) of § 76-10-1230(1) are very close to the language of the federal Child Online Protection Act (COPA), which has been repeatedly enjoined as unconstitutional by the Eastern District of Pennsylvania, the Third Circuit, and the U.S. Supreme Court. Most recently, after a lengthy trial on the merits, the district court explained in detail his holding that there are no effective means by which a content provider can restrict access to Internet content. *See ACLU v. Gonzales*, 478 F. Supp. 2d 775, (E.D. Pa. 2007).

and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.' *Warth v. Seldin,* 422 U.S. 490, 501, (1975).

*Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006)

Defendants fail to heed this requirement.

## THE TEST FOR STANDING IN
## FIRST AMENDMENT CHALLENGES

Article III of the Constitution, which limits federal judicial power to the adjudication of

"Cases" and "Controversies" is the basis for the constitutional elements of the standing doctrine.

In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167,

(2000), the Supreme Court explained that

> to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 180-181.

A plaintiff bringing a pre-enforcement facial challenge under the First Amendment

against a statute which punishes violators with civil or criminal sanctions need not demonstrate

to a certainty that it will be prosecuted under the statute in order to establish injury in fact.

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Rather, a plaintiff will satisfy the

"injury" requirement if it demonstrates merely a *credible or well-founded fear* that the statute

will be enforced against it. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298

(1979).

A plaintiff demonstrates proof of credible or well-founded fear of prosecution if the

statute in question can reasonably be construed to cover the expressive or communicative

activities in which a plaintiff presently engages or reasonably intends to engage in the future. *Babbitt*, 442 U.S. at 299-300.

A contention by the state that it does not intend to charge the plaintiff under the statute does not – as a matter of standing doctrine – negate the plaintiff's reasonable fear of prosecution. "[T]he alleged danger of this statute is, in large measure, one of self-censorship, a harm that can be realized even without an actual prosecution." *Virginia v. Booksellers Ass'n*, 484 U.S. at 383, 393 (1988).

# ARGUMENT

## I. DEFENDANTS' EMPHASIS ON FILTERING MISSES THE POINT OF BOTH PLAINTIFFS' CLAIMS AND THE COPA CASE ITSELF.

In Defendants' Summary of Argument and throughout their Memorandum, Defendants' place heavy emphasis on the fact that the Supreme Court has ruled that the use of filtering software can be a "less restrictive alternative" to protect minors from access to unwanted sexual content, citing the Court's decision in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004) concerning the "Child Online Protection Act" ("COPA"). Defendants' reliance on the COPA case is misplaced for at least two reasons.

First, the COPA line of decisions (including most recently the district court decision on remand from the Supreme Court, *see ACLU v. Gonzales,* 478 F. Supp. 2d 775 (E.D. Pa. 2007) squarely holds that the *voluntary* use *by parents* of filtering software is a "less restrictive alternative" to governmental censorship of Internet content. In this case, however, Plaintiffs are *not* challenging such voluntary use by parents of filtering tools. Instead, Plaintiffs are challenging a broad range of burdensome censorship regulations that are imposed directly on Internet content providers (speakers on the Internet) and on Internet service and hosting providers.

Second, and closely related to the first, the key meaning of the COPA line of cases (and the many other federal cases that follow the COPA reasoning, including the Tenth Circuit's decision in *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999)) is that parental use of filtering software is a less restrictive alternative *to governmental efforts to regulate the Internet.* In other words, the COPA case cited by Defendants relies on filtering *to strike down governmental censorship laws*, including laws that are very similar to those challenged in this case.

Thus, Plaintiffs fully agree that the COPA line of cases are critical to the Court's analysis of the claims in this case – but for the precisely opposite reason that Defendants assert. As we litigate the merits of this case, it will be Defendants' burden to demonstrate that the statutes challenged in this action are somehow different from the very similar laws struck down in the COPA case and other similar decisions. At the end of the day, the fact that parents can use filtering software to protect their children *without any governmental action whatsoever* will be a very high hurdle for Defendants to get over in their attempt to justify the burdens on free speech imposed by the statutes challenged here.

## II.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE HARMFUL TO MINORS PROVISION (§ 76-10-1206).

Defendants attack the standing of the Plaintiffs which they describe as "out-of-state content providers" (The Sexual Health Network, Inc., Comic Book Legal Defense Fund, Publishers Marketing Association, Association of American Publishers, Inc. and Freedom to Read Foundation) by saying that they "are not subject to the Utah Act under any conceivable scenario." (Def. Mem. p. 12.) Simply stated, that is false.

