JERROLD S. JENSEN (#1678)
MARK E. BURNS (#6706)
Assistant Attorneys General
MARK L. SHURTLEFF (#4666)
Utah Attorney General
Attorneys for Defendants
160 East 300 South, 5th Floor
P.O. Box 140857
Salt Lake City, Utah 84114-0857
Telephone: (801) 366-0353

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE KING'S ENGLISH, INC., et al.,<br><br>     Plaintiffs,<br><br>vs.<br><br>MARK SHURTLEFF, in his official capacity as ATTORNEY GENERAL OF THE STATE OF UTAH, et al.,<br><br>     Defendants. | REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT<br><br><br>Case No. 2:05CV00485<br><br>Judge Dee Benson |

  Pursuant to Rule 7-1(b)(3) of the Rules of Practice of the United States District Court for the District of Utah, Defendants submit the following Reply Memorandum in Support of their Motion to Dismiss the Amended Complaint.

## ARGUMENT

I. **PLAINTIFFS' RESPONSE CONFIRMS THEY LACK STANDING BECAUSE NONE CLAIM THEY ENGAGE IN CONDUCT PROSCRIBED BY THE ACT.**

Plaintiffs spend a great deal of time discussing the substantial amendments to Utah's harmful to minors law, but little attention is given to their specific circumstances, and the undeniable fact that none of them face a realistic threat of prosecution. As a federal appeals court recently recognized: "[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted." ACLU, et al. v. National Security Agency, et al, 2007 WL 1952370 *3 (6th Cir. July 6, 2007) (emphasis in original) (quoting Allen v. Wright, 468 U.S. 737, 752 (1984)).

Under controlling case law, the lack of such a threat is fatal to their case - they cannot show they have (1) suffered an injury-in-fact or realistic threat of prosecution; or (2) a causal connection between the amended act and the claimed injury. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-03 (1998) ("The irreducible constitutional minimum of standing contains three elements": "[1] injury in fact, [2] causation, and [3] redressability"). "Injury in fact" is a harm suffered by the plaintiff that is "concrete and actual or imminent, not conjectural or hypothetical." Id. at 103 (quotation marks omitted) (citing Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). "Causation" is "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Id. (citing Simon v. E. Ky. Welfare Rights Org.,

426 U.S. 26, 41-42 (1976). "Redressability" is "a likelihood that the requested relief will redress the alleged injury." Id. (citing Warth v. Seldin, 422 U.S. 490, 505 (1975)).

### A. NO DEMONSTRATION OF AN INJURY-IN-FACT.

In an effort to bolster their claimed right to standing, the plaintiff associations and companies herein attempt to bootstrap the rights of their "members and users" to "post and discuss First Amendment-protected content on the Internet." Pltfs. Mem. at iv. Putting aside for the moment the fact that none of those members and users are plaintiffs in this case, there has been no showing that any provision of Utah law would impair the right or ability of any person, particularly the plaintiffs herein, to post anything on the internet or discuss it. To be sure, "Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Valley Forge Christian Coll. v. Ams. United for Sep. of Church & State, Inc., 454 U.S. 464, 472 (1982) (quotation marks omitted).

The central issue in this case is whether the state can have any role in codifying a citizen's right to prevent material that is harmful to minors from coming into his or her home over the Internet. There is no question that in Ashcroft v. ACLU, 542 U.S. 656 (2004), the United States Supreme Court recognized the value and importance of filters in addressing this challenging problem for parents. Utah's harmful to minors legislation merely gives citizens the vehicle to implement that directive by allowing the citizen to request that their ISPs provide a filter upon payment of applicable fees. A filtering service would, of course, have no value if the

nature of the content could not be identified through commercially reasonable means before the filtering takes place.

The amended Utah Harmful to Minors law is narrowly drawn to apply to internet service providers doing business in Utah and content providers that have sufficient minimum contacts with the state to confer jurisdiction. Out-of-state content providers without sufficient minimum contacts with this state need not fear prosecution under Utah Code Ann. §§ 76-10-1205 or -1206 because jurisdiction would be a threshold requirement of any criminal case or enforcement action.

