**HOWREY LLP**
Wesley D. Felix  (6539)
Zachary J. Weyher (10846)
170 South Main Street, Suite 400
Salt Lake City, UT  84101
Telephone:  (801) 533-8383
Facsimile:  (801) 531-1486

**CENTER FOR DEMOCRACY
 & TECHNOLOGY**
John B. Morris, Jr. (Pro Hac Vice)
1634 Eye Street, NW # 1100
Washington, DC 20006
Telephone: (202) 637-9800 ext. 116
Facsimile: (202) 637-0968

**AMERICAN CIVIL LIBERTIES UNION
OF UTAH FOUNDATION, INC.**
Marina Baginsky Lowe (11482)
355 North 300 West
Salt Lake City, UT  84103
Telephone: (801) 521-9682
Facsimile: (801) 532-2850

**SONNENSCHEIN NATH &
 ROSENTHAL LLP**
Michael A. Bamberger (Pro Hac Vice)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE KING'S ENGLISH, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> MARK SHURTLEFF, et al., <br><br> Defendants. | Civil No. 2:05CV00485 DB <br><br> Judge Dee Benson <br> Magistrate Judge Samuel Alba |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Dockets.Justia.com

Plaintiffs hereby submit this memorandum in support of their motion for reconsideration of three aspects of the Court's November 29, 2007 Memorandum Opinion and Order (the "Opinion") or, in the alternative, for leave to file a Second Amended Complaint (a copy of which is attached hereto).

I. Plaintiffs IPNS of Utah, LLC and RigidTech.com, Inc. Have Standing to Challenge § 76-10-1231 Under the Commerce Clause.

The Court, in its Opinion, finds that IPNS of Utah, LLC and RigidTech.com, Inc. ("the ISPs") lack standing to challenge § 76-10-1231 under the Commerce Clause because the Court rejected the ISPs' allegations that compliance with § 76-10-1231 would be "burdensome and costly." The Court also held that a challenge to § 76-10-1231 based on the yet-to-be issued regulations under that section is premature. *See* Opinion at p. 14. These conclusions both (a) misapprehend the nature of the Commerce Clause challenge to any state regulation of the Internet, and (b) fail to appropriately construe the ISPs' allegations of burden on a motion to dismiss.

In the face of Commerce Clause challenges, federal courts have regularly invalidated state regulations of, or burdens on, the Internet. Courts – with the Tenth Circuit taking a lead – have determined that state Internet regulations are particularly suspect under the Commerce Clause because of the Internet's uniquely non-geographic nature, which renders it vulnerable to inconsistent state regulations.[1] As the Tenth Circuit noted in ACLU v. Johnson, 194 F.3d 1149

---

[1] PSINet v. Chapman, 362 F. 3d 227 (4th Cir. 2004) (Va. Statute); American Booksellers Found. v. Dean, 342 F. 3d 96 (2d Cir. 2003) (Vt. Statute); ACLU v. Johnson, 194 F. 3d 1149 (10th Cir. 1999) (N.M. Statute); Southeast Booksellers Ass'n v. McMaster, 282 F.Supp. 2d 389 (D.S.C. 2003); 371 F.Supp. 2d 773 (D.S.C. 2005) (S.C. Statute); CDT v. Pappert, 337 F.Supp. 2d 606 (E.D. Penn. 2004),; ACLU v. Goddard, No. Civ. 00-0505 TUC-AM (D. Ariz. Aug. 11, 2004) (Ariz. Statute); Cyberspace Communications, Inc. v. Engler, 142 F.Supp. 827 (E.D. Mich. 2001) (Mich. Statute); American Libraries Ass'n v. Pataki, 969 F.Supp. 160 (S.D. N.Y. 1997)

(1999), "the Supreme Court has long recognized that certain types of commerce are uniquely suited to national, as opposed to state, regulation." *Id.* at 1160. The Tenth Circuit continued: "[C]ertain types of commerce have been recognized as requiring national regulation. *The Internet is surely such a medium.*" *Id.* 1162 (emphasis added) (citation omitted). The Tenth Circuit specifically agreed with the conclusion in the leading Internet Commerce Clause case, American Libraries Ass'n v. Pataki, 969 F. Supp. 160 (S.D.N.Y. 1997), which held that like the national railroad system, the Internet " 'requires a cohesive *national* scheme of regulation.' " ACLU v. Johnson, 194 F.3d at 1162 (emphasis added) (quoting Pataki, 969 F. Supp. at 182).[2]