There is nothing in § 76-10-1206 which limits its application to in-state content providers. In fact, there is no mention of content providers, either in-state or out-of-state, in the core part of the section. By its own terms, the section applies to any "person," with no geographic or other limit. *See* § 76-10-1206(1). Although certain of the safe harbors and exemptions are limited to Utah entities, the underlying criminal offense is in no way limited.[6] While prior to the 2005 Amendments, it was unclear whether § 76-10-1206 applied to electronic distribution or exhibition, the 2005 and 2007 Amendments made it abundantly clear that it did.

---

[6]    Indeed, the very fact that the safe harbors are only available to Utah entities bolsters out-of-state Plaintiffs' standing to raise Commerce Clause objections.

Thus, § 76-10-1206 applies to those designated by Defendants as out-of-state content providers, and those Plaintiffs have standing to challenge § 76-10-1206.

As to those categorized by Defendants as "Utah-based providers who fear their websites may contain material harmful to minors" (The King's English, Sam Weller's Zion Bookstore, American Booksellers Foundation for Free Expression, ACLU of Utah, and Nathan Florence), Defendants simply disregard the allegations in the Amended Complaint as to the possible application of § 76-10-1206. For example, Defendants argue that certain of the Plaintiffs lack standing because while they "would be characterized as Utah-based content providers," they are "not considered by Defendants as parties distributing material harmful to minors . . ." (Def. Mem. at 16.) To support their contention, Defendants rely on an affidavit of Attorney General Mark Shurtleff and (now former) District Attorney David Yocom, filed back in August of 2005, that expresses their opinion with respect to whether material on Plaintiffs' websites constitute "harmful to minors" material under the 2005 Amendments (Def. Mem. at 17.) Defendants then go on to rather equivocally state that "[i]t <u>appears</u> that none of [Plaintiffs'] content involves a 'prurient interest in sex with minors,' so it is <u>unlikely</u> that its content would fall within the scope of the labeling requirements" (Def. Mem. at 17 (emphasis added.)) However, according to Defendants, if by chance it does fall under the scope of the Amended Act (since they readily concede that "<u>its impossible to know</u> just what was intended by the change" to the "harmful to minors" provision even though it was initially suggested by the Attorney General's Office (*see* Def. Mem. at 3, fn. 2) (emphasis added), Plaintiffs still apparently lack standing because, in their opinion, Plaintiffs can simply "meet the requirements of the Act." (Def. Mem. at 17.)[7]

---

[7]    The confusion in the Defendants' analysis is highlighted by the fact that although in the instant motion they argue that Plaintiff Nathan Florence lacks standing, in their subsequently-

Under the well-settled law of the United States Supreme Court and the 10th Circuit, even if Defendants' view of the facts was accurate – which it is not – the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Initiative and Referendum Institute*, 450 F.3d at 1089, quoting *Warth,* 422 U.S. at 501.

All of the Plaintiffs who provide or transmit content have alleged fear of prosecution because of material they sell or transmit with sexual content. *See* Am. Compl. ¶¶ 148, 151, 154, 165, 168-69, 170-71, 173-74, 176-77, and 180. The chilling effect of the harmful minors provision is compounded by the fact that Plaintiffs cannot know what material falls within the definition of "harmful to minors" after the 2007 Amendments. On its face, amended § 76-10-1201(4)(a) could limit "harmful to minors" to (a) descriptions or representations of nudity, sexual conduct, sexual excitement or sadomasochistic abuse ("Explicit Sex") where one or both of the participants is a minor; (b) descriptions or representations of Explicit Sex where neither of the participants is a minor but which appeals to the prurient interest of a minor in sex with or among minors; or (c) some other category of materials. We know from the recent filing by Defendant Salt Lake City County Dist. Atty. Miller that the 2007 amendment to § 76-10-1201(4)(a) was a mistake and presumably there was no legislative intent to change the meaning from what it was prior that amendment. At the same time, Defendants in this case (including Dist. Atty. Miller) state unequivocally that although it is "impossible to know just what was intended by the change," the 2007 Amendments "considerably tightened the Harmful to Minors

---

withdrawn Motion to Dismiss filed in August 2005, Defendants conceded that Mr. Florence's artwork could be considered "harmful to minors" and thus he had standing to challenge the statute. *See* Defendants' Memorandum in Support of Defendants' Motion to Dismiss, at 17 (filed Aug. 8, 2005).

statute" (Def. Mem. at 3) by relating only to "content involve[ing] a 'prurient interest in sex with minors'."