Furthermore, with the definitional change to the statute proscribing material appealing to the prurient interest in sex "with" minors, the class of potential plaintiffs publishing this sort of material is indeed small. Under no circumstances would that proscription apply to the King's English Bookstore, Sam Weller's bookstore, the Sexual Health Network or any of the other plaintiffs herein. Even if it did, these plaintiffs have made no attempt to establish a constitutional right to publish material appealing to a prurient interest in sex with minors. Doing so is criminally sanctionable under existing law.

To summarize, it is undisputed that none of the plaintiffs herein have actually been prosecuted and none face a realistic threat of it. The Amended Complaint contains no claims or allegations that any of the plaintiffs herein publish the material proscribed by Utah's Harmful to Minors law. For that reason, the Court should dismiss the Amended Complaint in its entirety.

## B. NO CAUSAL CONNECTION BETWEEN THE ACT AND THE CLAIMED INJURY.

A second fundamental requirement of standing that these plaintiffs fail to meet is a showing of a causal connection between the act, or defendants' actions, and their claimed injury. Causation "depends considerably upon whether the plaintiff is himself an object of the action . . . at issue." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Moreover, it has long been recognized that "a federal court [may] act only to redress injury that fairly can be traced to the challenged action of the defendant, and <u>not injury that results from the independent action of some third party not before the court.</u>" Simon, 426 U.S. at 41-42 (emphasis added). Here, the injury claimed by the content providers hinges on the actions of ISPs that they believe will improperly filter their content that does not meet the narrow definition of "harmful to minors." This court should not assume that ISPs will filter too much content or that the ISPs will be unable to implement a filtering system upon a consumer's request.

Section 1206 gives ISPs protection from prosecution by declaring them "not negligent" if they decide to implement a filtering system. Specifically, Utah Code Ann. § 76-10-1206(4) states:

> (4) (a) A service provider, as defined in Section 76-10-1230, is not negligent under this section if it complies with Section 76-10-1231.
> (b) A content provider, as defined in Section 76-10-1230, is not negligent under this section if it complies with Section 76-10-1233.

Utah Code Ann. § 76-10-1206(4). Like the new safe harbor provisions in Subsection (3), which require a heightened mental state and level of involvement by an ISP before it could be successfully prosecuted, Subsection (4) provides an additional level of protection for the ISPs that actually implement filters upon a consumer's request. Failing to implement a filter does not make ISPs guilty under Section 1206 - it merely takes away a favorable statutory presumption (being "not negligent" under Section 1206), leaving intact the other safe harbor provisions that require an ISP's proactive involvement in the distribution of harmful to minors material.

It is important to note that none of the ISPs herein contend that they are unable to implement a filtering service upon a customer's request. Even if such a claim were made, the new provision in the Act that allows the ISP to charge a reasonable fee for the service would offset any claimed injury. The reality is that many ISPs, certainly the national entities, already offer a filtering service because the market demands it (e.g., AOL and MSN's "Parental Controls"), and doing so is good for their business.

In this case, the plaintiff ISPs have failed to allege with any degree of specificity any injury whatsoever as a result of the Act. Likewise, the content providers are unable to point to a single piece of constitutionally protected content that would be "blocked" from a customer that wanted it as a result of the Utah law or defendants' anticipated efforts to enforce it. To the extent that the plaintiffs' argument hinges on an ISP "overblocking" protected content, that argument also fails because those actions would be attributable to third parties who are not defendants in this case.

## II. RESPONSE TO PLAINTIFFS' CHALLENGES TO SPECIFIC SECTIONS OF THE AMENDED HARMFUL TO MINORS ACT.

A. <u>Section 1206 Does Not Apply to These Plaintiffs Because the Harmful to Minors Definition is Narrowly Drawn.</u>

In determining whether Utah's amended harmful to minors law meets constitutional standards, the starting point in the analysis must be the definition of "harmful to minors" itself. The amended version of Utah Code § 76-10-1201 states in relevant part:

> 76-10-1201. Definitions.
>
>   For the purpose of this part:
> . . . .
>   (5) (a) "Harmful to minors" means that quality of any description or representation, in whatsoever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse when it:
>   (i) taken as a whole, appeals to the prurient interest in <u>sex with minors</u>;
>   (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; <u>and</u>
>   (iii) taken as a whole, does not have serious value for minors.
>   (b) Serious value includes only serious literary, artistic, political or scientific value for minors.