In this case, the fact that the Utah Division of Consumer Protection has not issued regulations or testing procedures that would apply to the plaintiff ISPs under § 76-10-1231 is irrelevant to the resolution of the Commerce Clause challenge. *Any* state tests or regulations – no matter what they say – would subject the ISPs (both of which have customers both in and outside of Utah, *see* Amended Complaint ¶¶ 28, 29) to the risk of inconsistent state-by-state regulation, in violation of the Commerce Clause. If § 76-10-1231 were to be upheld, Utah would be the first state in the nation to be able to regulate the Internet (and thus there would not in the first instance be any actual "inconsistency"). But the Commerce Clause does not require that a plaintiff wait until two states have in fact created inconsistent regulations – indeed, under the Commerce Clause, the harm is done whenever an interstate business must design its operations or modify its product offerings to comply with the *first* state's regulations. If a particular type of

---

(N.Y. Statute). But see American Booksellers for Free Expression v. Strickland, 512 F.Supp. 2d 1082 (S.D. Ohio 2007) (Ohio Statute) (dicta to the contrary).

[2]   See also, e.g., American Booksellers Found. v. Dean, 342 F.3d 96, 104 (2d Cir. 2003) ("We think it likely that the Internet will soon be seen as falling within the class of subjects that are protected from State regulation because they 'imperatively demand a single uniform rule.'") (quoting Cooley v. Board of Wardens, 53 U.S. 299, 319 (1852)).

3

business (such as the Internet, see ACLU v. Johnson) is not susceptible to state-by-state regulation, then regulation even by a single state violates the Commerce Clause.[3]

Moreover, the risk of inconsistent regulation becomes almost an absolute certainty when the subject of regulation is *by definition* inherently dependent on *local* community standards, as compliance with § 76-10-1231 would be. Thus, even if the states of Utah and Oregon (where in this case one of the ISPs also has customers) were to enact statutes and regulations based on § 76-10-1231 using similar or the same words (requiring service providers to filter out "harmful to minors" material), what is deemed to be "harmful to minors" under community standards in Utah is almost certain to be quite different than what is "harmful to minors" under Oregon community standards. Given inherent dependence on local community standards under § 76-10-1231, the risk of inconsistent state regulation is extremely high. That statutory section violates the Commerce Clause regardless of what tests and regulations the Utah Division of Consumer Protection ultimately might promulgate.

The Court also denied standing to the ISPs to challenge § 76-10-1231 because it did not credit the ISP plaintiffs' allegations that compliance with § 76-10-1231 would be "burdensome and costly." As an initial matter, even if compliance with a Utah regulation of the Internet were not very burdensome or costly, such regulation would still violate the Commerce Clause because inherently interstate businesses should be protected from *inconsistent* state-by-state regulations, even if the regulations are not very burdensome or costly.

---

[3] Surely if the Utah Legislature enacted a statute that required all railroads that operate in or pass through Utah to utilize a gauge of track to be determined by regulations to be issued by the Utah Division of Consumer Protection, the railroad would not be required to wait for the issuance of the regulations before it could bring a Commerce Clause challenge against the statute itself.

4

But in this case, compliance with § 76-10-1231 would be "burdensome and costly" as a matter of fact, as the ISP plaintiffs' alleged. Plaintiffs also alleged that they have customers both in and outside of Utah (and thus would be subject to two or more states' regulation, if courts permit states to impose statutes such as § 76-10-1231). In light of the inherently local nature of § 76-10-1231, and the Court's obligations to accept the ISPs' allegations as true and construe them in favor of the complaining party, plaintiffs believe that the Amended Complaint is adequate to establish standing. If the Court prefers to grant leave, plaintiffs would be willing, however, to again amend their complaint to make the burdens and costs more clear. Among the additional facts that plaintiffs allege in the proposed Second Amended Complaint are:

- both ISPs are small companies – with very lean staffs – that are attempting to compete in markets with extremely small profit margins, such that adding staffing and support obligations (to provide state-mandated filtering services or software, support their customers' use of such services or software, and submit their services and software to tests and regulations imposed by the Utah Division of Consumer Protection) can have a serious, concrete and negative impact on the viability of the ISPs' businesses;

- although one ISP does already offer a filtering capability to its customers, that capability is uniform across a multi-state customer base in which Utah customers are a fairly small minority, and having to offer three or more different filtering services to comply with differing regulations in, for example, Utah, Oregon, & Washington states (assuming that Utah and other states were all permitted to impose regulations as required under § 76-10-1231) would in fact be disruptive and costly to the ISP;