Moreover, putting aside the question of how content "involves" a prurient interest in sex with minors, since the amended "harmful to minors" definition (contrary to that of child pornography) covers both visual materials and text, under Defendants' reading works such as Vladimir Nabokov's *Lolita*, Gunther Grass' *The Tin Drum*, Judy Blume's *Forever*, and Stephen Chbosky's *The Perks of Being A Wallflower* – all of which involve descriptions of "sex with minors" but are unquestionably fully constitutionally protected – could be swept in under the statute.

Given this broad panoply of possible meanings, it should be no surprise that Plaintiffs have a reasonable fear of prosecution and that § 76-10-1206 has a chilling effect. Thus, Plaintiffs – both in-state and out-of-state – have standing to challenge this section under the First Amendment. In addition, Plaintiffs IPNS of Utah, LLC, and RigidTech.Com, Inc. have standing on behalf of their web hosting customers. Am. Compl. ¶¶ 156, 158.[8]

### III. PLAINTIFFS HAVE STANDING TO CHALLENGE THE TWO BLOCKING PROVISIONS (§ 76-10-1231 and § 76-10-1205)

Plaintiffs' initial Complaint challenged three separate provisions that required ISPs to block their customers' access to content on the Internet. These three provisions were similar in impact to a Pennsylvania statute that was overturned as unconstitutional in *Center for Democracy & Technology v. Pappert*, 337 F. Supp. 2d 606 (E.D. Pa. 2004). In that case, the

---

[8]     In addition, all out-of-state content providers have standing to challenge § 76-10-1206 on Commerce Clause grounds. Commerce Clause concerns are briefed more fully in the following section.

district court determined that as a collateral consequence of ISP's compliance with blocking orders to block access to about 350 web sites, the ISPs in Pennsylvania *also* blocked access to more than 1 million wholly unrelated (and completely legal) web sites.

The 2007 Amendments repealed the blocking provision most like the Pennsylvania scheme (§ 76-10-1232), and fixed some but not all of the problems with a second provision (§ 76-10-1231). Those amendments, however, actually made the constitutional problems in a third blocking provision – § 76-10-1205 – worse. Plaintiffs continue to challenge §§ 76-10-1231 and 76-10-1205.

A.    **Plaintiffs Have Standing to Challenge § 76-10-1231 on Commerce Clause Grounds.**

As noted above, the Utah Legislature included in the 2007 Amendments the "Overblocking Safeguard" language in § 76-10-1231(3)(a)(i). This safeguard language ensures that the only Internet users who will be affected by this section are those who *voluntarily* request filtering of their content, and that access to lawful speech (including sexually oriented speech) on the Internet will not be restricted for anyone else. Because of this safeguard language, Plaintiffs are no longer raising First Amendment challenges to this section.

Unfortunately, however, § 76-10-1231 goes beyond simply facilitating the voluntary use of filtering software by parents, and imposes concrete and costly burdens on Internet Service Providers, including Plaintiffs IPNS of Utah, LLC, and RigidTech.Com, Inc. Am. Compl.¶¶ 156, 158. Both of these Plaintiffs are Internet Service Providers and hosting companies as defined by the statutes challenged here, and both provide access and web hosting services to customers in *and outside* of the state of Utah. Am. Compl. ¶¶ 29, 30. As such, both are subjected by § 76-10-1231 to the likelihood of inconsistent state regulations of the exact type prohibited by the Commerce Clause of the U.S. Constitution.

In one of the leading cases applying the Commerce Clause to the Internet, the court

explained:

> The courts have long recognized that certain types of commerce demand
> consistent treatment and are therefore susceptible to regulation only on a national
> level. The Internet represents one of those areas; effective regulation will require
> national, and more likely global, cooperation. Regulation by any single state can
> only result in chaos, because at least some states will likely enact laws subjecting
> Internet users to conflicting obligations. Without the limitations imposed by the
> Commerce Clause, these inconsistent regulatory schemes could paralyze the
> development of the Internet altogether.

*American Library Association v. Pataki*, 969 F. Supp. 160, 181 (S.D.N.Y. 1997). In *ACLU v.*

*Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999), the Tenth Circuit specifically relied on the

*Pataki* decision in upholding an injunction against a New Mexico law regulating the Internet

along the lines attempted here by Utah.

As courts around the country have repeatedly held, state legislatures are highly

constrained when it comes to imposing burdens on Internet speakers or service providers.  Both

Plaintiffs IPNS of Utah and RigidTech.Com have standing to challenge § 76-10-1231 on

Commerce Clause grounds.