<u>Id.</u> (emphasis added). Relying on that definition, Section 1206 states in relevant part:

> 76-10-1206.  Dealing in material harmful to a minor -- Exemptions for Internet service providers and hosting companies.
>   (1) A person is guilty of dealing in material harmful to minors when, knowing that a person is a minor, or having negligently failed to determine the proper age of a minor, the person:
>   (a) <u>intentionally distributes or offers to distribute, exhibits or offers to exhibit to a minor</u> any material harmful to minors;
>   (b) <u>intentionally produces, presents, or directs</u> any performance before a minor, that is harmful to minors; or

> (c) <u>intentionally participates in</u> any performance before a minor, that is harmful to minors.
> . . . .
>     (c) (i) This section <u>does not apply to an Internet service provider</u>, as defined in Section 76-10-1230, if:
>     (A) the distribution of pornographic material by the Internet service provider occurs only incidentally through the Internet service provider's function of:
>     (I) transmitting or routing data from one person to another person; or
>     (II) providing a connection between one person and another person;
>     (B) the Internet service provider does not intentionally aid or abet in the distribution of the pornographic material; and
>     (C) the Internet service provider does not knowingly receive funds from or through a person who distributes the pornographic material in exchange for permitting the person to distribute the pornographic material.
>     (ii) This section <u>does not apply to a hosting company</u>, as defined in Section 76-10-1230, if:
>     (A) the distribution of pornographic material by the hosting company occurs only incidentally through the hosting company's function of providing data storage space or data caching to a person;
>     (B) the hosting company does not intentionally engage, aid, or abet in the distribution of the pornographic material; and
>     (C) the hosting company does not knowingly receive funds from or through a person who distributes the pornographic material in exchange for permitting the person to distribute, store, or cache the pornographic material.
>     (4) (a) A service provider, as defined in Section 76-10-1230, is not negligent under this section if it complies with Section 76-10-1231.
>     (b) A content provider, as defined in Section 76-10-1230, is not negligent under this section if it complies with Section 76-10-1233.

Utah Code Ann. § 76-10-1206 (as amended by the 2007 General Legislative Session, available at http://legislature.utah.gov) (emphasis added). It is apparent from the plain language of these statutes that they were written to proscribe the intentional and knowing distribution of a narrow category of material that the plaintiffs herein do not claim they distribute or produce. To fall within the scope of the amended Act, this material distributed or produced must: (1) appeal to the prurient interest in <u>sex with minors</u>; (2) be patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and (3) not have serious value for minors.

Section 1206 includes three mechanisms to help ensure that an ISPs, content providers and hosting companies do not unknowingly violate the Act. The first is the mens rea - an intentional state of mind. The second mechanism is a comprehensive safe harbor section. This section (1) requires proof of additional intentional and knowing conduct, (2) gives protection to the aforementioned entities if they implement a filter upon a customer's request (making them statutorily "not negligent") and (3) allows Utah-based content providers safe harbor under Section 1206 for identifying material that is "harmful to minors" as such.

As applied to the present case, the plaintiffs herein claim injury, but none have proffered any evidence to show they are engaging in, or will engage in, intentional conduct that would not be excluded by the safe harbor provisions quoted above. Furthermore, it is undisputed that none have been charged with a violation of Utah Code Ann. § 76-10-1206. Without actual or

imminent injury, these plaintiffs do not have standing to challenge the amended Utah law. Steel Co., 523 U.S. at 103.