- for the other ISP plaintiff that does not offer any type of filtering product, § 76-10-1231 would be burdensome on the ISP by requiring it to divert already limited staff resources to acquiring, stocking, and supporting a filtering product, and submitting such product to the regulations and tests to by Utah (as well as those set by other states, if Utah is permitted to impose regulations and tests on the ISP); and

- recent surveys and court decisions have concluded that the majority of parents in the U.S. already use filtering products, which are readily available in the marketplace (without any state-by-state regulations whatsoever), and thus the truly minimal arguable local benefit of § 76-10-1231 is outweighed by the interstate burden imposed by the statute.

5

Plaintiffs respectfully urge this Court to find that the ISPs have standing to challenge § 76-10-1231 under the Commerce Clause. If an amendment to the complaint would facilitate such a finding, plaintiffs stand ready to do so.

II.  Plaintiffs ISPs Have Standing to Challenge § 76-10-1205 Under Both the First Amendment and the Commerce Clause.

Plaintiffs maintain that they have standing to assert three independent claims against § 76-10-1205: based on the First Amendment, the Commerce Clause, and 47 U.S.C. § 230 (as referenced in Count VIII of the Amended Complaint):

**First Amendment:** Although the Court states in its Opinion, at 15, that § 76-10-1205 "on its face is clear," plaintiffs, with respect, still do not know what § 76-10-1205 means (a) in the context of an ISP offering Internet access service to customers, and (b) in the context of a web host company (including, under the terms of the statute, non-Utah-based companies) offering hosting services. This vagueness – in a criminal statute that is being applied to speech on the Internet – will have exactly the type of chilling impact that the First Amendment prohibits. The Supreme Court addressed these precise factors in Reno v. ACLU, 521 U.S. 844 (1997), involving the Communications Decency Act ("CDA"):

> The vagueness of the CDA is a matter of special concern for two reasons. First, the CDA is a content based regulation of speech. The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech. Second, the CDA is a criminal statute. In addition to the opprobrium and stigma of a criminal conviction, the CDA threatens violators with penalties including up to two years in prison for each act of violation. The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images.

Id. at 871.

Although the Court identified one hypothetical in which § 76-10-1205 might apply – a scenario in which a contract for service would "have an express requirement that the end-user receive

pornography material" – nothing in the statutory language limits it to an "express" contractual requirement (and indeed, in the off-line context of magazine distributors, § 76-10-1205 would certainly apply to "inducement" even in the absence of an express contractual requirement). If the Court (or the Utah Supreme Court) were able to provide a definitive interpretation of § 76-10-1205, binding on Defendants and stating that in the Internet context an express contractual requirement is an essential element of the crime specified in § 76-10-1205, then plaintiffs would agree that the ISP plaintiffs do not have standing because they would not meet the elements of the crime.

But in the absence of such a binding holding, § 76-10-1205 certainly could reach the following scenario involving an ISP:

- a Utah customer of a plaintiff ISP receives an unsolicited e-mail ("spam") containing pornographic material, through an e-mail service provided by the ISP;

- the customer demands that the ISP block all such pornographic material; and

- after the customer (through no fault or involvement of the ISP) receives another piece of spam with pornography, the customer files a complaint with one of the Defendants claiming that the ISP is guilty of the felony identified in § 76-10-1205.

Along the same lines, § 76-10-1205 could also reach the following scenario involving a non-Utah web hosting company:

- as the Court notes, many of the in-state and out-of-state plaintiffs (or their members) provide "harmful-to-minors" content on their websites;

- those plaintiffs (or their members) usually must use the services of a web hosting company, which often hosts both sexual and non-sexual content on the same web servers;

- a Utah citizen accesses the "harmful to minors" content on the web host's server, "reasonably" concludes that the content is pornographic, and demands that the web hosting company remove the content from their web server, arguing that § 76-10-1205 prohibits the web host from mixing both "pornographic" and non-pornographic material on the same web server.

In both of these scenarios, the service provider would be facing felony charges, and would either be technically unable to comply (in the ISP scenario) or would comply by removing (and therefore chilling) speech that is lawful for the original poster to make available over the Internet. In both situations, the First Amendment prohibits Utah's chilling of free speech caused by the threat of criminal sanctions under § 76-10-1205. The vagueness of the Utah statute raises the exact same vagueness concerns identified by the Supreme Court in <u>Reno v. ACLU</u>.