### B.    Plaintiffs Have Standing to Challenge § 76-10-1205 on First Amendment and Commerce Clause Grounds.

Section 76-10-1205 imposes on ISPs and hosting companies vague and wholly undefined

obligations to comply, under threat of criminal punishment, with demands made by customers

and other Internet users seeking to avoid access to Internet content.  As ISPs and hosting

companies under § 76-10-1205, both Plaintiffs IPNS of Utah and RigidTech.Com have standing

to challenge § 76-10-1231 on Commerce Clause grounds similar to that discussed above.  Both

also have standing to challenge the constitutionally fatal vagueness of the statute as amended by

the 2007 Amendments.

In addition, because § 76-10-1205 applies to all web hosting companies anywhere on the Internet, all Plaintiffs who post content on the Internet with a non-Utah hosting company have standing to challenge under the Commerce Clause Utah's attempt to regulate commerce that takes place outside of the state. Thus, Plaintiffs The Sexual Health Network, Inc., Comic Book Legal Defense Fund, Publishers Marketing Association, Association of American Publishers, Inc. Freedom to Read Foundation, and American Booksellers Foundation for Free Expression have standing to challenge § 76-10-1231 under the Commerce Clause.

In addition, all Plaintiffs have standing to challenge § 76-10-1205 on First Amendment grounds. Unlike with § 76-10-1231, § 76-10-1205 does *not* have the "Overblocking Safeguard" language that the Utah Legislature used to ensure that blocking by ISPs would not impact other customers and other web sites. Thus, under § 76-10-1205, there is no limitation or constraint on any ISP that complies with this provision by using "in-network" filtering in a manner that causes other web sites to be blocked. The risk of unconstitutional overblocking caused by this provision is detailed in Amended Complaint ¶¶ 118 – 138.

Plaintiffs Utah Progressive Network Education Fund, Inc. and Andrew McCullough both have web sites that are hosted on web servers that *also* host web sites that contain sexual content, and thus both Plaintiffs' web sites are particularly at risk of overblocking caused by § 76-10-1205. Am. Compl. ¶¶ 155, 167. Such blocking would violate these Plaintiffs free speech rights under the First Amendment, and thus both Plaintiffs have standing to challenge § 76-10-1205.

Similarly, because of the vagueness and complete lack of clarity about what ISPs (in Utah) and web hosting companies (wherever located) must do to comply with § 76-10-1205, and the risk of overblocking that is raised by § 76-10-1205, Plaintiffs believe that many if not all web sites on the Internet are at risk of unconstitutional overblocking. Web hosting companies located

8

outside of Utah may well seek to limit the types of content their customers can post in an effort to avoid potential liability under this Utah criminal statute. Thus, the ability of Internet content providers wherever located can either be directly harmed or indirectly chilled by enforcement of § 76-10-1205. Plaintiffs The Sexual Heath Network, Inc., Comic Book Legal Defense Fund, Publishers Marketing Association, Association of American Publishers, Inc. Freedom to Read Foundation, The King's English, Sam Weller's Zion Bookstore, American Booksellers Foundation for Free Expression, Nathan Florence, ACLU of Utah, IPNS of Utah, and RigidTech.Com have standing to raise First Amendment objections to § 76-10-1205 either directly or on behalf of their members and/or customers who post content on the Internet.

## IV. PLAINTIFFS HAVE STANDING TO CHALLENGE THE MANDATORY LABELING PROVISION (§ 76-10-1233).

Defendants' primary argument about why Plaintiffs lack standing to challenge § 76-10-1233 appears to be that it will be relatively simple for Utah content providers to comply with the statute, and so they are not harmed by it. This argument fails because it both misconstrues the statute and misses the point of Plaintiffs' claim against it.

Section 76-10-1233 essentially gives Plaintiffs two choices: they can either restrict minors access to their "harmful to minors" content on the Internet, or they can label their content as "harmful to minors." Both choices are unconstitutional.

The first option – to restrict access by minors to Internet speech, *see* § 76-10-1230(1)(b) and (c) – is nearly identical to the language of the federal Child Online Protection Act (COPA), which has been repeatedly enjoined as unconstitutional by the Eastern District of Pennsylvania, the Third Circuit, and the U.S. Supreme Court. *See ACLU v. Gonzales*, 478 F. Supp. 2d 775, U.S. Dist. LEXIS 20008, at \*10-\*11 (E.D. Pa. 2007). The bottom line of those cases is that there simply is no constitutionally acceptable method for content providers to restrict access by minors

9

to speech on the Internet. As those courts have held, such a statutory obligation violates the First Amendment, and the "in-state" content provider Plaintiffs (The King's English, Sam Weller's Zion Bookstore, American Booksellers Foundation for Free Expression, ACLU of Utah, and Nathan Florence) have standing to raise this First Amendment claim.