      B.    Section 1231 Does Not Raise Commerce Clause Concerns Because it Only Applies to Utah-Based ISPs.

Plaintiffs argue that Section 1231 violates the Commerce Clause of the federal constitution. The United States Supreme Court has held that the Commerce Clause of the United States Constitution contains a "negative command, known as the dormant Commerce Clause," which reserves "an area of trade free from interference by the States" and forbids state regulations that "erect barriers against interstate trade." Free Speech Coalition, Inc. v. Shurtleff, et al., 2007 WL 922247 (Mar. 23, 2007 D. Utah) (slip op.) (quoting American Trucking Assn. v. Michigan Public Service Comm'n, 545 U.S. 429, 433 (2005)). As the Court explained the general rule in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld <u>unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.</u>

Pike, 397 U.S. at 142 (emphasis added); see also United Haulers Assoc. v. Oneida-Kerkimer Solid Waste Mgmt. Auth., 1227 S.Ct. 1786, 1797 (2007) (per Chief Justice Roberts, with three Justices concurring and one Justice concurring in the judgment);[1] Kleinsmith v. Shurtleff, 2007

---

[1] The plurality opinion quotes the Pike standard. The Scalia and Thomas concurring opinions question the Court's "negative" Commerce Clause jurisprudence and the Pike balancing standard.

WL 541808 (Feb. 16, 2007 D. Utah) (slip. op.) (citing <u>American Target Advertising, Inc. v. Giani</u>, 199 F.3d 1241, 1254 (10th Cir. 2000) (also relying on <u>Pike</u> standard and noting that "[t]he party challenging a statute that regulates evenhandedly bears the burden of proving the statute's excess.")).

In the present case, there is no burden on interstate commerce because the amended Utah Act only regulates ISPs doing business in Utah. Starting again at the definitions, the Act only governs only those ISPs that provide a "computer communications facility" or an "internet access service" in this state. Specifically, Section 1230 states in relevant part:

> 76-10-1230. Definitions.
> As used in Sections 76-10-1231 and 76-10-1233:
> . . . .
> (5) (a) "Internet service provider" means a person engaged in the business of <u>providing a computer communications facility in Utah</u>, with the intent of making a profit, through which a consumer may obtain access to the Internet.
>     (b) "Internet service provider" does not include a common carrier if it provides only telecommunications service.
> . . . .
> (7) (a) Except as provided in Subsection (7)(b), "service provider" means:
>     (i) an <u>Internet service provider</u>; or
>     (ii) a person who otherwise <u>provides an Internet access service to a consumer in Utah</u> with the intent of making a profit.

Utah Code Ann. § 76-10-1230 (emphasis added). At the consumer's request, Section 1231 implements the filtering requirement as to the ISPs (with facilities in Utah or providing internet services in Utah) that meet this narrow definition. This section states in relevant part:

76-10-1231. Data service providers -- Internet content harmful to minors.
(1) (a) <u>Upon request by a consumer</u>, a service provider shall filter content to prevent the transmission of material harmful to minors to the consumer.
   (b) A service provider complies with Subsection (1)(a) if it uses a <u>generally accepted and commercially reasonable method of filtering</u>.
(2) At the time of a consumer's subscription to a service provider's service, or at the time this section takes effect if the consumer subscribes to the service provider's service at the time this section takes effect, the service provider shall notify the consumer in a conspicuous manner that the consumer may request to have material harmful to minors blocked under Subsection (1).
(3) (a) A service provider may comply with Subsection (1) by:
   (i) <u>providing in-network filtering</u> to prevent receipt of material harmful to minors, provided that the filtering does not affect or interfere with access to Internet content for consumers who do not request filtering under Subsection (1); or
   (ii) <u>providing software, or engaging a third party to provide software</u>, for contemporaneous installation on the consumer's computer that blocks, in an easy-to-enable and commercially reasonable manner, receipt of material harmful to minors.
   (b) A <u>service provider may charge</u> a consumer for providing filtering under Subsection (3)(a).
. . . .
(7) (a) The Division of Consumer Protection within the Department of Commerce shall, in consultation with other entities as the Division of Consumer Protection considers appropriate, test the effectiveness of a service provider's system for blocking material harmful to minors under Subsection (1) at least annually.
   (b) The results of testing by the Division of Consumer Protection under Subsection (7)(a) shall be made available to:
     (i) the service provider that is the subject of the test; and
     (ii) the public.
   (c) The Division of Consumer Protection shall make rules in accordance with Title 63, Chapter 46a, Utah Administrative Rulemaking Act, to fulfil its duties under this section.