As both ISPs and web hosts, the ISP plaintiffs have standing to object to this vague criminal threat, and the in-state and out-of-state content providers have standing to object to the chill on free speech that will be caused by hosting companies around the country acting cautiously in response to this Utah criminal statute.

**Commerce Clause:** For many of the same reasons discussed immediately above with regard to § 76-10-1231, the chilling effect of § 76-10-1205 on the actions of the plaintiff ISPs (both as access providers and as web hosts) is an unconstitutional burden on interstate communications, in violation of the Commerce Clause. Similarly, both in-state and out-of-state content providers have standing under the Commerce Clause to challenge the harmful chilling effect of § 76-10-1205 on the willingness of web hosting companies around the country from hosting lawful content that might make them subject to Utah's § 76-10-1205 criminal statute.

**47 U.S.C. 230:** By attempting to impose responsibility on both ISPs and web hosting companies for Internet content posted by other entities, § 76-10-1205 violates the terms of 47 U.S.C. § 230(c)(1), and as such is preempted pursuant to § 230(e)(3) of that statute (as challenged in Count VIII of the Amended Complaint). Section 230 insulates ISPs and web hosting companies from being held in any way responsible for or penalized because of online content posted by others.

8

As Section 230 explains:

> It is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation* . . . .

47 U.S.C. § 230(b)(2) (emphasis added). By imposing criminal liability on ISPs and web hosts for content posted on the Internet by third parties (including, in the web hosting example, customers of the web hosting company), § 76-10-1205 violates the terms of Section 230(c)(1) and is thus expressly preempted by § 230(e)(3). Both ISPs who are directly affected by § 76-10-1205, and content providers who benefit from the protections of Section 230 and would suffer from the chilling effect of § 76-10-1205, have standing to assert the preemption of § 76-10-1205.

III. Plaintiffs The King's English, Inc. and Sam Weller's Zion Bookstore Have Standing to Challenge §76-10-1206.

The Court in its November 29, 2007 Memorandum Opinion and Order (the "Opinion") finds that the fear of prosecution pled by The King's English, Inc. ("King's English") and Sam Weller's Zion Bookstore ("Sam Weller") was not credible and "mere speculation" because:

> The Court cannot accept Plaintiff's argument that the same books advertised and sold in the store — which have never been held to violate the Act — will now somehow be deemed by the State of Utah to violate the Act by being advertised and sold on-line.

(Opinion at p. 9.) On this basis (as well as others discussed below), standing was denied to these plaintiffs.

This is not an appropriate test. There are well-recognized differences between having a book for sale in a bricks and mortar store and posting a portion of it — such as the cover — on a website. The First Amendment analysis dealing "with traditional bookstores at physical locations ... does not apply to the 'unique and wholly new medium of world-wide communication' that is the Internet." PSINet v. Chapman, 362 F. 3d 227, 233 (4th Cir. 2004)

9

(citing Reno v. ACLU, 521 U.S. 844, 850 (1997). The key differences relevant to these parties and the statute at issue are as follows:

1. § 76-10-1206 deals with the offer or distribution to a minor of material that is harmful to minors. In the context of a retail establishment, the retailer deals face-to-face with the prospective customer. If the prospective customer is a minor and the work sought to be purchased is inappropriate for the age or maturity of the minor, the retailer can dissuade the minor from purchasing the work or refuse to sell it to him or her, and thus avoid legal complications. If one posts a cover or an excerpt on the Internet, as plaintiffs pled and will prove, there is no practical way to determine whether the material is viewed by a minor -- except possibly by mandatory filtering which unduly and unconstitutionally restricts adult access to constitutionally protected material. This inability to screen out minors – inherent in how the Internet operates – is precisely one of the critical factors that led the Supreme Court to strike down the Communications Decency Act in Reno v. ACLU, and led the district court to strike down the follow-on "Child Online Protection Act" in ACLU v. Gonzales, 478 F.Supp. 2d. 775 (E.D. PA. 2007).

2. Under § 76-10-1206, material is harmful to minors if, among other things, it "is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors." § 76-10-1206(4)(b). Although it is not entirely clear, it appears from § 76-10-1201(1) that the community under Utah law is local, "the vicinage where an offense ... occurred." Thus King's English and Sam Weller's have a legitimate concern that what may be appropriate for a minor in Salt Lake City, may not be so in a more conservative county elsewhere in Utah in which their web sites are viewed.