The second option would require the "in-state" Plaintiffs to label their speech as "harmful to minors." Although Defendants predict that labeling the speech will – as a technical matter – not be hard to do, this argument misses the point that Plaintiffs object to being forced to label their speech in the first place (regardless of whether it is easy or hard to do as a technical matter). Such "compelled speech" – including compelled speech intended to protect minors – has repeatedly been struck down by courts around the country. The Seventh Circuit recently summarized the relevant law:

> As the Supreme Court recently observed, some of its "leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47 (2006) (citing *W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943) and *Wooley v. Maynard,* 430 U.S. 705, 717 (1977)). The Court has stated that where a statute "[m]andat[es] speech that a speaker would not otherwise make," that statute "necessarily alters the content of the speech." *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 795 (1988).

*Entertainment Software Association v. Blagojevich,* 469 F.3d 641, 651 (7th Cir. 2006). No matter how technically simple Defendants claim that it will be for Plaintiffs to convey the speech compelled by § 76-10-1233, the speech is nevertheless unconstitutionally compelled. The "in-state" content provider Plaintiffs (The King's English, Sam Weller's Zion Bookstore, American Booksellers Foundation for Free Expression, ACLU of Utah, and Nathan Florence) have standing to challenge all of § 76-10-1233 on First Amendment grounds. In addition, Plaintiffs IPNS of Utah and RigidTech.com have standing to raise these same First Amendment claims on

behalf of their Utah-based web hosting customers, and in their own right based on harm to their web hosting business.

## CONCLUSION

All Plaintiffs have standing to challenge at least one of the four statutory provisions at issue here, and all four of those provisions are challenged by at least two Plaintiffs with standing.

To recap the points made above, the four sections are challenged by the following Plaintiffs:

**Harmful to Minors (§ 76-10-1206):** American Booksellers Foundation For Free Expression, American Civil Liberties Union Of Utah, Association Of American Publishers, Comic Book Legal Defense Fund, Nathan Florence, Freedom To Read Foundation, IPNS of Utah, Publishers Marketing Association, RigidTech.com, Sam Weller's Zion Bookstore, The King's English, and The Sexual Health Network

**Blocking (§ 76-10-1231):** IPNS of Utah and RigidTech.com

**Blocking (§ 76-10-1205):** All Plaintiffs

**Mandatory Labeling (§ 76-10-1233):** American Booksellers Foundation For Free Expression, American Civil Liberties Union Of Utah, Nathan Florence, Sam Weller's Zion Bookstore, and The King's English

And the individual Plaintiffs are challenging the following sections:

Amer. Booksellers Foundation For Free Expression: § 76-10-1205, -1206, -1233
Amer. Civil Liberties Union Of Utah: § 76-10-1205, -1206, -1233
Association Of American Publishers: § 76-10-1205, -1206
Comic Book Legal Defense Fund: § 76-10-1205, -1206
Nathan Florence: § 76-10-1205, -1206, -1233
Freedom To Read Foundation: § 76-10-1205, -1206
IPNS of Utah: § 76-10-1205, -1206, -1231
W. Andrew McCullough: § 76-10-1205
Publishers Marketing Association: § 76-10-1205, -1206
RigidTech.com: § 76-10-1205, -1206, -1231
Sam Weller's Zion Bookstore: § 76-10-1205, -1206, -1233
The King's English: § 76-10-1205, -1206, -1233
The Sexual Health Network: § 76-10-1205, -1206
Utah Progressive Network Education Fund: § 76-10-1205

Defendants' motion should be denied.

Respectfully submitted,

DATED this 2nd day of July, 2007.

DATED this 2nd day of July, 2007.

**HOWREY LLP**
170 South Main Street, Suite 400
Salt Lake City, UT 84101
Telephone: (801) 533-8383
Facsimile: (801) 531-1486

By _____
Zachary J. Weyher (10846)
Attorney for Plaintiffs

**CENTER FOR DEMOCRACY &
TECHNOLOGY**
John Morris (*Admitted Pro Hac Vice*)
1634 Eye Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 637-9800
Facsimile: (202) 637-0968

**AMERICAN CIVIL LIBERTIES UNION
OF UTAH FOUNDATION, INC.**
Marina Baginsky Lowe (11482)
355 North 300 West
Salt Lake City, UT 84103
Telephone: (801) 521-9862
Facsimile: (801) 532-2850

**SONNENSCHEIN NATH &
ROSENTHAL LLP**
Michael A. Bamberger (*Admitted Pro Hac
Vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of July, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice electronically to:

Mark E. Burns
markburns@utah.gov

Jerrold S. Jensen
JerroldJensen@utah.gov, penicox@utah.gov

/s/  Brittani Martin