Utah Code Ann. § 76-10-1231 (emphasis added). Several provisions of this Section are noteworthy. First, and most important, the statute does not create a system of censorship whereby the State of Utah decides what information a consumer receives. It is the consumer's choice. The consumer decides if he or she wishes to pay for and use a filtering system. Upon receipt of a consumer request, the ISP essentially serves a technical support role in helping the consumer implement the filtering system contemplated by the United States Supreme Court.

The second notable component of the amended Act is that ISPs can charge for the filtering service. This defuses the claim of some ISPs that implementing filters would not be financially feasible and that the state was not using the "least restrictive means" to protect minors from harmful content electronically distributed through the internet.

The last critical component is the rulemaking authority assigned to the Division of Consumer Protection. It is through these rules that the State of Utah will test the effectiveness of an ISP's efforts to filter content that is harmful to minors. It is an undisputed fact that these rules have not been written yet. Consequently, no steps have been taken to implement the critical enforcement provisions of Section 1231. Therefore, none of the plaintiffs herein have standing to assert that the rules, or the Act that they implement, violate the Commerce Clause or any other provision of the United States Constitution.

      C.      <u>Under No Circumstance Would Section 1205 Apply to These Plaintiffs Because None Allege That They "Induce Acceptance of Pornographic Material."</u>

On pages 7-9 of their memorandum, plaintiffs claim that they have standing to challenge Utah Code Ann. § 76-10-1205. Conspicuously absent from that portion of the memorandum and the Amended Complaint is any claim that any of these plaintiffs face a realistic threat of criminal prosecution under that section. Section 1205 states in relevant part:

> 76-10-1205. Inducing acceptance of pornographic material -- Exemptions for Internet service providers and hosting companies.
> (1) A person is guilty of inducing acceptance of pornographic material when he knowingly:
> (a) requires or demands as a condition to a sale, allocation, consignment, or delivery for resale of any newspaper, magazine, periodical, book, publication, or other merchandise that the purchaser or consignee receive any pornographic material or material reasonably believed by the purchaser or consignee to be pornographic; or
> (b) denies, revokes, or threatens to deny or revoke a franchise, or to impose any penalty, financial or otherwise, because of the failure or refusal to accept pornographic material or material reasonably believed by the purchaser or consignee to be pornographic.

Utah Code Ann. § 76-10-1205. These plaintiffs do not have standing because any claimed fear of prosecution under the foregoing Section is baseless. Nothing in the Amended Complaint alleges that any of these plaintiffs currently require the acceptance of pornographic material under any circumstance. Further, the amended Act added safe harbor provisions to address the concerns of some ISPs, adding an additional level of protection for ISPs that provide filters to the customers that request them.

Instead, the plaintiffs urge their "overblocking" theory, which was successful in a different case involving much different legislation. This theory presumes that, instead of just blocking content that is harmful to minors, ISPs will block constitutionally protected content as well. See Pltf's. Mem. at 8 and Amended Complaint at paragraphs 118-138. The critical flaw in this argument is that ISPs implementing in-network filters are under a legal duty under another provision of Utah law, Utah Code Ann. § 76-10-1231, to ensure that the filters they implement "not affect or interfere with access to Internet content for consumers who do not request filtering." Utah Code Ann. § 76-10-1231(3)(a)(i). In other words, the plaintiffs must assume that an ISP will violate the mandate of Section 1231 for their "overblocking" theory to be true.

The argument is pure sophistry in any event. The conduct prohibited in Section 1205 would only apply to an ISP or hosting company in the most unusual of situations, which are not present here. The ISP user agreement or service contract would have to have an express requirement that the end-user receive pornography as a condition of sale or, alternatively, that a penalty would be imposed against the end-user if pornographic material were refused after the service contract went into effect.