3.  The concept of "taken as a whole," required by § 76-10-1201(4)(a) and (c) is very different (and unclear) in the context of the Internet. A book cover, illustration or excerpt shown on the Internet may well be, in certain circumstances, the "whole," and thus judged independently and not in the context of the entire book.

Because of these relevant distinctions, the fact that plaintiff bookstores have not been charged with violations of § 76-10-1206 in their bricks and mortar bookstores does not mitigate against standing in this case. Because (a) the Internet reaches the entirety of Utah (not just Salt Lake City), (b) plaintiff bookstores have no effective way to identify much less screen minors, and (c) the legal standards for assessing an entire book may be different than portions of a book, plaintiff bookstores have a legitimate fear of prosecution under § 76-10-1206.

The Opinion also states that the Utah bookstore plaintiffs have not credibly pled that the materials they distribute meet the definition of "harmful to minors," that they have been chilled, and that they have "refrained from advertising, selling, or otherwise distributing materials they otherwise would but for the amended Act" (at p. 10). As in Virginia v. American Booksellers Ass'n, 484 U.S. 383, 393 (1988), "plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them." (*See* ¶¶ 148, 151 of the Amended Complaint.) Further, as in that case, "the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." 484 U.S. at 393. This fear was actualized during oral argument when counsel for the state responded with "probably" to a question from the Court whether the bookstores carry material which could fall within the definition of "harmful to minors."

In ACLU v. Johnson, 194 F. 3d 1149 (10th Cir. 1999), the State of New Mexico, responding to a challenge to an application of a harmful to minors statute to the Internet like this

case, argued that plaintiffs had no standing because they had not "demonstrated that they refrained from constitutionally protected conduct or actually violated the law" (at 1154). The 10th Circuit rejected the State's argument and found that plaintiffs had standing to bring the Internet challenge.

Finally, it is important to note that, shortly after the case was brought, the State of Utah agreed not to enforce the challenged sections, and that they were subsequently enjoined, first by a stipulated order entered by the Court on November 28, 2005, and then by a superseding preliminary injunction entered by the Court on August 25, 2006. Plaintiffs are well aware that every other challenge of the application by a state of its harmful to minors statute to the Internet had been successful[4] and thus that the Act also will likely be unconstitutional in that respect.

## CONCLUSION

For the reasons stated above, plaintiffs respectfully request the Court either reconsider its prior holdings and find that:

1. IPNs of Utah, LLC and RigidTech.com have standing to challenge § 76-10-1231.
2. IPNs of Utah, LLC and RigidTech.com, as well as all other content-providing plaintiffs, have standing to challenge § 76-10-1205.
3. The King's English, Inc. and Sam Weller's Zion Bookstore have standing to challenge § 76-10-1206.

---

[4] PSINet v. Chapman, 362 F. 3d 227 (4th Cir. 2004) (Va. Statute); American Booksellers Found. v. Dean, 342 F. 3d 96 (2d Cir. 2003) (Vt. Statute); ACLU v. Johnson, 194 F. 3d 1149 (10th Cir. 1999) (N.M. Statute); American Booksellers for Free Expression v. Strickland, 512 F.Supp. 2d 1082 (S.D. Ohio 2007) (Ohio Statute); Southeast Booksellers Ass'n v. McMaster, 282 F.Supp. 2d 389 (D.S.C. 2003); 371 F.Supp. 2d 773 (D.S.C. 2005) (S.C. Statute); ACLU v. Goddard, No. Civ. 00-0505 TUC-AM (D. Ariz. Aug. 11, 2004) (Ariz. Statute); Cyberspace Communications, Inc. v. Engler, 142 F.Supp. 827 (E.D. Mich. 2001) (Mich. Statute) American Libraries Ass'n v. Pataki, 969 F.Supp. 160 (S.D. N.Y. 1997) (N.Y. Statute).

or, in the alternative, grant plaintiffs leave to file the Second Amended Complaint attached to the Memorandum which spells out in greater detail the facts supporting plaintiffs' standing to assert their claims.

DATED this 19th day of February, 2008.

        **HOWREY LLP**
        170 South Main Street, Suite 400
        Salt Lake City, UT 84101

By _____
    Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of February, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice electronically to:

Mark E. Burns
markburns@utah.gov

Jerrold S. Jensen
JerroldJensen@utah.gov, penicox@utah.gov

/s/ Brittani Martin