The Amended Complaint makes no claim that any of these plaintiffs currently impose such obligations on their customers. Principally for this reason, these plaintiffs lack standing. The court should therefore dismiss their challenge to Utah Code Ann. § 76-10-1205.

### III. THE LABELING REQUIREMENT ONLY APPLIES TO PUBLISHERS OF A NARROW CATEGORY OF CONTENT, NONE OF WHOM ARE PLAINTIFFS IN THIS ACTION.

Under Utah's Harmful to Minors law, "[a] content provider that is domiciled in Utah, or generates or hosts content in Utah," must "restrict access to material harmful to minors." Utah Code Ann. § 76-10-1233(1). The Act defines a content provider as "a person domiciled in Utah or that generates or hosts content in Utah, and that creates, collects, acquires, or organizes electronic data for electronic delivery to a consumer with the intent of making a profit." Utah Code Ann. § 76-10-1230(3).

As noted above, the amended Act allows a consumer to request that their ISP provide a filter for the narrow category of material that meets the definition of "harmful to minors" set forth Utah Code Ann. § 76-10-1201(5), as amended by the 2007 Legislature. The 2007 amendments to the Act make it clear that the law only applies to content providers in Utah. The plain language of the statute makes it clear that it does not content providers outside the state. Therefore, the Commerce Clause of the United States Constitution would not be implicated if Utah's Attorney General were to undertake an enforcement action under the Act.

There is no dispute that he has not undertaken any enforcement action against these plaintiffs or the members and users of the associations and corporations herein. Given the nature of content created by the content providers which are plaintiffs herein, it would be nothing more than speculation to assume that an enforcement action would be brought against them at some point in the future. Until such action takes place, these plaintiffs cannot show an injury-in-fact.

Likewise, they cannot show a causal connection between the amended Act and their claimed injury.

In short, these plaintiffs do not meet the essential elements of standing as set forth in the United States Supreme Court's decisions in Warth and Lujan. See also DaimlerChrysler Corp. v. Cuno, 547 U.S. ----, 126 S.Ct. 1854, 1867 (2006) ("a plaintiff must demonstrate standing for each claim he seeks to press."). Controlling cases in this jurisdiction recognize these essential elements of constitutional standing. Doctor John's, Inc. v. City of Roy, 465 F.3d 1150 (10th Cir. 2006) (citing Lujan's "irreducible minimum" three-prong test); and Initiative and Referendum Institute, et al. v. Walker, et al., 450 F.3d 1082, 1087-88 (10th Cir. 2006) ("Although mere allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm, Laird v. Tatum, 408 U.S. 1, 13-14 (1972), plaintiffs may bring suits for prospective relief in First Amendment cases where they can demonstrate 'a credible threat of prosecution or other consequences flowing from the statute's enforcement.'"); D.L.S. v. Utah, 374 F.3d 971, 975 (10th Cir. 2004) (injury must arise from an "objectively justified fear of real consequences").

Reply Memorandum in Support of Motion to Dismiss
Case No. 2:05CV00485 TS
Page 17

CONCLUSION

For the above reasons, the court should find that these plaintiffs lack standing and grant defendants' Motion to Dismiss in its entirety.

DATED this 31st day of July, 2007.

        MARK L. SHURTLEFF
        Utah Attorney General


        /s/ Mark E. Burns
        JERROLD S. JENSEN
        MARK E. BURNS
        Assistant Attorneys General

CERTIFICATE OF SERVICE

       This is to certify that copies of the foregoing REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT was served by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

HOWREY LLP
Attorneys for Plaintiffs
Wesley D. Felix, e-filer

AMERICAN CIVIL LIBERTIES UNION OF UTAH FOUNDATION, INC.
Attorneys for Plaintiffs
Marina Baginsky Lowe, e-filer

CENTER FOR DEMOCRACY & TECHNOLOGY
John B. Morris, e-filer

SONNENSCHEIN NATH AND ROSENTHAL LLP
Attorneys for Plaintiffs
Michael E. Bamberger, e-filer

                                                      /s/ Mark E. Burns